UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

RONNIE VAN ZANT, INC., GARY R. ROSSINGTON,  :
JOHNNY VAN ZANT, BARBARA HOUSTON, as the  :
Trustee of the ALLEN COLLINS TRUST, and ALICIA  :
RAPP and CORINNA GAINES BIEMILLER, as the  :
Personal Representatives of the Estate of STEVEN  :   ___ Civ. ___
GAINES,  :
   :
   :
                 Plaintiffs,  :
   :
   - against -  :
   :
ARTIMUS PYLE (a/k/a THOMAS D. PYLE),  :   **COMPLAINT**
CLEOPATRA RECORDS, INC., CLEOPATRA FILMS, a :
division of CLEOPATRA RECORDS, INC., JOHN DOE,  :
JANE DOE, XYZ CORPORATION, and XYZ LLC (the  :
names of the last four defendants being fictitious and  :
unknown to plaintiffs, and intended to designate persons or :
entities that have or may have a role in the production and  :
distribution of the Motion Picture complained of in the  :
Complaint herein),  :
   :
                 Defendants.  :

------------------------------------------------------------------------ x

     Plaintiffs Ronnie Van Zant, Inc., Gary R. Rossington, Johnny Van Zant, Barbara

Houston, as the Trustee of the Allen Collins Trust, and Alicia Rapp and Corinna Gaines

Biemiller, as the Personal Representatives of the Estate of Steven Gaines, as and for their

Complaint herein, respectfully allege as follows:

### NATURE OF THE CASE

    1.    This is an action brought by Plaintiffs, surviving and deceased members (or the

legal representatives thereof) of the legendary 1970's rock band Lynyrd Skynyrd, to enjoin the

breach of a Consent Order, Judgment and Decree entered by this Court on October 11, 1988 (88

Civ. 3192 RWS) (the "Consent Order") stemming from the Defendants' actual or proposed

production, distribution, and/or display of a motion picture entitled "Street Survivors: The True

4764325.1

Story of the Lynyrd Skynyrd Plane Crash" (the "Motion Picture"), in contravention of the plain and unambiguous terms of the Consent Order. The terms of the Consent Order are sealed and nonpublic as provided by Paragraph 35 thereof. A copy is annexed hereto as Exhibit A.

## THE PARTIES

2.      Plaintiff Ronnie Van Zant, Inc. ("RVZI") is a corporation organized and existing under the laws of the State of Florida. Pursuant to an Order of the Florida Fourth Judicial Circuit Court, Probate Division, dated August 24, 2000, all assets and rights of the Estate of Ronald Van Zant ("Ronnie's Estate") were distributed to, and are owned by, RVZI. Judith Van Zant Jenness ("Jenness") is the widow of Ronald Van Zant ("Ronnie"), was the Personal Representative of Ronnie's Estate, and is the President of RVZI. Ronnie was a founding member, lead singer, and principal songwriter of the iconic 1970's band Lynyrd Skynyrd, who, along with several bandmates and others, was killed in a tragic plane crash in 1977.

3.      Plaintiff Gary R. Rossington ("Rossington") was a founding member, lead guitarist, and a songwriter of Lynyrd Skynyrd, who continues to create music and perform with other surviving members of Lynyrd Skynyrd to this day.

4.      Plaintiff Johnny Van Zant is the brother of the late Ronnie and currently creates music and performs with surviving members of Lynyrd Skynyrd.

5.      Plaintiff Barbara Houston is the Trustee of the Allen Collins Trust. Allen Collins ("Collins") was a founding member, lead guitarist, and songwriter of Lynyrd Skynyrd, who passed away in 1990 and is an intended beneficiary of the Consent Order.

6.      Plaintiffs Alicia Rapp and Corinna Gaines Biemiller are the Personal Representatives of the Estate of Steven Gaines ("Gaines"). Gaines was a guitarist, vocalist, and

songwriter of Lynyrd Skynyrd, who, along with several bandmates and others, was killed in the plane crash.

