UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

RONNIE VAN ZANT, INC., GARY R. ROSSINGTON, : 
JOHNNY VAN ZANT, BARBARA HOUSTON, as the :
Trustee of the ALLEN COLLINS TRUST, and ALICIA :
RAPP and CORINNA GAINES BIEMILLER, as the :
Personal Representatives of the Estate of STEVEN :
GAINES, :
  :
                    Plaintiffs, :   17 Civ. 3360 (RWS)
  :
     - against - :
  :
ARTIMUS PYLE (a/k/a THOMAS D. PYLE), : **Trial Dates:  July 11, 2017 and**
CLEOPATRA RECORDS, INC., CLEOPATRA FILMS, a : **July 12, 2017**
division of CLEOPATRA RECORDS, INC., JOHN DOE, :
JANE DOE, XYZ CORPORATION, and XYZ LLC (the :
names of the last four defendants being fictitious and :
unknown to plaintiffs, and intended to designate persons or :
entities that have or may have a role in the production and :
distribution of the Motion Picture complained of in the :
Complaint herein), :
  :
                    Defendants. :

-------------------------------------------------------------------x

## PLAINTIFFS' PRE-TRIAL MEMORANDUM

**[Redacted pursuant to the confidentiality order entered in this action.]**

OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104

*Attorneys for Plaintiffs*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND ................................................................................... 5

    Lynyrd Skynyrd ............................................................................................... 5

    The Plane Crash .............................................................................................. 5

    The 1988 Action .............................................................................................. 6

    The Consent Order .......................................................................................... 7

    Pyle's Exit From the Band ............................................................................. 11

    Cleopatra and Pyle's Collaboration on the Motion Picture .......................... 12

    Cleopatra Issues a Press Release Concerning the Motion Picture ................. 13

    The Cease and Desist Correspondence .......................................................... 14

    Defendants Press Forward with the Motion Picture Without Notifying Plaintiffs ........... 16

    Discovery By Plaintiffs in April 2017 of the Defendants' Plans ................... 18

    The Script Confirms That the Motion Picture Violates the Consent Order ......... 19

    This Action ..................................................................................................... 20

ARGUMENT ......................................................................................................... 21

I.    PLAINTIFFS ARE ENTITLED TO ENFORCE THE EXISTING PERMANENT INJUNCTION IN THE CONSENT ORDER TO BAR THE RELEASE OF THE MOTION PICTURE .................................................................................... 21

    A.    Defendants Have Violated the Consent Order .................................... 21

    B.    Defendants' Attempts to Evade the Consent Order's Prohibitions Lack Merit ...... 24

        1.    Cleopatra may not act in concert and participation with Pyle to violate the Consent Order ........................................... 24

        2.    Cleopatra and Pyle have violated the Consent Order ............... 26

        3.    The First Amendment does not permit Cleopatra to act in concert and participation with Pyle to violate the Consent Order and the Consent Order is not an impermissible prior restraint ................ 27

        4.    Plaintiffs are not estopped from enforcing the Consent Order ......... 29

II.     EVEN IF PLAINTIFFS WERE REQUIRED TO MEET THE PERMANENT INJUNCTION STANDARD ANEW, PLAINTIFFS ARE ENTITLED TO AN INJUNCTION ENJOINING THE RELEASE AND DISTRIBUTION OF THE MOTION PICTURE ...................................................................................................30

       A.     Plaintiffs Will Succeed on the Merits .................................................30

       B.     Plaintiffs Will Suffer Irreparable Injury Absent a Permanent Injunction .............30

       C.     Remedies Available at Law are Inadequate to Compensate Plaintiffs .................33

       D.     The Balance of the Equities Tips Decidedly in Favor of Plaintiffs .......................33

       E.     The Public Interest Will Be Served By the Issuance of an Injunction...................35

III.    PLAINTIFFS ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES.................35

CONCLUSION.........................................................................................................36

TABLE OF AUTHORITIES

Page

**Cases**

*Arbitration Before the N.Y. Stock Exchange, Inc. v. Pierce,*
   2004 WL 2072460 (S.D.N.Y. Sept. 8, 2004 (Sweet, J.)............................................................. 35

*Beastie Boys v. Monster Energy Co.,*
   87 F. Supp. 3d 672 (S.D.N.Y. 2015) ......................................................... 28, 33, 34

*Berger v. Heckler,*
   771 F.2d 1556 (2d Cir. 1985) ....................................................................... 33

*Broadcast Music, Inc. v. Prana Hosp., Inc.,*
   158 F. Supp. 3d 184 (S.D.N.Y. 2016) ......................................................... 33

*Broadcast Music, Inc. v. Wexford INR LLC,*
   2014 WL 4626454 (S.D.N.Y. Sept. 15, 2014)................................................ 33

*Canada Dry Del. Valley Bottling Co. v. Hornell Brewing Co., Inc.,*
   2013 WL 5434623 (S.D.N.Y. Sept. 30, 2013)................................................. 21

*Car Freshener Corp. v. Excellent Deals, Inc.,*
   2011 WL 3846520 (S.D.N.Y. Aug. 1, 2011)............................................... 33, 34

*CBS, Inc. v. Davis,*
   510 U.S. 1315 (1994)..................................................................................... 28

*Crosby v. Bradstreet & Co.,*
   312 F.2d 483 (2d Cir. 1963) ..................................................................... 27, 28

*Grondin v. Rossington,*
   690 F. Supp. 200 (S.D.N.Y. 1988) ..................................................... 6, 7, 29, 32

*Hurley v. Coughlin III,*
   158 F.R.D. 22 (S.D.N.Y. 1993) ................................................................... 21

*In re Masters Mates & Pilots Pension Plan,*
   957 F.2d 1020 (2d Cir. 1992) ...................................................................... 21

*Johnson & Johnson v. Wagonfeld,*
   206 F. Supp. 30 (S.D.N.Y. 1960) ................................................................. 29

iii

*Metro Foundation Contractors, Inc. v. Arch Ins. Co.*,
   551 Fed. Appx. 607 (2d Cir. 2014) ..................................................................... 35

*Near v. State of Minn. ex rel. Olson*,
   283 U.S. 697 (1931) ......................................................................................... 28

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1976) ......................................................................................... 28

*NML Cap., Ltd. v. Rep. of Argentina*,
   727 F.3d 230 (2d Cir. 2013) ............................................................................. 25

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971) ......................................................................................... 28

*Payroll Express Corp. v. Aetna Cas. & Surety Co.*,
   659 F.2d 285 (2d Cir. 1981) ............................................................................. 33

*Packingham v. North Carolina*,
   No. 15-1194, --- S. Ct. ---,  2017 WL 2621313 (U.S. June 19, 2017) .................... 27

*PRL USA Holdings, Inc. v. United States Polo Ass'n, Inc.*,
   No. 14-CV-764 RJS, 2015 WL 1442487 (S.D.N.Y. Mar. 27, 2015) ...................... 21

*Retail Credit Co. v. Russell*,
   218 S.E.2d 54 (Ga. 1975) ................................................................................. 28

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*,
   745 F. Supp. 2d 616 (S.D.N.Y. 2010) ............................................................... 32

*S.E.C. v. Platinum Investment Corp.*,
   98 Fed. Appx. 33 (2d Cir. 2004) ....................................................................... 25

*Sub-Zero, Inc. v. Sub Zero NY Refrigeration & Appliances Servs., Inc.*,
   2014 WL 1303434 (S.D.N.Y. Apr. 1, 2014) ................................................. 30, 33

*U.S. Polo Ass'n v. PRL USA Holdings, Inc.*,
   800 F. Supp. 2d 515 (S.D.N.Y. 2011) (Sweet, J.),
     *aff'd* 511 Fed. Appx. 81 (2d Cir. 2015) ................................... 30, 32, 33, 35

*Zeiler v. Deitsch*,
   500 F.3d 157 (2d Cir. 2007) ............................................................................. 21

**Statutes and Rules**

Fed. R. Civ. P. 65 ................................................................................................................. 25

## PRELIMINARY STATEMENT[1]

This is an action brought by Plaintiffs, surviving members and legal representatives of deceased members of the legendary 1970's rock band Lynyrd Skynyrd, to enjoin the breach of a Consent Order, Judgment and Decree entered by this Court on October 11, 1988 (88 Civ. 3192 RWS) (the "Consent Order") – the Defendants' production and intended release of a motion picture tentatively entitled "Street Survivors:        of the Lynyrd Skynyrd Plane Crash" (the "Motion Picture").[2]  Defendants intend to release the Motion Picture to coincide with the impending 40th anniversary of the tragic 1977 plane crash that killed several band members and others.  The Consent Order bars the Defendants' release of the Motion Picture.