7.      Defendant Artimus Pyle (a/k/a Thomas D. Pyle) ("Pyle") was a one-time member of Lynyrd Skynyrd and a survivor of the plane crash.

8.      Upon information and belief, Defendant Cleopatra Records, Inc. ("Cleopatra Records") is a corporation organized and existing under the laws of the State of California that is working in concert and participation with Pyle in connection with, among other things, producing, distributing, and/or displaying the Motion Picture.

9.      Upon information and belief, defendant Cleopatra Films is a division of Cleopatra Records (with Cleopatra Records, "Cleopatra," and together with Pyle and other named but unknown defendants, the "Defendants") and is working in concert or participation with Pyle in connection with, among other things, producing, distributing, and/or displaying the Motion Picture.

10.     The last four named Defendants in the caption of this action are Defendants whose names are fictitious and unknown to Plaintiffs and represent persons or entities that have or may have a role in the production, distribution, and/or display of the Motion Picture.

## VENUE AND JURISDICTION

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District, in that this Court entered the Consent Order, the violations of which are the subject matter of this action.

12.     This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1331 having had federal question jurisdiction over the underlying action (which included claims under

the Lanham Act, 15 U.S.C. § 1051, *et seq.*) in which the Consent Order (to which Pyle is a signatory) was entered, the violations of which are the subject matter of this action.

13.     In the Consent Order (at ¶ 33), this Court specifically retained jurisdiction over the action and the parties for the purpose of enforcing the provisions thereof.

14.     Cleopatra is subject to this Court's jurisdiction because: (a) Paragraph 1 of the Consent Order applies the injunction provided thereby to both the signatories thereto and "all others in concert or in participation with them," which broad language includes Cleopatra; (b) Paragraph 26 of the Consent Order requires Pyle to notify and advise parties he is working with, such as Cleopatra, of the terms of the Consent Order and, even if Pyle failed to do so before commencing work on the Motion Picture, Cleopatra was on notice of the Consent Order and its restrictions immediately following receipt of a cease and desist letter; (c) the Motion Picture will inevitably be distributed and shown in New York; and (d) the Court has inherent authority to enforce its own orders, including the Consent Order.

## FACTUAL BACKGROUND

### Lynyrd Skynyrd

15.     Lynyrd Skynyrd was an American rock band formed in Jacksonville, Florida in 1964. Lynyrd Skynyrd gained worldwide popularity and acclaim in the 1970's, with hits like "Sweet Home Alabama" and "Free Bird" that rose to the top of music charts worldwide. Lynyrd Skynyrd was inducted into the Rock and Roll Hall of Fame in 2006.

16.     Ronnie, Rossington, and Collins were founding members of, and songwriters for, Lynyrd Skynyrd. Ronnie was the lead vocalist, and Rossington and Collins were the lead guitarists.

17.     Following the band's founding, additional band members were added.   The members of Lynyrd Skynyrd, as it existed in 1977 prior to the crash, included, as relevant for the purposes of this action, Ronnie, Rossington, Collins, Gaines, Pyle, and backup vocalists, including Gaines' sister, Cassie Gaines.

18.     Defendant Pyle was not an original member of Lynyrd Skynyrd but was the band's drummer at the time of the crash.

19.     By 1977, the band had released six record albums, which sold many millions of copies in the United States and worldwide.

20.     One of these albums, named "Street Survivors," was released just three days before the plane crash, while the band was on tour across the country.

## The Plane Crash

21.     On October 20, 1977, at the height of the band's popularity, Lynyrd Skynyrd was en route from a show in Greensville, South Carolina to a show in Baton Rouge, Louisiana when its chartered plane ran out of fuel and crashed in Mississippi.  Ronnie, Gaines, Cassie Gaines, the band's assistant road manager, the pilot, and the co-pilot all died in the crash.  Twenty others survived, including Pyle.

22.     Following the crash, the band went on a ten-year hiatus.

23.     As previously found by this Court, the hiatus was the result of a "blood oath" that certain of the band members and widows of other band members had taken "never to use the name Lynyrd Skynyrd again in an effort not to capitalize on the tragedy that had befallen the group," which oath was observed by all concerned for ten years.