Specifically, the Consent Order permanently enjoins Defendant Artimus Pyle (a/k/a Thomas D. Pyle) ("Pyle"), a signatory thereto, and those acting "in concert and participation" with him (such as the other named Defendants, Cleopatra Records Inc. and Cleopatra Films, as well as entities affiliated with them, collectively, "Cleopatra"), from using the name Lynyrd Skynyrd and the name, likeness, portrait, picture, performances or biographical material of certain of Lynyrd Skynyrd's deceased founding members, Ronald Van Zant ("Ronnie") and Steven Gaines ("Gaines"), except to the limited extent specifically set forth therein. (Consent Order, ¶1.)  In violation of these prohibitions, and despite them being on notice of the terms of the Consent Order, Defendants worked together to develop and promote the Motion Picture, which is named after Lynyrd Skynyrd's last album – "Street Survivors" – released mere days

---

[1]  The purpose of the Plaintiffs' Pre-Trial Memorandum is to discuss the principal factual and legal issues to be tried beginning on June 11, 2017.  It is not intended to set out all evidence or arguments that the Plaintiffs will make at trial or in this action.  The Plaintiffs reserve all of their rights.

[2]  The Motion Picture has had several names since the project commenced in June 2016, including ▆▆▆▆▆ ▆▆▆▆▆▆▆▆ "Free Bird," "Street Survivors: The True Story of the Lynyrd Skynyrd Plane Crash," "Street Survivors: ▆▆▆▆▆ of the Lynyrd Skynyrd Plane Crash," and the apparent latest iteration, "Street Survivors: ▆▆▆▆▆ of the Lynyrd Skynyrd Plane Crash."

1

4812560.1

before the plane crash; uses the name and history of Lynyrd Skynyrd; and uses the name, likeness, portrait, picture, performances and biographical material of Ronnie and Gaines; and has been publicly promoted by Pyle as being a "story about the music and the band and a rise and fall that happened so suddenly" that is being told by Defendants despite "the powers that be" (*i.e.*, without the requisite authorization) – precisely what the Consent Order prohibits.

Despite Defendants' attempt in May 2017, four days *after* this litigation commenced, to falsely create the appearance that Pyle had a more limited role in the Motion Picture, the evidence makes clear that Pyle and Cleopatra worked in active concert and participation together to develop and promote the Motion Picture for the better part of one year, and continued to do so as late as the very week the Plaintiffs brought this action.  Among other things, the evidence establishes that:

- Cleopatra paid for Pyle to travel to Los Angeles in June 2016 to:  (i) execute a contract, dated June 7, 2016, with Cleopatra ███████████████████████ █████, (ii) meet with the director selected for the project, Jared Cohn ("Cohn"), (iii) provide over eleven hours of "painstakingly" detailed interviews for use in writing the screenplay and as ███████████████████ (iv) ███ with Cohn, and (v) ████████████████████████████████;

- Pyle and Cleopatra executed a contract concerning the Motion Picture despite Pyle's warning of possible litigation and that "if it got to the point where [his] involvement in the movie would prevent the movie from being made, [then he] would back away from it….";

- Pyle's contract with Cleopatra ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████;

- contrary to Cleopatra's current position, manufactured solely for the purposes of this action, Cleopatra touted Pyle's deep involvement with the Motion Picture throughout its development, including in a press release it issued in June 2016 which announced that: (i) Cleopatra "has signed former Lynyrd Skynyrd drummer Artimus Pyle to an exclusive production deal *to co-write and co-produce* a feature film about the 1977 plane crash that took the lives of several band and crew members of the Lynyrd Skynyrd band"

(emphasis added), and (ii) "Jared Cohn has been tapped to direct the project and will co-write along with Pyle";

- Pyle gave multiple press interviews concerning the Motion Picture in which he described the Motion Picture as a "story about the music and the band and a rise and fall that happened so suddenly";

- Pyle and Cohn worked together on the script for the Motion Picture, with Cohn taking on the role of scrivener based on material provided by Pyle and ██████████ ██████████████████████████████████████████████████ ██████████████;

- Cleopatra paid for Pyle to travel to Los Angeles again in April 2017 so that he could be present for auditions, including for the roles of Plaintiff co-founding member Gary Rossington, Ronnie, and Gaines, among other band members, and a table read of the script;

- Pyle had a role in selecting and coaching the actors for the Motion Picture, including for the roles of Plaintiff Gary Rossington, Ronnie, and Gaines, to influence how the band members' portrait, likeness, and biographical material was depicted;

- Cleopatra paid for Pyle to travel to Los Angeles once again in May 2017, just days before this litigation was commenced, to film a cameo appearance for the Motion Picture; and

- it was not until May 9, 2017, days *after* the Plaintiffs commenced this litigation, that Cleopatra sought to distance itself from Pyle by urging him to sign a one-page hastily prepared letter purportedly rendering his June 7, 2016 contract with Cleopatra ███ ██████████████████ paying him a "bonus" of $2,500, falsely describing his role as that of a mere ████████████████ rather than the ████████ and "co-writer" it previously described him as, and falsely claiming that ██████████████ ████████████████████████████████████████.

In view of Pyle and Cleopatra's concerted joint effort to develop and promote the Motion Picture over the course of a year, Defendants' post-litigation attempt to diminish the taint of Pyle's involvement is of no effect – indeed, it is a tacit admission that Pyle's actual role violated the Consent Order. Moreover, contrary to representations to this Court that Cleopatra took steps in July 2016 to "address [Plaintiffs'] concerns," the evidence (including Cleopatra's own deposition testimony) now confirms that Cleopatra did not do so, and instead chose to forge

ahead with the Motion Picture at its own risk, despite having actual notice of the Consent Order's terms.

Given the Defendants' clear violation of the existing permanent injunction contained in the Consent Order, Plaintiffs are entitled to enforcement of the injunction in the Consent Order enjoining the release and distribution of the Motion Picture. Moreover, even if Plaintiffs were required to satisfy the standard for a permanent injunction anew (which they are not), there is no question that they can do so. If the Motion Picture is released, it will cause irreparable injury to Plaintiffs which cannot be adequately compensated by monetary damages. Among other things, such a film would harm the Lynyrd Skynyrd name, brand, and reputation; eliminate various Plaintiffs' rights under the Consent Order to prevent a former band member from purporting to tell the Lynyrd Skynyrd story to the public; confuse the public; dilute the marketplace for films about Lynyrd Skynyrd's history made consistent with the terms of the Consent Order, including an authorized film project that Plaintiffs are actively pursuing; and defeat the Plaintiffs' right to use productively and lawfully the name and history of Lynyrd Skynyrd and the name, likeness, portrait, picture, performances and biographical material of Ronald Van Zant or of Steven Gaines, each of which would constitute irreparable harm. The permanent injunction that Plaintiffs seek is tailored to enforce the Plaintiffs' rights under the Consent Order and does not impinge on any of Defendants' First Amendment rights. Each of the Plaintiffs, and indeed the public, has an interest in the enforcement of the injunction contained in an Order of this Court, and the Consent Order should be enforced as bargained for and entered.

## FACTUAL BACKGROUND

### Lynyrd Skynyrd

The legendary American rock band Lynyrd Skynyrd was formed in Jacksonville, Florida in 1964. Lynyrd Skynyrd gained worldwide popularity and acclaim in the 1970's with hits like "Sweet Home Alabama" and "Free Bird" that rose to the top of music charts worldwide. Lynyrd Skynyrd was inducted into the Rock and Roll Hall of Fame in 2006.

Ronnie, Plaintiff Gary Rossington ("Rossington"), and Allen Collins ("Collins") were founding members of, and songwriters for, Lynyrd Skynyrd. Ronnie was the lead vocalist, and Rossington and Collins were the lead guitarists.

Following the band's founding, additional band members were added. The members of Lynyrd Skynyrd, as it existed in 1977 prior to the crash, included, as relevant for the purposes of this action, Ronnie, Rossington, Collins, Gaines, Pyle, and backup vocalists, including Gaines' sister, Cassie Gaines. Pyle was not an original member of Lynyrd Skynyrd but was the band's drummer at the time of the crash.

By 1977, the band had released six record albums, which sold many millions of copies in the United States and worldwide. One of these albums, named "Street Survivors," was released just three days before the plane crash, while the band was on tour across the country.

### The Plane Crash

On October 20, 1977, at the height of the band's popularity, Lynyrd Skynyrd was en route from a show in Greenville, South Carolina to a show in Baton Rouge, Louisiana when its chartered plane ran out of fuel and crashed in Mississippi. Ronnie, Gaines, his sister Cassie Gaines, the band's assistant road manager, the pilot, and the co-pilot all died in the crash. Twenty others survived, including Pyle.