24.     Throughout those ten years, Jenness was solicited repeatedly by various book and film producers to consent to and sell the rights to projects regarding Ronnie's life and death, but she rejected each of those proposals.

### The 1988 Action

25.     In 1987, the surviving members of the band reunited and organized a new band (the "87-88 Band") for a tribute tour to Lynyrd Skynyrd (the "Tribute Tour").

26.     Disputes arose between certain of the Plaintiffs and the 87-88 Band concerning the Tribute Tour and a subsequent tour, leading to litigation in this Court (the "1988 Action"). The 1988 Action, styled *Grondin et ano. v. Rossington et al.*, Case No. 88 Civ. 3192 (RWS), sought to enjoin the 87-88 Band from performing under the name "Lynyrd Skynyrd" and to enjoin the 87-88 Band's record company from marketing an album produced from the performances on the Tribute Tour. (At the time of the 1988 Action, Jenness was acting in her former capacity as the Personal Representative of Ronnie's Estate and was using her prior surname, Grondin.)

27.     Pyle was a defendant in the 1988 Action.

28.     In an opinion dated June 9, 1988 (and amended June 14, 1988), reported at 690 F. Supp. 200 (S.D.N.Y. 1988) (Sweet, J.) (the "1988 Opinion"), the Court granted the requested relief with respect to the album. Finding a likelihood that the album cover's prominent "Lynyrd Skynyrd Live" logo and additional reference to the "Lynyrd Skynyrd Tribute Tour 1987" would confuse consumers as to the source of the album, the Court required the record company to affix a label to the album cover explicitly conveying that the recording was of the reorganized 87-88 Band and not of Lynyrd Skynyrd. In addition, while declining to preliminarily enjoin the 1988 tour that was already underway, the Court, after a multi-day evidentiary hearing, made specific

findings on the injunction motion supporting the likelihood of success on the merits, and found

that potential concert-goers would be confused and that damages would be incalculable.  This

Court held:

> In this case, Grondin has established irreparable injury and will
> probably succeed on the merits.  She thus may win permanent
> injunctive relief. …
>
> Indeed, if in this case confusion or a valid contract can be shown,
> irreparable injury follows.  The number of consumers who would
> attend a concert of 87-88 Lynyrd Skynyrd and thereafter would be
> less inclined to purchase previously released Lynyrd Skynyrd
> albums is incalculable.  Also incalculable is the number of
> consumers who would purchase the Live album under the
> impression they were purchasing previously released material or
> who would be less inclined to purchase old Lynyrd Skynyrd
> materials based on their impression of the Live album.
> Additionally, to the extent Grondin entered into a contract
> motivated by the desire to preserve her husband's memory, her
> emotional damages are difficult to quantify.  A review of the
> merits clarifies the issues of injury.

1988 Opinion, 690 F. Supp. at 204.

## The Consent Order

29.    Following the Court's 1988 Opinion, the parties to the 1988 Action, including

certain of the Plaintiffs and Pyle, engaged in protracted settlement negotiations, culminating in

the 31-page (exclusive of exhibits) Consent Order, which this Court entered as an Order on

October 11, 1988.

30.    Pyle was a signatory to the Consent Order.

31.    Although Pyle purported to sign the Consent Order "Under Protest," (a) his

"Under Protest" notation is of no legal import, and (b) he later expressly reaffirmed and agreed

to be bound by the Consent Order in a Mutual Release, Settlement and Termination Agreement

dated as of August 3, 1991.

32.     The Consent Order imposed severe, and sharply defined, restrictions on the parties' (including Pyle's) use of the name "Lynyrd Skynyrd" and the right to tell the story of Lynyrd Skynyrd, including the right to participate in the making of a theatrical motion picture.