Following the crash, the band went on a ten-year hiatus.  As previously found by this Court in an opinion dated June 9, 1988 (and amended June 14, 1988), reported at 690 F. Supp. 200 (S.D.N.Y. 1988) (Sweet, J.) (the "1988 Opinion"), the hiatus was the result of a "blood oath" that certain of the band members and widows of other band members had taken "never to use the name Lynyrd Skynyrd again in an effort not to capitalize on the tragedy that had befallen the group," which oath was observed by all concerned for ten years. 1988 Opinion, 690 F. Supp. at 202; *see also id.* at 204-207 (holding that the "blood oath" was a valid and enforceable agreement).  Throughout those ten years, Ronnie's widow and the President of Plaintiff Ronnie Van Zant, Inc. ("RVZI"), Judith Van Zant Jenness, was solicited repeatedly by various book and film producers to sell the rights to projects regarding Ronnie's life and death, but she rejected all of those proposals.

### The 1988 Action

In 1987, the surviving members of the band reunited and organized a new band (the "87-88 Band") for a tribute tour to Lynyrd Skynyrd (the "Tribute Tour").  Disputes arose between certain of the Plaintiffs and the 87-88 Band concerning the Tribute Tour and a subsequent tour, leading to litigation in this Court (the "1988 Action").  The 1988 Action, styled *Grondin et ano. v. Rossington et al.*, Case No. 88 Civ. 3192 (RWS), sought to enjoin the 87-88 Band (including Pyle) from performing under the name "Lynyrd Skynyrd" and to enjoin the 87-88 Band's record company from marketing an album produced from the performances on the Tribute Tour.

In the Court's 1988 Opinion, the Court granted the requested relief with respect to the album.  Finding a likelihood that the album cover's prominent "Lynyrd Skynyrd Live" logo and additional reference to the "Lynyrd Skynyrd Tribute Tour 1987" would confuse consumers as to the source of the album, the Court required the record company to affix a label to the album

cover explicitly conveying that the recording was of the reorganized 87-88 Band and not of Lynyrd Skynyrd. In addition, while declining to preliminarily enjoin the 1988 tour that was already underway, the Court, after a multi-day evidentiary hearing, made specific findings on the injunction motion supporting the likelihood of success on the merits, and found that potential concert-goers would be confused and that damages would be incalculable. The Court held:

> In this case, Grondin has established irreparable injury and will probably succeed on the merits. She thus may win permanent injunctive relief. ...
>
> Indeed, if in this case confusion or a valid contract can be shown, irreparable injury follows. The number of consumers who would attend a concert of 87-88 Lynyrd Skynyrd and thereafter would be less inclined to purchase previously released Lynyrd Skynyrd albums is incalculable. Also incalculable is the number of consumers who would purchase the Live album under the impression they were purchasing previously released material or who would be less inclined to purchase old Lynyrd Skynyrd materials based on their impression of the Live album. Additionally, to the extent Grondin entered into a contract motivated by the desire to preserve her husband's memory, her emotional damages are difficult to quantify. A review of the merits clarifies the issues of injury.

1988 Opinion, 690 F. Supp. at 204.

## The Consent Order

Following the Court's 1988 Opinion, the parties to the 1988 Action, including certain of the Plaintiffs and Pyle, engaged in protracted settlement negotiations, culminating in the 31-page (exclusive of exhibits) Consent Order, which this Court entered as an Order on October 11, 1988. Pyle was a signatory to the Consent Order.

Although Pyle purported to sign the Consent Order "Under Protest," (a) his "Under Protest" notation is of no legal import, as he acknowledged at his deposition; (b) he later expressly reaffirmed and agreed to be bound by the Consent Order in a Mutual Release,

Settlement and Termination Agreement dated as of August 3, 1991 (the "Termination Agreement"); (c) even before the Termination Agreement, he agreed in an agreement dated December 12, 1990 that ███████████████████████████████████████ ███████████████████████████████████; (d) he has accepted payment of amounts under the Consent Order and related agreements without dispute for decades, which he continues to receive to this day (Pyle Tr., 34:22-24, 41:23-43:3)[3]; and (e) he obtained other benefits from the Consent Order, including the ability to "go forward with the music" (Pyle Tr., 34:3-16).

The Consent Order imposed sharply defined restrictions on various parties' (including Pyle's) (a) use of the name "Lynyrd Skynyrd," (b) right to tell the story of Lynyrd Skynyrd, including the right to participate in the making of a theatrical motion picture, and (c) use of the name, likeness, portrait, picture, performances or biographical material of Ronnie or Gaines. As is pertinent for purposes of this action, the Consent Order permanently restrains and enjoins the defendants in the 1988 Action (collectively, with the exception of MCA Records, Inc., the "1988 Defendants"), including Pyle, "and all corporations owned or controlled by any of [them], and all agents, attorneys, employees, officers, directors, successors, assigns, *and all others in concert or participation with them*" from, *inter alia*:

- "[u]sing or purporting to authorize use of the name 'Lynyrd Skynyrd' or any logos, trade or service marks associated with the name 'Lynyrd Skynyrd', in the entertainment industry or otherwise, except as specifically authorized [t]herein," and

---

[3] Citations to deposition testimony are in the form of the witness's last name, followed by the indicated page(s) of the transcript. As of the time of filing, Plaintiffs have not yet had an opportunity to depose certain witnesses they have subpoenaed in this action, including Prodigy Public Relations, LLC and John Lappen. Accordingly, Plaintiffs reserve all rights with respect to such witnesses. The citations to deposition testimony in this brief are not intended to, and do not reflect, the Plaintiffs' position that such deposition testimony is admissible. Rather, it is intended to reflect that the facts are supported by such witness testimony, which may be presented live or by deposition, depending on witness availability.

- "[u]sing the name, likeness, portrait, picture, performances or biographical material of Ronnie Van Zant ('Van Zant') or Steven Gaines ('Gaines') for any purpose whatsoever, except as specifically authorized [t]herein...."

(Consent Order, ¶ 1(ii)-(iii)(emphasis added).)

The Consent Order further provides that no party has rights and entitlements in or to the name "Lynyrd Skynyrd" other than as expressly set forth in the Consent Order:

> The rights and entitlements of all of the parties hereto in and to the name "Lynyrd Skynyrd" as among themselves shall henceforth be only those rights and entitlements expressly set forth herein, notwithstanding any and all prior oral and written agreements in such connection. *No party shall have the right to utilize the name "Lynyrd Skynyrd" except as specifically permitted herein, and any unauthorized use, by any party, shall be deemed a breach of this Order.*

(Consent Order, ¶ 24) (emphasis added).)

The Consent Order carves out a limited exception that permits each of the individual defendants and the plaintiffs in the 1988 Action to exploit his (or the applicable decedent's) own respective life story in any manner or medium "without obligation, financial or otherwise, to any other party [t]hereto," but such authorization is expressly subject to an important proviso:

> [N]o such exploitation of life story rights is authorized which purports to be a history of the "Lynyrd Skynyrd" band, as opposed to the life story of the applicable individual.

(Consent Order, ¶ 3.)

Moreover, because Ronnie, Rossington, and Collins were the founders and the heart of Lynyrd Skynyrd, the Consent Order provides that any use of the history of the Lynyrd Skynyrd band "in whole or in part" requires the prior written approval of Ronnie's Estate (of which RVZI is the successor), Rossington, and Collins (or his estate or other legal representative, *i.e.*, the Allen Collins Trust):

> There shall be no exploitation in whole or in part of the history of
> the Lynyrd Skynyrd band without the prior written approval of
> Rossington, Collins and Ronnie's Estate. …

(Consent Order, ¶ 4.)  RVZI, Rossington, and the Allen Collins Trust have never consented to

Pyle's exploiting of the history of Lynyrd Skynyrd, in whole or in part, as Defendants concede.

(Perera Tr., 153:19-154:5, 155:5-17; Pyle Tr., 16:7-15.)

The Consent Order further prohibits any of the 1988 Defendants from making "any use of

the name, likeness, portrait, picture, or biographical material of Van Zant or of Gaines" except

pursuant to certain conditions enumerated in the Consent Order, none of which applies here.

(Consent Order, ¶ 5.)

Furthermore, under the Consent Order, the 1988 Defendants (including Pyle) agreed to:

> notify and advise all of their present and future managers, booking
> agents, attorneys, promoters, publicists, related record and
> merchandising companies, all distributors, and all other agents and
> representatives of the terms [t]hereof, insofar as such define the
> authorized and permitted uses of the words 'Lynyrd Skynyrd.'…

(Consent Order, ¶ 26.)