33.     As is pertinent for purposes of this action, the Consent Order permanently restrains and enjoins the defendants in the 1988 Action (collectively, with the exception of MCA Records, Inc., the "1988 Defendants"), including Defendant Pyle, "and all corporations owned or controlled by any of [them], and all agents, attorneys, employees, officers, directors, successors, assigns, *and all others in concert or participation with them*" from, *inter alia*:

- "[u]sing or purporting to authorize use of the name 'Lynyrd Skynyrd' or any logos, trade or service marks associated with the name 'Lynyrd Skynyrd', in the entertainment industry or otherwise, except as specifically authorized [t]herein," and

- "[u]sing the name, likeness, portrait, picture, performances or biographical material of Ronnie Van Zant ('Van Zant') or Steven Gaines ('Gaines') for any purpose whatsoever, except as specifically authorized [t]herein...."

(Consent Order, ¶ 1(ii)-(iii)(emphasis added).)

34.     While the Consent Order permits each of the individual defendants and the plaintiffs in the 1988 Action to exploit his (or the applicable decedent's) own respective life story in any manner or medium without obligation, financial or otherwise, to any other party thereto, such authorization is expressly subject to an important proviso:

> [N]o such exploitation of life story rights is authorized which purports to be a history of the "Lynyrd Skynyrd" band, as opposed to the life story of the applicable individual.

(Consent Order, ¶ 3.)

35.     Moreover, because Ronnie, Rossington, and Collins were the founders and the heart of Lynyrd Skynyrd, the Consent Order expressly provides that any use of the history of the Lynyrd Skynyrd band "in whole or in part" requires the prior written approval of Ronnie's Estate (of which RVZI is the successor), Rossington, and Collins (or his estate or other legal representative, *i.e.*, the Allen Collins Trust):

> There shall be no exploitation in whole or in part of the history of the Lynyrd Skynyrd band without the prior written approval of Rossington, Collins and Ronnie's Estate. …

(Consent Order, ¶ 4.)

36.     RVZI, Rossington, and the Allen Collins Trust have never consented to Pyle's exploiting of the history of Lynyrd Skynyrd, in whole or in part.

37.     The Consent Order further prohibits any of the 1988 Defendants from making "any use of the name, likeness, portrait, picture, or biographical material of Van Zant or of Gaines" except pursuant to certain conditions enumerated in the Consent Order, none of which applies here.  (Consent Order, ¶ 5.)

38.     The Consent Order (at ¶ 24) provides that no party has rights and entitlements in or to the name "Lynyrd Skynyrd" other than as expressly set forth in the Consent Order:

> The rights and entitlements of all of the parties hereto in and to the name "Lynyrd Skynyrd" as among themselves shall henceforth be only those rights and entitlements expressly set forth herein, notwithstanding any and all prior oral and written agreements in such connection.  No party shall have the right to utilize the name "Lynyrd Skynyrd" except as specifically permitted herein, and any unauthorized use, by any party, shall be deemed a breach of this Order.

(Consent Order, ¶ 24.)

39.     Furthermore, under the Consent Order, the 1988 Defendants (again, including Pyle) agreed to "notify and advise all of their present and future managers, booking agents,

attorneys, promoters, publicists, related record and merchandising companies, all distributors, and all other agents and representatives of the terms [t]hereof, insofar as such define the authorized and permitted uses of the words 'Lynyrd Skynyrd.'…" (Consent Order, ¶ 26.)

40.     The Consent Order (at ¶ 26) further requires the 1988 Defendants (including Pyle) to immediately notify (i) the plaintiffs in the 1988 Action of any third party's failure to comply with the terms of the Consent Order and (ii) such third party of the applicable terms of the Consent Order and demand prompt compliance therewith. (*Id.*)

41.     Paragraph 26 of the Consent Order further provides: "In no event shall the [1988 Defendants] implicitly or through inaction authorize the violation of the terms [t]hereof by any third party." (*Id.*)

42.     Under the Consent Order (at ¶ 33), this Court retained jurisdiction over the 1988 Action and over the parties for the purpose of enforcing the Consent Order's terms.