The Consent Order (at ¶ 26) further requires the 1988 Defendants (including Pyle) to

immediately notify (i) the plaintiffs in the 1988 Action of any third party's failure to comply with

the terms of the Consent Order and (ii) such third party of the applicable terms of the Consent

Order and demand prompt compliance therewith. (*Id.*)  Paragraph 26 of the Consent Order

further provides:  "In no event shall the [1988 Defendants] implicitly or through inaction

authorize the violation of the terms [t]hereof by any third party." (*Id.*)

Thus, while Pyle is free to exploit his "own respective life story," he may not use the

name or history of Lynyrd Skynyrd or the name, likeness, portrait, picture, performances or

biographical material of Ronnie or of Gaines except as specifically set forth in the Consent

4812560.1                                        10

Order. (Consent Order, at ¶¶ 1(ii)-(iii) and 3-5, 24.) A movie like the Motion Picture that, as Defendants claim, centers on a single event[4] – the plane crash (which was the defining moment in the band's history) – does far more than that. Further, while Cleopatra is free to make a movie concerning Lynyrd Skynyrd subject to acquiring any necessary rights, it may not make a movie in concert with Pyle that violates the Consent Order nor continue its efforts to bring such movie to fruition given its knowledge of the Consent Order's prohibitions.

Under the Consent Order (at ¶ 33), this Court retained jurisdiction over the 1988 Action and over the parties for the purpose of enforcing the Consent Order's terms. The Consent Order (at ¶ 34) also provides for the award of attorneys' fees to the prevailing party in any proceeding brought to enforce its terms and conditions.

<u>**Pyle's Exit From the Band**</u>

Subsequent to 1988, surviving members of Lynyrd Skynyrd and others continued to perform together, including certain of the Plaintiffs and Pyle. Disputes soon arose between Pyle and the other members of the band, and Pyle abruptly left the band during a show in Toronto on August 2, 1991. Pyle and others signed the Termination Agreement to memorialize Pyle's exit from the band. In Paragraph 1 of the Termination Agreement, Pyle "expressly reaffirm[ed] and agree[d] to be bound by existing agreements...to which Pyle is a signatory," specifically including the Consent Order (enumerated in subsection (c) of Paragraph 1 of the Termination Agreement).

According to publicly available information, since his termination from the band, Pyle has had run-ins with the law. In 1993, Pyle entered a plea and was convicted of attempted capital sexual battery and lewdly fondling, assaulting or simulating sexual acts on two female

---

[4] As discussed *infra*, the Motion Picture also presents the story of the band, in further violation of the Consent Order.

11

children, ages 4 and 8, requiring him to register as a convicted sex offender. He is currently registered as a convicted sex offender.

**Cleopatra and Pyle's Collaboration on the Motion Picture**



Pyle and Cleopatra's collaboration on the Motion Picture █████████████

█████████████████████████████████████ (Perera Tr., 18:9-15.) ████

████████████████████████████████████████████████████████████████

████ (Perera Tr., 36:15-23.)

Thereafter, in June 2016, Cleopatra flew Pyle out to Los Angeles, California and █████████████████████████ concerning the Motion Picture. (Perera Tr., 42:13-43:19.) That agreement, entitled the █████████████████████ and dated June 7, 2016 (the "Pyle-Cleopatra Agreement"), set forth the terms of Pyle (defined as the ███████) and Cleopatra's collaboration on the Motion Picture. It provided, *inter alia*, that:

- Pyle would be a ████████ of the Motion Picture (at 1);

- Pyle would be █████████████████████████████████████ ████████████ (¶ 1);

- the Motion Picture ████████████████████ ██████████████ (¶ 2(i));

- ██████████████████████████████████████ ████████████ (¶ 2(v));

- ████████████████████████████████████ (¶ 2(vi));

- ████████████████████████████████████████████ (¶ 2(vii)); and

- ███████████████████████████████ (¶ 3).

Pyle testified that he did not negotiate the terms of the agreement because all he "wanted to do was tell the story of my friends and they [Cleopatra] were giving me that opportunity." (Pyle Tr., 45:7-8)   While Pyle did not have any comments or changes to the written agreement prior to signing it, he warned Cleopatra, in June 2016, of ██████████████████████ and stated that "if it got to the point where [his] involvement in the movie would prevent the movie from being made, [then he] would back away from it...." (Perera Tr., 49:17-52:17; Pyle Tr., 71:25-72:4.) Accordingly, Cleopatra was on notice at least as early as June 2016 of potential legal issues with working with Pyle to develop the Motion Picture. Indeed, Pyle testified that he is "sure that [Cleopatra] did ask" him for a copy of the Consent Order at that time, but Pyle did not have a copy. (Pyle Tr., 63:15-24.)

During his June 2016 trip to Los Angeles, Pyle also met with Cohn, ██████████████ ████████████████████████, and was interviewed by Cohn over the course of "two really grueling, hard days" to ██████████████████████ for the Motion Picture with Cohn. (Perera Tr., 44:17-45:14, 47:6-8; Pyle Tr., 53:17-54:7.) Although Cleopatra has claimed that Cohn did extensive other research for the film, neither Cleopatra nor Cohn has produced any document concerning such alleged research, producing only footage of Cohn's interviews of Pyle and emails establishing that the script was based in large measure, if not entirely, on information provided by Pyle.

**Cleopatra Issues a Press Release Concerning the Motion Picture**

To drum up publicity for the Motion Picture, ████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ (Perera Tr., 97:17-98:15.) In its draft press release, Cleopatra emphasized Pyle's role in co-writing the screenplay for the Motion Picture, announcing that: (i)

Cleopatra "has signed former Lynyrd Skynyrd drummer Artimus Pyle to an exclusive production deal *to co-write and co-produce* a feature film about the 1977 plane crash that took the lives of several band and crew members of the Lynyrd Skynyrd band" (emphasis added), and (ii) "Jared Cohn has been tapped to direct the project and will co-write along with Pyle." The press release also included a quote from Pyle: "This film's story – MY story – is not just about the plane crash but also about my personal relationship with the genius that was Ronnie Van Zant, whom I loved like a brother and still miss to this day." The press release was released, unchanged, on June 24, 2016.

Although Cleopatra claims that this is the only press release that it authorized, documents that it produced in this action establish other publicity for the Motion Picture at that time, and the day before, in various media outlets. This publicity makes clear that Pyle was promoting the Motion Picture as a story of Lynyrd Skynyrd, saying:

- the Motion Picture is "a good movie that tells a very passionate, intimate story about the music and the band and a rise and fall that happened so suddenly";

- he "want[s] the movie to portray my band members the way they were...Real, funny people who loved the music, loved the success that allowed us to be able to travel the world and play for kings and queens all over this planet";

- the Motion Picture is "a much-deserved movie for the fans of Skynyrd, and for people who'll become fans after they see it"; and

- he is grateful that Cleopatra is "stepping up the way it has, when nobody else was willing to go against the powers that be, to get this story told."

### The Cease and Desist Correspondence

In July 2016, it came to Plaintiffs' attention through the press that Pyle and Cleopatra intended to produce a theatrical motion picture then reported as being entitled "Free Bird," the same title as Lynyrd Skynyrd's hit song. Immediately upon hearing of this, counsel delivered a cease and desist letter to Cleopatra on behalf of Lynyrd Skynyrd and certain of the Plaintiffs (the

"Cease and Desist Letter"). The Cease and Desist Letter recounted the circumstances under which the prospective motion picture came to Plaintiffs' attention, and advised that it would violate the terms of the Consent Order. Counsel made clear that Cleopatra was not authorized to make a film with Pyle which either purports to be or is the history of Lynyrd Skynyrd, in whole or in part; to use the name, likeness, portrait, picture or biological material of Ronnie, Rossington, or Gaines in any manner; and to use "Free Bird" as a title of any motion picture, including one which is purportedly Pyle's story. The Cease and Desist Letter stated that "if [Cleopatra] furnish[es] to us a copy of the proposed screenplay and it proves the film is in fact the Artimus Pyle story and is in no way a history of the Band, that it does not violate the terms and conditions of the Consent Decree, and further that the Motion Picture is re-titled, our clients may be willing to reevaluate their position."



(Perera Tr., 73:8-75:12.) To be sure, "history" shows that Plaintiffs have reminded Pyle and those acting in concert and participation with him of the terms of the Consent Order on several occasions over the last nearly thirty (30) years, including in June of 2000 and November of 2012. The most recent Cease and Desist Letter was yet another such occasion.