43.     The Consent Order (at ¶ 34) provides for the award of attorneys' fees to the prevailing party in any proceeding brought to enforce its terms and conditions.

44.     Thus, while Pyle is free to exploit his own personal life story, he may not use the name or history of Lynyrd Skynyrd or the name, likeness, portrait, picture, performances or biographical material of Ronnie or of Gaines except as specifically set forth in the Consent Order. (Consent Order, at ¶¶ 1(ii)-(iii) and 3-5, 24.)

45.     Further, while Cleopatra is free to make a movie concerning Lynyrd Skynyrd subject to acquiring any necessary rights, it may not make a movie co-written by Pyle that violates the Consent Order nor continue its efforts to bring such movie to fruition despite its knowledge of the violations.

4764325.1                                    10

## Pyle's Exit From the Band

46.      Subsequent to 1988, surviving members of Lynyrd Skynyrd and others continued to perform together, including certain of the Plaintiffs and Pyle.

47.      Disputes soon arose between Pyle and the other members of the band, and Pyle abruptly left the band during a show in Toronto on August 2, 1991.

48.      Pyle and others signed a "Mutual Release, Settlement and Termination Agreement" (the "Termination Agreement") effective as of August 2, 1991 to memorialize Pyle's exit from the band.

49.      In Paragraph 1 of the Termination Agreement, Pyle "expressly reaffirm[ed] and agree[d] to be bound by existing agreements...to which Pyle is a signatory," specifically including the Consent Order (enumerated in subsection (c) of Paragraph 1).

50.      According to publicly available information, since his termination from the band, Pyle has had run-ins with the law.  Specifically, in 1993, Pyle pleaded guilty to charges of attempted capital sexual battery and to lewdly fondling, assaulting or simulating sexual acts on two female children, ages 4 and 8, requiring him to register as a convicted sex offender.  He is currently registered as a convicted sex offender.

51.      As noted herein, unless they are stopped by this Court, the Defendants' violations of the Consent Order will dilute the marketplace for a film about Lynyrd Skynyrd made consistent with the terms of the Consent Order (which Plaintiffs are in the process of developing and for which a producer has been selected), defeat the Plaintiffs' right to use productively and lawfully the name and history of Lynyrd Skynyrd and the name, likeness, portrait, picture, performances or biographical material of Ronnie or of Gaines, and harm the Lynyrd Skynyrd name, brand, and reputation, each of which constitutes irreparable harm.  Moreover, given Pyle's

4764325.1                                          11

sordid criminal history, any project created and promoted by Pyle without authorization which uses the name "Lynyrd Skynyrd" and purports to tell the history of Lynyrd Skynyrd, in whole or in part, including the film in issue, would only further exacerbate the risk of irreparable harm to the Lynyrd Skynyrd name, brand, and reputation.

## The Cease and Desist Correspondence

52.    In July 2016, it came to Plaintiffs' attention through the press that Pyle and Cleopatra, with which Pyle is apparently associated, intended to produce a theatrical motion picture then reported as being entitled "Free Bird," the same title as Lynyrd Skynyrd's hit song.

53.    Immediately upon hearing of this, counsel delivered a cease and desist letter to Cleopatra on behalf of Lynyrd Skynyrd and certain of the Plaintiffs in the instant action (the "Cease and Desist Letter").

54.    In the Cease and Desist Letter, counsel recounted the circumstances under which the prospective motion picture came to Plaintiffs' attention, and advised that it would violate the terms of the Consent Order.  Counsel made clear that Cleopatra was not authorized to make a film with Pyle which either purports to be or is about the history of Lynyrd Skynyrd, in whole or in part; to use the name, likeness, portrait, picture or biological material of Ronnie, Rossington, or Gaines in any manner; and to use "Free Bird" as a title of any motion picture, including one which is purportedly Pyle's story.  The Cease and Desist Letter stated that "if [Cleopatra] furnish[es] to us a copy of the proposed screenplay and it proves the film is in fact the Artimus Pyle story and is in no way a history of the Band, that it does not violate the terms and conditions of the Consent Decree, and further that the Motion Picture is re-titled, our clients may be willing to reevaluate their position."