In response to the Cease and Desist Letter, counsel for Cleopatra claimed that Cleopatra did not have a copy of the Consent Order and that Pyle no longer had a copy. In light of the Consent Order's status as a sealed document, counsel sent Pyle a copy of the Consent Order at

the address that Cleopatra's counsel provided – *i.e.*, "c/o Cleopatra Records, Inc." As noted above, Pyle was not only authorized, but required, to notify and advise those with whom he works, such as Cleopatra, of the restrictions and requirements of the Consent Order and demand prompt compliance with all such terms (*see* Consent Order, at ¶ 26).

Cleopatra received the Consent Order (in the envelope addressed to Pyle) on or about July 23, 2016, and Brian Perera, Cleopatra's managing member, ███████████████ ██████████████ (Perera Tr., 108:13-21.) ███████████████████████ ████████████████████████████████████████████████████ ███████████████████████████ (Perera Tr., 108:22-117:6.) ███████████ ████████████████████████████████

Thereafter, Plaintiffs heard nothing further from the Defendants. Plaintiffs also did not come across any further press articles or other information concerning the film. Accordingly, Plaintiffs believed that Cleopatra obtained the Consent Order from Pyle and recognized the impropriety of the prospective project, and Plaintiffs therefore believed the matter to be closed because the Defendants had abandoned or at least sufficiently modified the Motion Picture to comply with the Consent Order.

### Defendants Press Forward with the Motion Picture Without Notifying Plaintiffs

However, Plaintiffs later learned that rather than abandoning the Motion Picture, Defendants pressed forward with it, without notifying Plaintiffs. Notwithstanding its post-litigation position that tries to minimize Pyle's role, the evidence shows that in addition to spending hours telling Cohn the history of the band for the screenplay, █████████████ ████████████████████████████████████████████████, had a role in selecting and coaching the actors for the Motion Picture to make sure that they had the proper

███████████ to portray Ronnie, Gaines and the others, and filmed a cameo appearance for the

Motion Picture. Pyle concedes that he "can't say that [he] did anything to conform" with the

requirements of the Consent Order when developing the Motion Picture. (Pyle Tr., 67:12-13.)

     In fact, it was not until May 9, 2017, almost a year later and four days *after* this litigation

was commenced, that Cleopatra decided ████████████████████████

███████████ (Perera Tr., 206:13-15.) On May 10, 2017, Cleopatra sent Pyle a text message

urging him ██████████████████████████████████████

█████████████████████████████████████████████████

████████████████ That same day, Cleopatra ████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████ (Perera Tr.,

200:11-19, 206:10-209:4, 211:9-13.) Moreover, by that time substantially all of the footage had

been shot, and the May 9 Letter was an ex post facto attempt to create "alternative facts."

     Indeed, there was no such agreement between Pyle and Cleopatra in July 2016, or at any

time before May 9, 2017. To the contrary, before the May 9 Letter was signed, Cleopatra and

Pyle were still operating under the Pyle-Cleopatra Agreement and their collaboration on the

Motion Picture was still in full swing:  in just the three weeks before the May 9 Letter was executed, Cleopatra paid for Pyle to make two separate trips to Los Angeles, California for the purposes of, *inter alia*, meeting with Cohn, assisting with casting for the Motion Picture, including the roles of Rossington, Ronnie, and Gaines, participating in a table read of the script and giving pointers to the actors, and filming a cameo appearance for the Motion Picture. (Perera Tr., 200:11-19, 206:10-209:4, 211:9-13; Pyle Tr., 81:10-84:24.)  It was not until Plaintiffs commenced this action that Defendants attempted to rewrite history in the hope of diluting Pyle's involvement.[5]

### Discovery By Plaintiffs in April 2017 of the Defendants' Plans

On or about April 26, 2017, Plaintiffs learned through the press that the Defendants were about to start filming the Motion Picture – billed as a "Lynyrd Skynyrd 1977 Plane Crash Biopic" – then entitled "Street Survivors: The True Story of the Lynyrd Skynyrd Plane Crash" and they were publicizing it to be exactly the type of film which the Consent Order prohibits. Moreover, according to that same article, actors were hired for the biographical roles of Ronnie, Gaines and other members of the band, in further violation of the Consent Order.  Other articles and press reports reported that the Motion Picture is based on a screenplay written by the film's director, Cohn, based on "painstakingly" detailed interviews with Pyle.  To this day, the Motion

---

[5] Indeed, it is evident that Cleopatra manufactured the May 9 Letter which it urged Pyle to sign on May 10, 2017 so that Mr. Perera could assert in his Declaration, sworn on May 10, 2017 and submitted in support of Cleopatra's opposition to Plaintiffs' application for a preliminary injunction and temporary restraining order, that  "Mr. Pyle did not write the film, will not be credited as the writer, director, or producer of the film, and has no input as to how the film is made, its content, or its final cut." [Dkt. No. 34].  Of course, by this late date, Pyle had already had significant input on how the film was made and its content by, *inter alia*, providing over eleven hours of videotaped material for the screenplay, ████████████████████ ████████████████, helping select the actors, and promoting the Motion Picture in the press.

Picture's page on IMDb, the "Internet Movie Database," lists Pyle and Cohen as co-writers, even though the entry was updated since this action commenced.

As in the June 2016 press, in the April 2017 press, Pyle is quoted as stating that the Motion Picture is "a good movie that tells a very passionate, intimate story about the music and the band and a rise and fall that happened so suddenly"; that he wants the Motion Picture "to portray my band members the way they were:  real, funny people who loved music, loved the success that allowed us to be able to travel the world and play for kings and queens all over this planet"; that the Motion Picture is "for the fans of Skynyrd, and for people who'll become fans after they see it"; and that he is "grateful that Cleopatra is stepping up the way it has, when nobody else was willing to go against the powers that be, to get this story told."   Pyle has confirmed the accuracy of these quotes. (Pyle Tr., 115:12-116:6.)

### The Script Confirms That the Motion Picture Violates the Consent Order

The script of the Motion Picture confirms that the Motion Picture is exactly how Pyle has promoted it and that it violates the Consent Order – it purports to be the story of Lynyrd Skynyrd and its band members, including those killed in the crash. ████████████████

████████████████████████████████████████

████████████████

████████████████████████████████████

And indeed, the Motion Picture is not just about the plane crash and the day before and after.  According to Pyle, it is ███████████████████████ (Pyle Tr., 103:14-17.)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  (Pyle Tr., 96:19-99:24, 103:14-

17.) ███████████████████████████████████████████

███████████████████████████ – and is not Pyle's "own respective life story" in

which he merely refers to "'Lynyrd Skynyrd' and related matters" or "describe[s] and portray[s]

his experience(s) with 'Lynyrd Skynyrd'" as is permitted by the Consent Order.

In short, the Motion Picture is Lynyrd Skynyrd's life story and is a misuse of the name,

likeness, portrait, picture, performances and biographical material of Ronnie and Gaines.

<u>**This Action**</u>

In view of the press reports published in late April 2017, on May 5, 2017, the Plaintiffs

commenced this action to enforce the terms of the Consent Order and to enjoin the violation of

its terms.  In their Complaint, the Plaintiffs seek a permanent injunction (Count I) and attorneys'

fees as provided for under Paragraph 34 of the Consent Order (Count II).

Since the action has commenced, the shooting of the film has been completed and

Cleopatra is in the process of completing the editing and the special effects.[6]  (Tr. of May 17,

2017 Hearing, at 26:20-27:10.)  By Pyle's account, Cleopatra was not surprised to be hailed into

this Court with respect to the Motion Picture, telling Pyle in a phone conversation after the

lawsuit was filed: "[Y]ou were right." (Pyle Tr., 120:14-16.)

---

[6] This Court, on Plaintiffs' motion for preliminary injunction and temporary restraining order, maintained the status quo by requiring each Defendant to "provide Plaintiffs' counsel with three-weeks written notice before it (1) shows all or any part of the [Motion Picture] to any third-party that is not participating in the production of the Motion Picture, or (2) enters into a contract to sell or distribute the Motion Picture…." Order on Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order [Dkt. No. 11].

4812560.1                                          20

## ARGUMENT

I. **PLAINTIFFS ARE ENTITLED TO ENFORCE THE EXISTING PERMANENT INJUNCTION IN THE CONSENT ORDER TO BAR THE RELEASE OF THE MOTION PICTURE**

The permanent injunction that Plaintiffs seek, enjoining the release and distribution of the Motion Picture, is warranted:  Plaintiffs are seeking to enforce an injunction already ordered by the Court.  After all, "a consent decree is no more than a settlement that contains an injunction." *Hurley v. Coughlin III*, 158 F.R.D. 22, 29 (S.D.N.Y. 1993), *citing In re Masters Mates & Pilots Pension Plan*, 957 F.2d 1020, 1025 (2d Cir. 1992).  This Court unquestionably has the authority to enforce the terms of its own previously issued orders.  *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, No. 14–CV–764 RJS, 2015 WL 1442487, at *6 (S.D.N.Y. Mar. 27, 2015). *See also Zeiler v. Deitsch*, 500 F.3d 157, 170 (2d Cir. 2007) ("As a general rule, once a federal court has entered judgment, it has ancillary jurisdiction over subsequent proceedings necessary to vindicate its authority, and effectuate its decrees.") (quotation and citation omitted).