55.     In response, counsel for Cleopatra claimed that Cleopatra did not have a copy of the Consent Order and that Pyle no longer had a copy.

56.     In light of the Consent Order's status as a sealed document, counsel sent Pyle a copy of the Consent Order at the address that Cleopatra's counsel provided, "c/o Cleopatra Records, Inc."

57.     As noted above, Pyle was not only authorized, but required, to notify and advise those with whom he works, such as Cleopatra, of the restrictions and requirements of the Consent Order and demand prompt compliance with all such terms (*see* Consent Order, at ¶ 26).

58.     Thereafter, Plaintiffs heard nothing further from the Defendants, including no response to counsel's request that they provide a copy of the proposed screenplay.

59.     Plaintiffs also did not come across any further press articles or other information concerning the prospective film.  Accordingly, Plaintiffs believed that Cleopatra obtained the Consent Order from Pyle and recognized the impropriety of Pyle's prospective project, and Plaintiffs therefore believed the matter to be closed because the Defendants had abandoned or at least sufficiently modified the prospective motion picture to comply with the Consent Order.

### Recent Discovery By Plaintiffs of the Defendants' Plans

60.     On April 26, 2017, however, Plaintiffs learned through the press that the Defendants are about to proceed to start filming a motion picture – billed as a "Lynyrd Skynyrd 1977 Plane Crash Biopic" – entitled "Street Survivors: The True Story of the Lynyrd Skynyrd Plane Crash" (the Motion Picture) and they are publicizing it to be exactly the type of film which the Consent Order prohibits.  Moreover, according to that same article, actors have apparently been hired for the biographical roles of Ronnie, Gaines and other members of the band, in further violation of the Consent Order.

61.     According to other articles and press reports published in recent days, the Motion Picture is based on a screenplay written by the film's director, Jared Cohen, based on "painstakingly" detailed interviews with Pyle.  IMDb, the "Internet Movie Database," lists Pyle and Cohen as co-writers.

62.     Pyle continues to promote the Motion Picture in the press as "a good movie that tells a very passionate, intimate story about the music and the band and a rise and fall that happened so suddenly."

63.     He has stated that he wants the Motion Picture "to portray my band members the way they were:  real, funny people who loved music, loved the success that allowed us to be able to travel the world and play for kings and queens all over this planet."

64.     According to Pyle, the Motion Picture is "for the fans of Skynyrd, and for people who'll become fans after they see it."

65.     That type of film would do far more than just tell the story of Pyle's life.  To the contrary, it would violate the clear prohibitions of the Consent Order, including the express prohibitions on the use of the name and history of Lynyrd Skynyrd (at ¶¶ 1(ii) and 3-4, 24) and the name, likeness, portrait, picture, performances or biographical material of Ronnie or of Gaines (at ¶¶ 1(iii) and 5) except as specifically set forth in the Consent Order.

66.     Indeed, Pyle implicitly acknowledges that his actions and those of the other Defendants violate the Consent Order.  Specifically, Pyle declared in the press:  "I'm grateful that Cleopatra is stepping up the way it has, when nobody else was willing to go against the powers that be, to get this story told."

67.     Apparently, the "powers that be" include this Court, because it is this Court's Consent Order that governs and prohibits him from doing precisely what he is doing.  Such a

statement is both (a) an acknowledgment by Pyle of the constraints that the Consent Order places upon him and those working in concert with him to co-write a screenplay for and produce a film about the history of the band, and (b) an admission that Pyle and Cleopatra's conduct constitutes a willful and knowing violation of the Consent Order.

## This Action

68.     The Plaintiffs now bring this action to enforce the terms of the Consent Order and to enjoin the violation of its terms.