Moreover, since the Consent Order is already a judgment that Plaintiffs are entitled to enforce, which itself contains a permanent injunction, the traditional elements of an injunction are not applicable. *See Canada Dry Del. Valley Bottling Co. v. Hornell Brewing Co., Inc.*, 2013 WL 5434623, *11 (S.D.N.Y. Sept. 30, 2013).  Accordingly, to prevail, the Plaintiffs need only show by a preponderance of the evidence that Defendants have violated the Consent Order. *Id.* at *7.  Plaintiffs unquestionably meet this burden.

### A.    Defendants Have Violated the Consent Order

The evidence establishes that Defendants have violated, and absent action of this Court will continue to violate, the injunction provisions of the Consent Order.  By developing and producing the Motion Picture, Pyle, together with Cleopatra, knowingly violated the express

injunction contained in the Consent Order which permanently restrains and enjoins Pyle, and "all others in concert and participation with" him (such as Cleopatra), from, *inter alia*, using the name "Lynyrd Skynyrd" and using the name, likeness, portrait, picture, performances or biographical material of Ronnie or Gaines for any purpose whatsoever, except as specifically authorized under the narrowly circumscribed and extremely limited authorization contained therein. (Consent Order, ¶ 1(ii)-(iii).)

Indeed, the fact that the Motion Picture contravenes the express terms the Consent Order is evident on its face:  the current working title "Street Survivors:  ███████ of the Lynyrd Skynyrd Plane Crash" directly uses the name "Lynyrd Skynyrd," as well as "Street Survivors," the last album Lynyrd Skynyrd released just days before the plane crash.  This is no coincidence. While Cleopatra's principal, Mr. Perera, initially █████████████████████, testifying that, for instance, ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ (Perera Tr. 120:17-123:18; *see also* 132:13-133:12.)

Moreover, the script confirms that the Motion Picture is more than just Pyle's story, but rather purports to be a history of Lynyrd Skynyrd and its band members – exactly as Pyle has publicized it. █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████

And indeed, the Motion Picture is not just about the plane crash and the day before and after.  According to Pyle, it is ███████████████████████ (Pyle Tr., 103:14-17.)



██████████ and, as such, purports to be a history of the "Lynyrd Skynyrd" band.  (Pyle Tr., 96:19-99:24, 103:14-17.)

However, even if the Motion Picture were just about the plane crash as Defendants assert, it would still violate the Consent Order.  In the absence of obtaining the requisite authorizations set forth in Paragraphs 2 and 4 to use the name and history of Lynyrd Skynyrd (which, as Defendants concede, was not obtained here), the Consent Order contains only one permissible use of the name and history of Lynyrd Skynyrd, which does not apply to the Motion Picture: Paragraph 3 permits Pyle to exploit his "own respective life story," including in motion pictures, in connection with which he may "refer to 'Lynyrd Skynyrd' and related matters and to describe and portray his experience(s) with 'Lynyrd Skynyrd.'"  The Motion Picture is *not* Pyle's life story. █████████████████████████████

████████████████████████████

██████████████████████████ The Motion Picture thus "purports to be a history of the 'Lynyrd Skynyrd' band, as opposed to the life story of the applicable individual [Pyle]," and, as such, is expressly prohibited by the Consent Order's terms.

Accordingly, Pyle and Cleopatra have violated the express terms of the Consent Order, warranting enforcement of the permanent injunction contained therein to bar the Defendants from continuing any further work on, and from distributing and releasing, the Motion Picture.

**B.    Defendants' Attempts to Evade the Consent Order's Prohibitions Lack Merit**

Defendants do not dispute the limitations imposed by the Consent Order. Indeed, Pyle has flaunted his lack of authority to make the Motion Picture, gloating to the press that he appreciates Cleopatra "stepping up" to "go against the powers that be." Instead, in this action, Cleopatra has argued that (a) it is not bound by the Consent Order because it is not a party to the 1988 Action,[7] (b) it has not run afoul of the Consent Order, (c) it has a First Amendment right to publish the Motion Picture and an injunction enjoining it from publishing the Motion Picture would constitute an impermissible prior restraint, and (d) Plaintiffs are estopped from enforcing the Consent Order because they have violated it. Each of Cleopatra's arguments fails.

**1.    Cleopatra may not act in concert and participation with Pyle to violate the Consent Order**

As the Plaintiffs already made clear in their Reply Memorandum of Law in Further Support of Motion for Temporary Restraining Order and Preliminary Injunction (the "Plaintiffs' Reply") [Dkt. No. 26], Cleopatra, while not a party to the 1988 Action, is subject to the injunction contained in the Consent Order by its express terms, and the cases that Cleopatra has relied upon in support of its broad claim that consent orders are merely contracts that only bind the signatories are inapposite. (Plaintiffs' Reply, at 4.) Simply put, Orders of the Court are more than mere contracts.

---

[7] Cleopatra has also suggested that Pyle is not bound by the Consent Order because he purportedly signed it "Under Protest." Even if such a notation had any legal import under the circumstances (it does not, as even Pyle himself concedes (Pyle Tr., 32:14-16)), as noted above, Pyle subsequently expressly reaffirmed and agreed to be bound by the Consent Order. *See* discussion at 7-8, *supra*. Indeed, not once in response to the prior notices he has received, or those who have acted in concert and participation with him have received, over the years concerning conduct in violation of the Consent Order has Pyle contended that he is not bound by the Consent Order's terms.

Moreover, courts, including the Second Circuit Court of Appeals, commonly enter and uphold injunctions that restrain non-parties in concert or participation with the parties to an action from engaging in certain prohibited conduct. *See, e.g., S.E.C. v. Platinum Investment Corp.*, 98 Fed. Appx. 33, 36 (2d Cir. 2004) (affirming injunction against non-party grandfather who acted in "active concert or participation" with parties to district court action); *NML Cap., Ltd. v. Rep. of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013) ("Every injunction issued by a district court automatically forbids others—who are not directly enjoined but act "in active concert or participation" with an enjoined party—from assisting in a violation of the injunction."), *citing* Fed. R. Civ. P. 65(d).

Indeed, enforcement of such injunctions is expressly authorized by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 65(d)(2)(C) (providing that an injunction order may bind "other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B) [the parties or the parties' officers, agents, servants, employees, and attorneys]" so long as they "receive actual notice of it by personal service or otherwise."). "The rule is designed to codify the doctrine that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *S.E.C.*, 98 Fed. Appx. at 34 (citation omitted). Here, Pyle has praised Cleopatra for "stepping up" to do precisely that.

There is no question that Cleopatra, though a non-signatory to the Consent Order, is bound by the injunction contained therein. Despite Cleopatra's post-litigation efforts to distance itself from Pyle, Pyle and Cleopatra worked closely together – or "in concert or participation" – to develop and promote the Motion Picture, as reflected by, among other things, the Pyle-Cleopatra Agreement, the press release approved by Cleopatra, press interviews given by Pyle,

the script, the evidence demonstrating Pyle's intimate involvement with developing the script and choosing the actors for the Motion Picture, Pyle's numerous Cleopatra-funded trips to Los Angeles to work on the Motion Picture, and Cleopatra's payment to Pyle. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(Perera Tr., 108:13-21.)  Indeed, Pyle warned Cleopatra that the film could cause potential issues from the outset, in June 2016.  As such, Cleopatra had actual notice of the injunction contained in the Consent Order (as well as the balance of the restrictions contained therein) at least as of July 2016, and is thus bound by it.

### 2.   Cleopatra and Pyle have violated the Consent Order

Cleopatra's post-litigation description of the Motion Picture and Pyle's role is belied by public reports of the Motion Picture, the script itself, and the evidence adduced in discovery, which makes clear that, contrary to Cleopatra's assertions that Pyle's involvement was limited to interviews that he gave as part of broader "extensive" research that was done for the project, Pyle was a moving force behind the Motion Picture.  Among other things, he was interviewed on camera for two days for purposes of ████████ for the Motion Picture; ████████ ████████████████████████████████████████████████████████; participated in selecting actors for the Motion Picture, including for the roles of Rossington, Ronnie, and Gaines; and made several trips, as recently as May 2, 2017 – three days before this litigation was commenced – to California for the purpose of working on the Motion Picture, coaching the actors on how best to depict the band members, and filming scenes for the Motion Picture.  Indeed, it was only *after* this action was commenced that Defendants sought to create

the false impression of a more diminished role for Pyle with respect to the Motion Picture, at a time when the taint of his involvement could not be undone.