69.     If filming does not cease, and if the Motion Picture is completed and distributed, it will dilute the marketplace for a film about Lynyrd Skynyrd made consistent with the terms of the Consent Order (in contrast to Defendants' prospective film, which may contain a potentially inaccurate or skewed portrayal of Lynyrd Skynyrd's story as filtered solely through the eyes of Pyle masquerading as *the* "True Story" of a defining moment in the band's history), destroy the Plaintiffs' right to use productively and lawfully the name and history of Lynyrd Skynyrd and the name, likeness, portrait, picture, performances or biographical material of Ronnie or of Gaines in an authorized manner consistent with Paragraphs 3, 4, and 5 of the Consent Order (which they are actively pursuing and for which a producer has been selected), and harm the Lynyrd Skynyrd name, brand, and reputation.

70.     The loss that such a violation of the Plaintiffs' rights under the Consent Order would cause is incalculable and constitutes irreparable harm.

71.     In short, the Consent Order contains the following provisions, each of which Pyle (in concert and participation with Cleopatra) is violating:

- permanently restrains and enjoins Pyle and "all corporations owned or controlled by [him] and all agents, attorneys, employees, officers, directors, successors, assigns, *and all others in concert or participation with them*" from, *inter alia*:

- o "[u]sing or purporting to authorize use of the name 'Lynyrd Skynyrd' or any logos, trade or service marks associated with the name 'Lynyrd Skynyrd', in the entertainment industry or otherwise, except as specifically authorized [t]herein," and

- o "[u]sing the name, likeness, portrait, picture, performances or biographical material of Ronnie Van Zant ('Van Zant') or Steven Gaines ('Gaines') for any purpose whatsoever, except as specifically authorized [t]herein...."

(Consent Order, ¶ 1(ii)-(iii) (emphasis added);

- provides that "no [] exploitation of life story rights [as permitted therein] is authorized which purports to be a history of the 'Lynyrd Skynyrd' band, as opposed to the life story of the applicable individual" (Id., ¶ 3);

- provides that "[t]here shall be no exploitation in whole or in part of the history of the Lynyrd Skynyrd band without the prior written approval of Rossington, Collins and Ronnie's Estate," which approval was not obtained here (Id., ¶ 4);

- prohibits Pyle from making "any use of the name, likeness, portrait, picture, or biographical material of Van Zant or of Gaines" except pursuant to certain conditions enumerated in the Consent Order, none of which applies here (Id., ¶ 5);

- provides that "[n]o party shall have the right to utilize the name 'Lynyrd Skynyrd' except as specifically permitted [t]herein, and any unauthorized use, by any party, shall be deemed to be a breach of this Order" (Id., ¶ 24);

- requires Pyle to "notify and advise all of [his] present and future managers, booking agents, attorneys, promoters, publicists, related record and merchandising companies, all distributors, and all other agents and representatives of the terms [t]hereof, insofar as such define the authorized and permitted uses of the words 'Lynyrd Skynyrd'" (Id., ¶ 26);

- requires Pyle, upon learning of any failure by a third party to comply with the terms of the Consent Order, to immediately notify (a) the plaintiffs in the 1988 Action, including certain Plaintiffs herein, of such failure, and (b) such third party of the applicable terms of the Consent Order and demand compliance with all such terms (Id.); and

- provides that "[i]n no event shall [Pyle] implicitly or through inaction authorize the violation of the terms [t]hereof by any third party." (Id.)

72.      By reason of the foregoing, this Court should not condone such a flagrant flouting of the Consent Order and should grant the relief Plaintiffs request.

## FIRST CAUSE OF ACTION
### (Permanent Injunction)

73.     Plaintiffs repeat each of the allegations set forth in paragraphs 1 through 72 above as though fully set forth herein.

74.     The Consent Order memorialized the settlement of the 1988 Action and was entered as a Consent Order, Judgment, and Decree of this Court.

75.     Pyle was a signatory to the Consent Order, which he entered into with the advice of counsel and expressly reaffirmed in a subsequent signed agreement.