While Cleopatra would have been free on its own to make a movie concerning Lynyrd Skynyrd subject to acquiring any necessary rights, it may not, *together with Pyle*, make a movie that uses the name or history, in whole or in part, of Lynyrd Skynyrd or the name, likeness, portrait, picture, performances or biographical material of Ronnie or of Gaines in violation of the Consent Order nor continue its efforts to bring such movie to fruition despite its knowledge of the Consent Order's terms. Cleopatra has done so and has thereby violated the Consent Order.

### 3. The First Amendment does not permit Cleopatra to act in concert and participation with Pyle to violate the Consent Order and the Consent Order is not an impermissible prior restraint

The First Amendment does not permit Cleopatra to act in concert and participation with Pyle to violate the Consent Order. Cleopatra and Pyle are not simply making a documentary about a newsworthy event as they claim. They are making a film, which they themselves concede is not absolutely historically accurate (indeed, even Pyle is disconcerted by the ████ ████████████████████████████████████████████████████ (Pyle Tr., 95:20-96:18)), that uses the name "Lynyrd Skynyrd" and the name, likeness, portrait, picture, performances or biographical material of Ronnie and Gaines and purports to tell the story of the band, and its tragic end, without authorization – exactly what the Consent Order prohibits.

Moreover, this Court's Consent Order is unlike the order in the case on which Cleopatra primarily relies for its First Amendment argument, *Crosby v. Bradstreet & Co.*, 312 F.2d 483 (2d Cir. 1963), as well as cases applying *Crosby* and the recent decision of the United States Supreme Court in *Packingham v North Carolina*, No. 15-1194, --- S. Ct. ---, 2017 WL 2621313 (U.S. June 19, 2017). Rather than containing a vague or sweeping restriction on speech, the

Consent Order enjoins only the 1988 Defendants (including Pyle) and those "in concert or participation" with them (which, here, includes Cleopatra) from, *inter alia*, using the name "Lynyrd Skynyrd" and the name, likeness, portrait, picture, performances or biographical material of Ronnie or Gaines without authorization, as was bargained for to end the 1988 Action. As such, the restrictions contained in the Consent Order are clear and narrowly tailored to serve specific private, commercial, and reputational interests. Such narrowly tailored injunctions have been upheld consistently in the face of arguments alleging an unconstitutional prior restraint. *See, e.g., Retail Credit Co. v. Russell*, 218 S.E.2d 54, 62-63 (Ga. 1975) (distinguishing *Crosby* and holding that order enjoining publication of an adjudicated libel was "clear and sweeps no more broadly than necessary" and thus did not constitute an unconstitutional prior restraint).

Moreover, classic prior restraint cases (including cases that Cleopatra has cited) are dramatically different from this one, and involve vague and/or broad prohibitions on protected speech, such as the expression of news and commentary on current events and other matters of profound public importance. *See e.g. Near v. State of Minn. ex rel. Olson*, 283 U.S. 697 (1931) (statute suppressing as a public nuisance scandalous and defamatory newspapers); *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) (injunction against newspaper publication of classified historical study on Vietnam War policy); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) (order restraining the news media from reporting certain details about impending murder trial); *CBS, Inc. v. Davis*, 510 U.S. 1315 (1994) (injunction prohibiting news media from airing videotape footage of unsanitary practices in the meat industry). There is no such protected speech at issue here. Indeed, Defendants have no First Amendment right to violate the Plaintiffs' protected rights as set forth in the Consent Order. *See Beastie Boys v. Monster Energy Co.*, 87 F. Supp. 3d 672, 679 (S.D.N.Y. 2015) (while defendant "surely" had "First Amendment right to

express itself," "it has no legitimate interest, let alone a First Amendment interest, in further dissemination or use" of video that infringed plaintiffs' copyrights and trademark rights).

### 4.     Plaintiffs are not estopped from enforcing the Consent Order

Cleopatra has stated that it may contend that Plaintiffs' claims are barred by unclean hands because they have allegedly violated the Consent Order. Any such argument is unavailing. First, Plaintiffs have not violated any provision of the Consent Order, let alone the injunction provisions they are seeking to enforce. To the contrary, each modification of the terms of the Consent Order over the past approximately thirty years that has been necessitated with the passage of time has been expressly agreed upon, either as memorialized in writing or as performed by the parties as though bound for years, if not decades. *See* 1988 Opinion, 690 F. Supp. at 205-206 (equitably enforcing contract which the parties had performed as though bound for ten years). Pyle never once took any action to enforce any alleged breach of the Consent Order by Plaintiffs. (Pyle Tr., 65:1-23.)

Significantly, in all the years since the Consent Order was entered, one thing has remained constant: the Plaintiffs have consistently enforced the injunction provisions of the Consent Order at every opportunity, including against Pyle and others working in concert and participation with Pyle. Plaintiffs have throughout the decades acted to protect and preserve the legacy of Lynyrd Skynyrd and the quality of its music. In view of such vigorous enforcement by Plaintiffs, there can be no argument that Plaintiffs have waived, or are somehow estopped from enforcing, the injunction contained in the Consent Order against Defendants. Indeed, plaintiffs have not been so foreclosed even in cases where, unlike Plaintiffs, they had a comparatively lackluster history of enforcing their rights. *See, e.g., Johnson & Johnson v. Wagonfeld*, 206 F. Supp. 30, 31 (S.D.N.Y. 1960) (holding that plaintiff's conceded "failure in the past to enforce its

fair trade rights are irrelevant in the instant case so long as presently it vigorously enforces such rights").

**II.   EVEN IF PLAINTIFFS WERE REQUIRED TO MEET THE PERMANENT INJUNCTION STANDARD ANEW, PLAINTIFFS ARE ENTITLED TO AN INJUNCTION ENJOINING THE RELEASE AND DISTRIBUTION OF THE MOTION PICTURE**

Although this Court has the unquestionable authority to enforce the permanent injunction contained in the Consent Order against the Defendants and the Consent Order squarely prohibits the Defendants' conduct, the Plaintiffs are entitled to permanent injunctive relief even if they were required to meet the standard anew. The Court may grant a permanent injunction where the plaintiff has shown success on the merits and (1) that it has suffered an irreparable injury, (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted, and (4) that the public interest would not be disserved by a permanent injunction. *Sub-Zero, Inc. v. Sub Zero NY Refrigeration & Appliances Servs., Inc.*, 2014 WL 1303434, *6 (S.D.N.Y. Apr. 1, 2014) (internal citation omitted); *U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539-40 (S.D.N.Y. 2011) (Sweet, J.), *aff'd*, 511 Fed. Appx. 81 (2d Cir. 2013). The Plaintiffs have met this burden.

    **A.   Plaintiffs Will Succeed on the Merits**

As set forth above, Plaintiffs will establish success on the merits: Defendants' collaboration to develop and produce the Motion Picture violates the express terms of the Consent Order, including, without limitation, Paragraphs 1, 3, 4, 5, and 24 of the Consent Order.

    **B.   Plaintiffs Will Suffer Irreparable Injury Absent A Permanent Injunction**

Plaintiffs will suffer irreparable injury if the publication of the Motion Picture is not enjoined. If the Motion Picture is released and distributed, it will put in solely Pyle's hands the

telling of the most significant event in the band's history and the personal history of those killed in the crash – the heart of what is precluded by the Consent Order. It also will dilute the marketplace for a film about Lynyrd Skynyrd made consistent with the terms of the Consent Order, destroy the Plaintiffs' right to use productively and lawfully the name and history of Lynyrd Skynyrd and the name, likeness, portrait, picture, performances or biographical material of Ronnie or of Gaines in an authorized manner consistent with Paragraphs 3, 4, and 5 of the Consent Order (which they are actively pursuing and for which a producer has been selected), and harm the Lynyrd Skynyrd name, brand, and reputation.