76.     As such, Pyle was aware of the terms and conditions of the Consent Order and his need to comply therewith.

77.     Despite the forgoing, upon information and belief, Pyle, in concert and participation with Cleopatra, has knowingly and purposefully violated numerous terms and conditions of the Consent Order, including, but not limited to, Paragraphs 1(ii) and (iii), 3, 4, 5, 24, and 26.

78.     The Defendants' conduct as set forth herein would contravene the Consent Order and cause irreparable and incalculable damage to the Lynyrd Skynyrd name, brand, and reputation, confuse the public, dilute the marketplace for films about Lynyrd Skynyrd's history, including the authorized film that Plaintiffs are actively pursuing, and defeat the Plaintiffs' rights set forth in the Consent Order.

79.     Money damages are inadequate to compensate the Plaintiffs for the irreparable harm the Defendants' conduct would cause because the damages are incalculable.

80.     The threatened irreparable injury to Plaintiffs is actual and imminent:  according to published reports, the Motion Picture is about to be or is currently in the filming stage, with the main cast set and retained (including actors to portray Ronnie and Rossington).

81.     The balance of the hardships tips decidedly in the Plaintiffs' favor because the Plaintiffs seek to enforce the agreement that they and Pyle bargained for to end the 1988 Action, which agreement was memorialized, and approved by this Court in the Consent Order, while Defendants seek to flout it.

82.     By reason of the foregoing, the Defendants, jointly and severally, and all corporations and entities owned or controlled by them, and all agents, attorneys, employees, officers, directors, successors, assigns, and all others in concert or participation with them, should be permanently enjoined from producing, distributing and/or displaying the Motion Picture or any motion picture that exploits in whole or in part the history of Lynyrd Skynyrd or makes use of the name "Lynyrd Skynyrd" or the name, likeness, portrait, picture, performances or biographical material of Ronald Van Zant or of Steven Gaines in any manner or medium, including, without limitation, in theatrical feature or television motion pictures or streaming services, or engaging in any other act in violation of the terms of the Consent Order.

## SECOND CAUSE OF ACTION
### (Attorneys' Fees)

83.     Plaintiffs repeat each of the allegations set forth in paragraphs 1 through 82 above as though fully set forth herein.

84.     Paragraph 34 of the Consent Order provides that "[a]n amount equal to actual and reasonable attorneys fees shall be awarded to the prevailing party in any proceeding brought to enforce the terms and conditions of this Order."

85.     Due to the actions of the Defendants, the Plaintiffs were compelled to initiate this proceeding in order to enforce the terms and conditions of the Consent Order, and incurred attorneys' fees in connection with their prosecution of this action.

86.     As a result, and pursuant to Paragraph 34 of the Consent Order, the Plaintiffs are entitled to payment by the Defendants of the Plaintiffs' actual and reasonable attorneys' fees in this action, in an amount to be determined.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs seek the entry of judgment against the Defendants as follows:

(A)     on the First Cause of Action, permanently enjoining all Defendants, jointly and severally, and all corporations and entities owned or controlled by them, and all agents, attorneys, employees, officers, directors, successors, assigns, and all others in concert or participation with them, from producing, distributing and/or displaying the Motion Picture or any motion picture that exploits in whole or in part the history of Lynyrd Skynyrd or makes use of the name "Lynyrd Skynyrd" or the name, likeness, portrait, picture, performances or biographical material of Ronald Van Zant or of Steven Gaines in any manner or medium, including, without limitation, in theatrical feature or television motion pictures or streaming services, or engaging in any other act in violation of the terms of the Consent Order;

(B)     on the Second Cause of Action, awarding Plaintiffs actual and reasonable attorneys' fees incurred by the Plaintiffs in commencing and maintaining this action to enforce the terms and conditions of the Consent Order; and

(C)     awarding such further relief as is just and proper.

Dated:  May 5, 2017

OTTERBOURG P.C.

By:_____

Richard G. Haddad
Sandor Frankel
Pauline McTernan
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
rhaddad@otterbourg.com
sfrankel@otterbourg.com
pmcternan@otterbourg.com

*Attorneys for Plaintiffs*

4764325.1