There is also a substantial risk of reputational harm to the Plaintiffs as a result of (a) any objectionable content concerning Lynyrd Skynyrd, Ronnie, or Gaines contained in an unauthorized motion picture, including scenes that, █████████████████, veer away from historical accuracy,[8] (b) the potential spillover effect of Pyle's sordid personal history, and (c) the Plaintiffs' lack of input on any aspect of the Motion Picture or its production, including its

---

[8] Indeed, while the Motion Picture purports to recount the plane crash as experienced by Pyle with the alleged goal of absolute historical accuracy, such alleged accuracy is belied by multiple scenes and details that are demonstrably false ███████████████████████████ For example, the Motion Picture depicts ███

█████████████████████████████████████

██████████████████████████████ (Perera Tr., 161:16-163:8.) Moreover, the Motion Picture ████

████ (Pyle Tr., 95:20-96:18.) Prevention of the threat to the Lynyrd Skynyrd name, brand, and reputation that such unauthorized (and, in this case, inaccurate) accounts can cause are among the protections the parties bargained for in the Consent Order, which requires prior written approval before the history of Lynyrd Skynyrd can be exploited in whole or in part (and which approval was not obtained).

alleged screenplay writer and director.[9]   Each of these harms constitutes irreparable harm. *See* 1988 Opinion, 690 F.Supp. at 204 ("if in this case confusion or a valid contract can be shown, irreparable injury follows"); *U.S. Polo Assn'n*, 800 F. Supp.2d at 540 ("loss of control over one's reputation is neither calculable nor precisely compensable") (citation and internal quotation omitted); *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 621-23 (S.D.N.Y. 2010) (reputational harm from a breach of an agreement may constitute irreparable harm).

Further, there is a significant risk that consumers will be confused as to the source of the Motion Picture. Cleopatra's proposed solution of including "cards" containing disclaimers at the beginning and end of the Motion Picture does not ameliorate the aforementioned irreparable harm that the publication of the Motion Picture would cause Plaintiffs.   In any event, such "cards" would only be seen by consumers that have already paid to view the Motion Picture. As a result, they would hardly serve to counter the public perception caused by Pyle's promotion of the Motion Picture that it is "official." *See* 1988 Opinion, 690 F. Supp. at 209-10 (finding that dedication to the victims of the 1977 crash, visible only after on purchases the album and removes its plastic wrapper, was insufficient to alleviate potential consumer confusion). Cards are not a contemplated protection under the Consent Order.

In sum, Plaintiffs will suffer irreparable harm if the Motion Picture is released.

---

[9] Cohn, who allegedly wrote the script and directs the Motion Picture, has been described by William Hughes of the A.V. Club as "a direct-to-DVD auteur whose five-to-six film-a-year output includes horror schlock like Hulk Blood Tapes, and the disastrously cheap 50 Shades of Grey wanna-be Bound" whose work "doesn't necessarily fill .us with confidence about the movie's take on the band's history or the fateful crash, even if Pyle—who's had disagreements over the years with his fellow survivors over Lynyrd Skynyrd's legacy—promises the film will present his bandmates as they actually were: 'real, funny people who loved the music.'"

**C.    Remedies Available at Law are Inadequate to Compensate Plaintiffs**

Remedies available at law are inadequate to compensate Plaintiffs for their irreparable injury because the losses of reputation and goodwill are not precisely quantifiable. *Sub-Zero*, 2014 WL 1303434, at \*6; *U.S. Polo Assn'n*, 800 F. Supp.2d at 541; *Car-Freshener Corp. v. Excellent Deals, Inc.*, 2011 WL 3846520, \*4 (S.D.N.Y. Aug. 1, 2011). Due to the substantial but unquantifiable nature of Plaintiffs' damages, the harm must be prevented before it accrues, rather than attempting the impossible task of trying to quantify it after the fact. *See Payroll Express Corp. v. Aetna Cas. & Surety Co.*, 659 F.2d 285, 292 (2d Cir. 1981) (legal remedies may be found inadequate where any calculation of damages would be speculative). Indeed, monetary damages awarded "after the fact" are inherently inadequate where, as here, the Plaintiffs have been deprived of their legal rights. *See Broadcast Music, Inc. v. Wexford INR LLC*, 2014 WL 4626454, \*9 (S.D.N.Y. Sept. 15, 2014).

**D.    The Balance of the Hardships Tips Decidedly in Favor of Plaintiffs**

The balance of the hardships also tips decidedly in favor of Plaintiffs. "Generally, defendants do not suffer hardship when required to comply with the law...On the other hand, plaintiffs do suffer hardship when deprived of their legal rights." *Broadcast Music*, 2014 WL 4626454, at \*9. *See also Broadcast Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184, 196 (S.D.N.Y. 2016) ("[T]he Court cannot detect any hardship that an injunction obliging defendants to comply with their legal duties would impose on them."); *Beastie Boys*, 87 F.Supp.3d at 679 (finding that a permanent injunction would protect the plaintiffs from further injury without imposing any cognizable hardship on defendant). The Consent Order's terms are precisely what the parties bargained for to end the 1988 Action, and Plaintiffs are entitled to have the Consent Order enforced as written and entered. *Berger v. Heckler*, 771 F.2d 1556, 1579 (2d Cir. 1985).

In addition, Defendants were provided with ample opportunity to avoid violating the Consent Order. As early as June 2016, when the project commenced and Pyle executed his contract with Cleopatra, Pyle warned Cleopatra of potential ███████████████ ███████ due to prior litigation. (Perera Tr., 49:17-52:17.) Mere weeks later, in July 2016, Cleopatra received the Cease and Desist Letter from Plaintiffs notifying it of the restrictions contained in the Consent Order and ██████████████████████████ In addition, Pyle has had notice of the restrictions contained in the Consent Order for almost thirty years and has been consistently reminded of those restrictions over the decades.

Nevertheless, in knowing defiance of the Consent Order's express terms, Defendants continued to work together on the Motion Picture, even as recently as early May 2017, when Cleopatra paid for Pyle to fly to California to film a cameo for the film. (Perera Tr., 137:7-138:15.) It was not until May 9, 2017, four days *after* Plaintiffs commenced this action and at which point the filming on the Motion Picture was substantially completed, that Cleopatra finally decided that ███████████████████████ (Perera Tr., 206:13-15; *see also id.* at 207:13-209:4 and 211:9-13.) Defendants then engaged in a charade to create a false record and give the false impression that Pyle's involvement in the Motion Picture ceased as of either ██████████ or ████████████

Moreover, under the circumstances, Cleopatra and Pyle will suffer no abridgment of their First Amendment rights, and no prejudice that would outweigh the hardship to Plaintiffs. *See Beastie Boys*, 87 F. Supp. 3d at 679. The permanent injunction that Plaintiffs seek is tailored to enforce the Plaintiffs' rights under the Consent Order and does not impinge on any of Defendants' constitutional rights. Accordingly, the balance of hardships tips in Plaintiffs' favor. *See Car-Freshener Corp.*, 2011 WL 3846520, at *5.

E.    **The Public Interest Will Be Served By the Issuance of a Permanent Injunction**

Lastly, the public interest will be served by the issuance of a permanent injunction. The injunction, in the form of the Consent Order, has already been issued, and the public has an interest in the enforcement of orders of this Court. If orders of this Court are not enforced, public confidence in the institution will be severely eroded, and the judicial interest in settling litigations will be undermined. Moreover, a permanent injunction will eliminate possible consumer confusion over which of two competing films is authorized, and the Defendants cannot claim that the public will be injured in any manner if their film is not released, particularly since, as they admit, their film contains embellishments and other details that are not historically accurate. *See U.S. Polo Ass'n*, 800 F. Supp.2d at 541 ("The consuming public has a protectable interest in being free from confusion, deception and mistake.").

III.   **PLAINTIFFS ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES**

"Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the language is sufficiently clear." *Metro Foundation Contractors, Inc. v. Arch Ins. Co.*, 551 Fed. Appx. 607, 610 (2d Cir. 2014) (citation omitted). The attorneys' fees provision of the Consent Order could not be any clearer: "An amount equal to actual and reasonable attorneys' fees shall be awarded to the prevailing party in any proceeding brought to enforce the terms and conditions of this order." (Consent Order, ¶ 34.) This action is precisely such a proceeding. Accordingly, if the Plaintiffs prevail at trial, they are entitled to an award of actual and reasonable attorneys' fees under the Consent Order. *See Arbitration Before the N.Y. Stock Exchange, Inc. v. Pierce*, 2004 WL 2072460, *15 (S.D.N.Y. Sept. 8, 2004) (Sweet, J.).

4812560.1                                       35

## CONCLUSION

By reason of the foregoing, the Plaintiffs are entitled to the permanent injunction and attorneys' fees that they seek in this action.

Dated:  June 26, 2017

By: /s/ *Richard G. Haddad*
        Richard G. Haddad
        Sandor Frankel
        Pauline McTernan
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
rhaddad@otterbourg.com
sfrankel@otterbourg.com
pmcternan@otterbourg.com

*Attorneys for Plaintiffs*

4812560.1                              36