**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| RONNIE VAN ZANT, INC., GARY R. ROSSINGTON, JOHNNY VAN ZANT, BARBARA HOUSTON, as the Trustee of the ALLEN COLLINS TRUST, and ALICIA RAPP and CORINNA GAINES BIEMILLER, as the Personal Representatives of the Estate of STEVEN GAINES, | Case No: 17-cv-3360 |
|         Plaintiffs, | |
|    -against- | |
| ARTIMUS PYLE (a/k/a THOMAS D. PYLE), CLEOPATRA RECORDS, INC., JOHN DOE, JANE DOE, XYZ CORPORATION, and XYZ LLC (the names of the last four defendants being fictitious and unknown to plaintiffs, and intended to designate persons or entities that have or may have a role in the production and distribution of the Motion Picture complained of in the Complaint herein), | |
|         Defendants. | |

---

**CLEOPATRA'S PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

MANDEL BHANDARI LLP
Evan Mandel
Robert Glunt
80 Pine Street, 33rd Floor
New York, NY 10005
T:  (212) 269-5600
F:  (646) 964-6667

*Attorneys for Defendants*
*Cleopatra Records, Inc. and Cleopatra Films*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................ 1

FINDINGS OF FACT ....................................................................................... 4

    Cleopatra and Its Motion Picture ................................................................ 4

    Plaintiffs Learn about Cleopatra's Film and Decide Not To Sue ....................... 7

    The Film is Not a History of the Band........................................................ 10

    The Consent Decree .............................................................................. 11

    Plaintiffs' Violation of the Consent Decree ................................................ 12

    Other Works about the Band.................................................................... 13

    Plaintiffs' Failed Efforts To Produce a Film or Book .................................... 16

    Plaintiffs' Latest Project ........................................................................ 17

CONCLUSIONS OF LAW ............................................................................... 18

    Requirements for a Permanent Injunction .................................................. 18

    The First Amendment and the Rule Against Prior Restraint Preclude
    Any Injunction ..................................................................................... 18

    Defendants Have Not Waived Their First Amendment Rights ......................... 25

    Laches Bars Any Injunction in this Case.................................................... 27

    Unclean Hands Bars Any Injunction ......................................................... 29

    Artimus Pyle is Not Bound by the Consent Decree....................................... 31

    Cleopatra is Not Bound by the Consent Decree ........................................... 31

    Cleopatra Did Not Violate the Consent Decree ........................................... 34

    The Lack of Irreparable Harm Precludes an Injunction.................................. 36

    Balancing Hardships Weights Against and Injunction ................................... 40

    Plaintiffs' Claims Against Pyle Are Moot................................................... 41

    No Missing Witness Inference Is Warranted ............................................... 42

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*ACLU of Illinois v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ................................................................. 18

*Aguilar v. Immigration & Customs Enf't Div. of the U.S. Dep't of Homeland Sec.,*
  811 F. Supp. 2d 803 (S.D.N.Y. 2011) .................................................... 17

*Alcatel USA, Inc. v. DGI Techs., Inc.,*
  166 F.3d 772 (5th Cir. 1999) ................................................................. 29

*Alexander v. United States,*
  509 U.S. 544 (1993)............................................................................... 19

*Allens Creek/Corbetts Glen Pres. Grp., Inc. v. West,*
  2 F. App'x 162 (2d Cir. 2001)................................................................ 28

*Ass'n for Retarded Citizens of Connecticut, Inc. v. Thorne,*
  30 F.3d 367 (2d Cir. 1994) ............................................................... 31, 32

*Beastie Boys v. Monster Energy Drinks,*
  87 F. Supp. 3d 672 (S.D.N.Y. 2015) ...................................................... 22

*Bergenline Prop. Grp., LLC v. Coto,*
  Index No. A-0259-14T2, 2015 WL 7428755
  (N.J. App. Div. Nov. 10, 2015)............................................................... 30

*Burroughs v. Metro-Goldwyn Mayer, Inc.,*
  491 F. Supp. 1320 (S.D.N.Y.) ........................................................... 37, 39

*Cameo Convalescent Ctr., Inc. v. Senn,*
  738 F.2d 836 (7th Cir. 1984) ................................................................. 42

*Canada Dry Delaware Valley Bottling Co. v. Hornell Brewing Co., Inc.,*
  Case No. 11 Civ. 4308 (PGG), 2013 WL 5434623
  (S.D.N.Y. Sept. 30, 2013)....................................................................... 36

*CBS, Inc. v. Davis,*
  510 U.S. 1315 (1994)....................................................................... 20, 23

*Chirco v. Crosswinds Communities, Inc.,*
  474 F.3d 227 (6th Cir. 2007) ................................................................. 28

*Church Mut. Ins. Co. v. Kleingardner,*
  2 Misc. 3d 676, 683, 774 N.Y.S.2d 265
  (Sup. Ct. 2003)....................................................................................... 30

*Clonus Assocs. v. Dreamworks, LLC,*
   417 F. Supp. 2d 248 (S.D.N.Y. 2005) ................................................. 39

*Cobalt Multifamily Inv'rs I, LLC v. Shapiro,*
   Case No. 06 CIV. 6468 KMW MHD, 2013 WL 5418588
   (S.D.N.Y. Sept. 27, 2013)................................................................. 31

*Conopco, Inc. v. Campbell Soup Co.,*
   95 F.3d 187 (2d Cir. 1996) ........................................................ 26, 28

*Consumers Union of United States, Inc. v. General Signal Corp.,*
   724 F.2d 1044 (2d Cir. 1983) ............................................................ 39

*Correction Officers Benev. Ass'n v. Kralik,*
   Case No. 04 CIV. 2199 (PGG), 2009 WL 856395
   (S.D.N.Y. Mar. 26, 2009) ................................................................. 41

*Crosby v. Bradstreet & Co.,*
   312 F.2d 483 (2d Cir. 1963) ........................................................ 21, 40

*CRP/Extell Parcel I, L.P. v. Cuomo,*
   394 Fed. Appx. 779 (2d Cir. 2010) ..................................................... 37

*Dunn v. Carey,*
   808 F.2d 555 (7th Cir. 1986) ............................................................. 30

*E.E.O.C. v. Recruit U.S.A., Inc.,*
   939 F.2d 746 (9th Cir. 1991) ............................................................. 29

*Ellis v. Gallatin Steel Co.,*
   390 F.3d 461 (6th Cir. 2004) ............................................................. 36

*Elrod v. Burns,*
   427 U.S. 347 (1976)......................................................................... 40

*Ex parte Wright,*
   443 So. 2d 40 (Ala. 1983)................................................................. 30

*Ford Motor Co. v. Lane,*
   67 F. Supp. 2d 745 (E.D. Mich. 1999)................................................ 20

*Haas v. Leo Feist, Inc.,*
   234 F. 105 (S.D.N.Y. 1916)............................................................... 26

*Hicks v. Casablanca Records,*
   464 F. Supp. 426 (S.D.N.Y. 1978) ..................................................... 18

*In re United Pan-Europe Comms, N.V.*,
  Case Nos. 02–16020 (BRL), M–47(RWS), 2003 WL 221819
  (S.D.N.Y. Jan. 30, 2003) ................................................................ 38

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ....................................................................... 17

*JSG Trading Corp. v. Tray–Wrap, Inc.*,
  917 F.2d 75 (2d Cir. 1990) ............................................................ 36

*Kamat v. Kurtha*,
  Case No. 05 CIV.10618 KMW THK, 2008 WL 5505880
  (S.D.N.Y. Apr. 14, 2008) ............................................................... 27

*Keith v. Volpe*,
  118 F.3d 1386 (9th Cir. 1997) ...................................................... 30

*Lake James Community Volunteer Fire Dept., Inc. v. Burke*,
  149 F.3d 277 (4th Cir. 1998) ........................................................ 24

*Latin Am. Music Co. v. Am. Soc. of Composers Authors & Publishers*,
  593 F.3d 95 (1st Cir. 2010) .......................................................... 42

*Legal Aid Soc'y v. City of N.Y.*,
  114 F. Supp. 2d 204 (S.D.N.Y. 2000) ......................................... 24

*Leonard v. Clark*,
  12 F.3d 885 (9th Cir. 1993) .......................................................... 24

*Madison Square Garden Boxing, Inc. v. Shavers*,
  562 F.2d 141 (2d Cir. 1977) ......................................................... 31

*Marinaccio v. Boardman*,
  Case No. 1:02 CV 00831 NPM, 2005 WL 928631
  (N.D.N.Y. Apr. 19, 2005) ......................................................... 24, 25

*Martin v. Wilks*,
  490 U.S. 755 (1989) ....................................................................... 31

*Matter of Providence Journal Co.*,
  820 F.2d 1342 (1st Cir. 1986) ................................... 19, 21, 23, 40

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees and Rest. Employees Int'l Union*,
  239 F.3d 172 (2d Cir. 2001) .................................... 19, 22, 24

*Monster Comms., Inc. v. Turner Broadcasting Sys., Inc.*,
  935 F. Supp. 490 (S.D.N.Y. 1996) ............................................. 40

*Motorola Credit Corp. v. Uzan*,
   561 F.3d 123 (2d Cir. 2009) ............................................................ 28, 29

*N.Y. Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013) ............................................................ 40

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971) ................................................... 20, 21, 23, 40

*Nat'l Football League Players Ass'n v. Nat'l Football League Props., Inc.*,
   Case No. 90 Civ. 4244 (MJL), 1991 WL 79325
   (S.D.N.Y. May 7, 1991) ................................................................... 38

*Near v. State of Minnesota ex rel. Olson*,
   283 U.S. 697 (1931) ........................................................................ 22

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1976) ........................................................................ 19

*New Era Publications International, ApS v. Henry Holt and Company, Inc.*,
   873 F.2d 576 (2d Cir. 1989) ............................................................ 27

*New Kids on the Block v. News Am. Pub., Inc.*,
   971 F.2d 302 (9th Cir. 1992) ........................................................... 23

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
   166 F.3d 65 (2d Cir. 1999) .............................................................. 23

*Novalogic, Inc. v. Activision Blizzard*,
   41 F. Supp. 3d 885 (C.D. Cal. 2013) .............................................. 26

*O&L Assocs. v. Del Conte*,
   601 F. Supp. 1463 (S.D.N.Y. 1985) ............................................... 33

*Odom v. Senkowski*,
   Case No. 96-CV-554, 1997 WL 458450,
   (N.D.N.Y. Aug. 7, 1997) ................................................................. 41

*Perkins v. City of Chicago Heights*,
   47 F.3d 212 (7th Cir. 1995) ............................................................. 30

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945) ........................................................................ 29

*Procter & Gamble Co. v. Bankers Trust Co.*,
   78 F.3d 219 (6th Cir. 1996) ..................................................... passim

*Retail Credit Co. v. Russell*,
  218 S.E.2d 54 (Ga. 1975) ................................................................ 22

*Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.*,
  754 F. Supp. 2d 616 (S.D.N.Y. 2010) ............................................. 38

*Roach v. Morse*,
  440 F.3d 53 (2d Cir. 2006) ....................................................... 17, 35

*Rodriguez v. Walker*,
  Case No. 97 CIV. 2823 KTD, 1999 WL 61834
  (S.D.N.Y. Feb. 9, 1999) ................................................................. 42

*Rudd Equip. Co., Inc. v. John Deere Constr. & Forestry Co.*,
  834 F.3d 589 (6th Cir. 2016) ......................................................... 26

*S.E.C. v. Platinum Inv. Corp.*,
  98 F. App'x 33 (2d Cir. 2004) ........................................................ 33

*Saint Laurie Ltd. v. Yves Laurent Am., Inc.*,
  Case No. 13-CV-6857 (DAB), 2015 WL 12991205
  (S.D.N.Y. Mar. 27, 2015) ............................................................... 36

*Saratoga Vichy Spring Co. v. Lehman*,
  625 F.2d 1037 (2d Cir. 1980) ........................................................ 26

*Schad v. Borough of Mt. Ephraim*,
  452 U.S. 61 (1981) ......................................................................... 18

*Scripps-Howard Broad. Co. v. Regency Elecs., Inc.*,
  765 F.2d 146 (6th Cir. 1985) ......................................................... 42

*SEC v. Haligiannis*,
  608 F. Supp. 2d 444 (S.D.N.Y. 2009) ............................................ 33

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975) ....................................................................... 18

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
  646 F. Supp. 2d 510 (S.D.N.Y. 2009) ............................................ 29

*Superior Films, Inc. v. Dep't of Educ. of State of Ohio, Div. of Film Censorship*,
  346 U.S. 587 (1954) ....................................................................... 17

*Tiffany (NJ) Inc. v. eBay Inc.*,
  600 F.3d 93 (2d Cir. 2010) ....................................................... 23, 34

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
   60 F.3d 27 (2d Cir. 1995) ........................................................... 36

*United States v. Caccia*,
   122 F.3d 136 (2d Cir. 1997) ....................................................... 43

*United States v. City of N.Y.*,
   198 F.3d 360 (2d Cir. 1999) ....................................................... 31

*United States v. Gaskin*,
   364 F.3d 438 (2d Cir. 2004) ....................................................... 43

*United States v. Int'l Broth. Of Teamsters*,
   266 F.3d 45 (2d Cir. 2001) ......................................................... 32

*United States v. Mittelstaedt*,
   31 F.3d 1208 (2d Cir. 1994) ....................................................... 42

*Velez v. Novartis Pharm. Corp.*,
   Case No. 04 CIV. 9194 CM, 2010 WL 11043081
   (S.D.N.Y. Feb. 25, 2010)............................................................ 42

*Watford v. Scully*,
   Case No. 88 CIV. 8372 (RWS), 1989 WL 58062
   (S.D.N.Y. May 24, 1989)............................................................ 41

*West v. West*,
   825 F. Supp. 1033 (N.D. Ga. 1992) ............................................ 29

*Williams v. Arctic Cat, Inc.*,
   Case No. 3:11-CV-445, 2014 WL 1028476
   (N.D.N.Y. Mar. 13, 2014)........................................................... 42

*Worldwide Diamond Trademarks, Ltd. v. Blue Nile, Inc.*,
   Case No. 14-CV-3521 (VSB), 2014 WL 7933941
   (S.D.N.Y. Nov. 6, 2014) ........................................................ 36, 38

## **Rules**

Fed. R. Civ. P. 65(d) .................................................................... 33

## TABLE OF ABBREVIATIONS

| Abbreviation | Item |
|---|---|
| Cleopatra | Defendants Cleopatra Records and Cleopatra Films |
| Cohn | Designations of the Deposition of Jared Cohn Dated June 26, 2017 |
| DX | Cleopatra's Trial Exhibits |
| PX | Plaintiffs' Trial Exhibits |
| Pyle | Designations of the Deposition of Artimus Pyle Dated June 20, 2017 |
| TR | Trial Transcript |

## PRELIMINARY STATEMENT

Plaintiff seek only one thing in this case:  an injunction prohibiting Cleopatra from publishing its film about a plane crash that involved the band Lynyrd Skynyrd.  This is Plaintiffs' third attempt to obtain this relief.  Plaintiffs first sought a TRO, and Judge McMahon denied it.  Plaintiffs then sought a Preliminary Injunction, and this Court denied it.  Plaintiffs' third bite at the apple is no more meritorious than its first two.  Plaintiffs' sole claim for an injunction fails for the following seven reasons:

*First*, Cleopatra has a constitutional right to publish its film.  It is beyond serious dispute that the Constitution protects free expression for purposes both academic and commercial, and whether embodied in speech, writing, or filmmaking.  And at the heart of First Amendment jurisprudence is the longstanding rule against prior restraints.  There is no "acting in concert" exception to the First Amendment or the rule against prior restraints and no authority upholding a prior restraint in a case bearing even a passing resemblance to this one.  While Plaintiffs attempt to argue waiver, they cannot locate a single case in which a party waived its First Amendment rights simply by acting in concert with someone else.

*Second*, Plaintiffs' claims are barred by laches.  In July 2016, Plaintiffs sent Cleopatra a cease and desist letter, to which Cleopatra responded by advising Plaintiffs that it had a First Amendment right to make a film.  Plaintiffs freely admit that, in August 2016, Cleopatra told them that it was making the film.  Despite this, Plaintiffs waited almost a year to bring this action.  In the interim, Cleopatra spent over $1 million making its film.  The facts of this case are virtually identical to those that the Second Circuit held "mandated" a finding of laches in *New Era Publications Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576 (2d Cir. 1989).

***Third***, Plaintiffs will not suffer any harm, let alone irreparable harm.  Plaintiffs admit that movies about the band increase record sales and ticket sales.  Plaintiffs have been trying and failing to make a movie for thirty years, and they were a lot closer to making a film two decades ago than they are today.  They're never going to make a film; and, even if they do, it would be the seventh film about Lynyrd Skynyrd, which is no different from being the sixth film about the band.  Plaintiffs freely admit that they have been violating the Consent Decree provisions requiring that the date follow the band's name and that certain musicians participate in each performance and recording precisely because the Plaintiffs are no longer concerned with consumer confusion.  Thus, consumer confusion is not a basis for issuing an injunction.  Finally, Plaintiffs admit that they hope to include Artimus Pyle in their own film, conclusively proving that Plaintiffs will not suffer any reputational harm with Pyle being associated with the band or Cleopatra's film.  The undisputed facts preclude any showing of harm, let alone irreparable harm.

Cleopatra respectfully submits that the Court need proceed no further than these first three defects in Plaintiffs' claim.  However, Plaintiffs' claims fail for four other reasons:

***Fourth***, Plaintiffs have repeatedly and brazenly violated the very order that they now seek to enforce.  Three provisions in the Consent Decree are designed to protect the integrity of the band – a requirement that the year follow the band's name, a requirement that the band perform only if certain enumerated musicians participate, and limitations on who can make a film or book or otherwise exploit the history of the band.  Plaintiffs admit that they have been violating the first two provisions for decades.  Plaintiffs have also failed to pay the royalties that are required by the Consent Decree.  As a result, Plaintiffs' unclean hands prevents them from obtaining the injunction they seek.

***Fifth***, the only basis for Plaintiffs' permanent injunction is a 1988 Consent Decree that Cleopatra never signed.  The Consent Decree was issued in a case in which Cleopatra was not a party and had no opportunity to appear, a case seeking to enforce a "blood oath" that Cleopatra never swore.  Cleopatra never agreed to the deal that Plaintiffs want the Court to enforce and never surrendered the rights that Plaintiffs would have the Court strip away.  Cleopatra is not bound by the Consent Decree and cannot be held it its terms.

***Sixth***, Cleopatra has not violated the Decree.  It is settled law that a party cannot violate an order until they have notice of it, which did not happen until late July 2016.  There is zero evidence that Cleopatra did anything after late July 2016 other than obtain basic background information from Pyle.  And even Plaintiffs do not claim that obtaining information from Pyle violates the Decree, which does not constitute "acting in concert" with Pyle.  Instead, Plaintiffs attempt to muddy the water by citing pre-July 2016 conduct.  But this Court cannot punish Cleopatra for violating an order that it had not received, indeed an order that Plaintiffs insisted be kept secret under seal.

***Seventh***, Artimus Pyle, the party with whom Cleopatra allegedly "acted in concert," did not assent to the Consent Decree, signing the document only "under protest."  As a consequence, neither he nor Cleopatra can be held to its terms.

***Finally***, the claim for an injunction against Pyle is moot since it is undisputed that he does not have access to Cleopatra's film or the legal or physical ability to exhibit or distribute the film.

Cleopatra renews its motion for summary judgment and its motion for judgment as a matter of law.  Under any reading of the facts, Plaintiffs' request for an injunction fails as a matter of law.

## FINDINGS OF FACT

**Cleopatra and Its Motion Picture**

1.      Defendant Cleopatra Records ("Cleopatra") is a Los Angeles based Independent Recording Label.  TR 115:4-19.

2.      In addition to producing music, Cleopatra also makes and distributes films about musical groups, musicians, and events that have historical importance in rock and roll history. TR 116:25-118:4.

3.      For three years, Cleopatra has been interested in making a film about the 1977 plane crash the killed many of the original members of Lynyrd Skynyrd.  TR 118:25-119:12.

4.      Lynyrd Skynyrd is a famous American band that helped to popularize the "Southern Rock" genre during the 1970s.  Known for hits like "Sweet Home Alabama" and "Free Bird," the band toured all over the world, and released multiple platinum records. TR 10:2-15.

5.      In early 2016, Cleopatra decided to move forward with a feature length film based on the 1977 crash.  TR 119:1-20.

6.      Cleopatra engaged Jared Cohn, a director and screenwriter, to write and direct the film.  DX 805; TR 131:8-132:3.

7.      In the interests of historical accuracy, Cleopatra also contacted Artimus Pyle, one of the band members who survived the crash.  Pyle is one of only a few living eyewitnesses to the plane crash itself.  TR 121:6-14.

8.      At Cleopatra's request, Pyle indicated that he would be willing to provide information about the events.  DX 9; TR 123:4-125:9.

9.      In exchange, Cleopatra provided Pyle with a contract entitling him to 5% of the film's profits and a credit as a "consultant" or "co-producer."  DX 9.

10.     Pyle was hired to be a "historical consultant," i.e. to provide information about his experience in the plane crash.  TR 127:4-8; 139:2-6.

11.     In addition to his work as a historical consultant, Pyle was to make a cameo appearance in the film.  DX 9.

12.     Other than expressing an interest in having some of his original music appear in the film, Pyle made no effort to negotiate the terms of his contract with Cleopatra.  TR 130:13-15; 201:8-10.

13.     In June 2016, Pyle traveled to Los Angeles.  TR 142:19-22.

14.     During the June 2016 trip, Cohn interviewed Pyle for 11 hours, hoping to document as much information as possible about the crash.  Cohn 42:24-43:16; TR 142:23-143:6.

15.     The entire interview was videotaped by Cohn, and the resulting video was produced in this case.  TR 143:3-9.

16.     Originally, Cleopatra did not know what role Pyle would play and thought that he might assist with the writing of the script.  TR 127:9-16.

17.     However, Pyle's service as a writer quickly proved impossible.  TR 138:9-10; 139:9-10.

18.     Pyle has never in his life used a computer.  Pyle 45:18-46:7.

19.     Cohn wrote seventeen drafts of the script.  DX 301-317.

20.     Although Pyle was sent hard copies of one or two drafts of the script, he did not read them.  Pyle 85:25-86:10; Cohn 61:13-24, 74:17-75:12.

21.     Cohn attempted to discuss the script with Pyle, but Pyle's responses were incoherent.  Cohn 75:25-78:10.

22.     When Cohn attempted to ask specific questions, Pyle frequently launched into an unrelated tangent.  Cohn 75:25-78:10.

23.     Pyle never understood his role on the film to be that of a writer.  Pyle 23:1-6.

24.     Pyle did not "write any part of the script."  TR 139:9-10; Pyle 88:19-21; Cohn 40:13-15.

25.     Pyle provided Cleopatra with historical information concerning the 1977 crash. TR 139:2-6.

26.     After the Los Angeles interview, Cohn regularly asked Pyle follow-up questions by phone in order to obtain details about the plane crash, such as the type of clothing worn, the brands of beverages consumed, and mannerisms of people involved in the crash, and his and others' diction.  Cohn 43:17-44:25.

27.     Pyle provided similar information to the costume designer and the actors.  Cohn 48:11-25, 58:12-59:8.

28.     While Pyle also viewed some of the casting videos, Pyle's reaction was not taken into account when Cohn made the casting decisions.  Cohn 49:14-51:5.

29.     Extensive documentary evidence confirms that Pyle's role on the film was to provide historical information about events, statements, diction, clothing, and mannerisms.  DX 401-412; PX 15-47.

30.     Pyle has had no control over how the film was made, its content or its final cut. TR 146:13-147:11.

31.     Pyle does not have a copy of the film and has no control over whether it is released, distributed, or otherwise exhibited.  TR 147:15-25.

32.     Pyle was not Cohn's sole source of information for the film.  TR 188:4-12; Cohn 32:2-15; 91:23-94:8.

33.     Cohn obtained all of the information that he could about the plane crash, from books, films, articles, interviews conducted by third-parties, and websites.  TR 188:4-12; Cohn 32:2-15; 91:23-94:8.

34.     Although Cohn exhaustively researched the history of the plane crash, he is the sole author of the script for the film.  Cohn 8:22-9:20.

**Plaintiffs Learn about Cleopatra's Film and Decide Not To Sue**

35.     In June 2016, a number of entertainment publications wrote stories about the fact that Pyle was working with Cleopatra on a film about the Lynyrd Skynyrd plane crash.  DX 55 at CLEO00165-73.

36.     In July 15, 2016, Plaintiffs sent a Cease and Desist letter to Cleopatra.  DX 1.

37.     The Cease and Desist Letter said that Cleopatra's film violated the Consent Decree:

> [Cleopatra's film] is about the Band and its history, which is not permitted under the Consent Decree and has not been authorized by the parties…. Moreover, the use of the 'Free Bird' title practically screams the intent to promote and market the Motion picture as the story of the Band.  The use of this title is wrongful and deceptive, especially within the sated context of the Motion Picture and would be in violation of the Consent Decree; this Motion Picture would violate the Consent Decree even if it was simply titled 'The Artimus Pyle Story….   Please be advised as follows:  (i) you are not authorized to make a film which either purports to be or is about the history of the Band, in whole or in part….

DX 1.

38.     Further, in the Cease and Desist Letter, Plaintiffs advised Cleopatra that they would sue if Cleopatra did not confirm in writing that it was ceasing its production of the film:

> We hereby demand that you immediately cease and desist from production of the Motion Picture and that you confirm to [Plaintiffs] in writing promptly that you will do so. If you do not accede to this demand, please be advised that our clients have instructed us to take any and all action which we deem necessary to protect and enforce their rights to the fullest extent of the law, including without limitation, the institution of litigation.

*Id.*

39.   Cleopatra requested the Plaintiffs provide an actual copy of the Consent Decree described in their letter.  DX 2, 3, and 8.

40.   Cleopatra had never been party to the original lawsuit between Plaintiffs and Pyle and had never agreed to be bound by the Consent Decree.  DX 15; TR 47:20-48:3.

41.   Prior to July of 2016, Cleopatra had never seen a copy of the Consent Decree. TR 128:20-129:2.

42.   Cleopatra had not seen the Consent Decree prior to signing its contract with Pyle and interviewing him concerning the 1977 plane crash.  TR 128:20-129:2.

43.   The Consent Decree was placed under seal after it was signed and was not publicly available.  DX 15.

44.   Perera and Cohn reviewed the Decree together and concluded that Plaintiffs themselves were obviously in violation of it.  Cohn 17:6-25, 20:5-23.

45.   Pyle believed that the Consent Decree was no longer operative because Plaintiffs had been ignoring it for years.  Pyle 64:3-25.

46.   On July 21, 2016, Cleopatra rejected Plaintiffs' demand that it immediately confirm that it had ceased working on the project.  DX 3.

47.   Cleopatra's counsel specifically told Plaintiffs' counsel that it had a constitutional right to make the film, writing:  "In any event, Cleopatra Films is not subject to any agreement

with your clients.  It has a First Amendment right to produce and distribute a dramatic film depicting, describing, and/or based upon true, historical events, as it sees fit."  DX 3.

48.     In their failed attempt to obtain a temporary restraining order and preliminary injunction, Judith Van Zant ("Van Zant"), President of Plaintiff Ronald Van Zant, Inc., and Plaintiff Gary Rossington ("Rossington") testified that, after sending the Consent Decree, "we heard nothing further from Defendants."  PX 21 ¶ 30.  Plaintiffs have subsequently admitted that this testimony was false.

49.     On August 5, 2016, Jared Cohn, the director of Cleopatra's film, messaged Van Zant to inquire as to whether she wanted to participate in the film.  DX 54; TR 31:2-7; 62:21-63:16; 134:25-135:20.

50.     Van Zant appeared to have no objection to the film, simply asking for more information about the film and how she could be involved.  DX 54.

51.     On the advice of Cleopatra's counsel, Evan Cohen, Perera and Cohn ceased having direct communications with the Plaintiffs.  TR 135:24-136:4.

52.     Around this time, Pyle reached out to Plaintiffs about the film in the hope that they would participate in it.  Pyle 22:5-23, 65:24-66:21.

53.     At this time, Cleopatra also reached out to Plaintiffs' management company, Vector Management, to see if they wanted to participate in the film.  TR 136:5-137:19.

54.     Cleopatra took actions to minimize additional involvement with Pyle after receiving a copy of the Consent Decree.  TR 137:20-138:20.

55.     Since Cleopatra received the Consent Decree in July 2016, Cleopatra has not described Pyle as being a writer, producer, or director of the film.  DX 60; TR 141:16-25.

56.     A link to a pre-Cease and Desist Letter *Rolling Stone* article was included in one of Cohn's social media communications by Cohn's "virtual assistant," without Cohn's or Cleopatra's knowledge.  Cohn 122:4-123:25.

57.     Cleopatra significantly modified Pyle's agreement after Plaintiffs' Cease and Desist Letter was sent.  DX 5.

58.     Under the new agreement, Pyle will not be credited as being the producer, director, or writer when the film is released.  And instead of receiving 5% of the film's profits, Pyle will receive only $2,500 for his work on the film.  DX 5.

59.     The movie began filming on April 24, 2017.  Cohn 13:25-14:3.

60.     Principal photography was completed on May 15, 2017.  Cohn 23:12-13.

61.     Cleopatra has invested over $1.2 million in producing the film.  DX 13; TR 145:20-146:6.

**The Film is Not a History of the Band**

62.     Lynyrd Skynyrd was founded around 1970. TR 69:22-24.

63.     Artimus Pyle was not a founding member of the Lynyrd Skynyrd and did not join until 1975.  TR 70:2-6.

64.     Cleopatra's film does not depict the founding of the band or events prior to Pyle's joining of the band.  TR 71:4-6; *see also, generally* DX 6.

65.     The entire film is told from Pyle's perspective, as he is the main character. DX 401; Cohn 141:11-18; TR 140:2-10; 143:15-16; *see also, generally* DX 6.

66.     The entire film takes place during the week of the 1977 plane crash.  TR 133:13-14; 153:18-154:2; Cohn 96:5-8; *see also, generally* DX 6.

67.     The film does not depict the forty years of Lynyrd Skynyrd history after the 1977 plane crash.  TR 72:13-15; *see also, generally* DX 6.

68.     Cleopatra intends to place cards in the opening credits of the film that make clear that it was not authorized by Lynyrd Skynyrd, or any current or former member of Lynyrd Skynyrd.  TR 146:7-12.

69.     The film will not use recordings of the music of Lynyrd Skynyrd or any songs written by the band.

**The Consent Decree**

70.     The Consent Decree arises out of a prior litigation (the "1988 Action") to which Cleopatra was not a party.  DX 15; TR 47:20-48:3.

71.     The 1988 Action sought to enjoin the surviving members of Lynyrd Skynyrd from using the band's name in performance.  TR 16:7-17:4.

72.     The Consent Decree placed three limitations on the use of the band name Lynyrd Skynyrd ("LS").  DX 15.

73.     ***First***, the post-crash band was permitted to use LS only if it placed the calendar year after the band's name, e.g. "Lynyrd Skynyrd 1989" (hereinafter, the "Date Requirement"). In order to comply with the Decree, "[t]he calendar year shall not be included in parentheses and shall be of a size, type, and prominence equal in all respects to the words 'Lynyrd Skynyrd.'" DX. 15, §2(a).; TR 24:12-19.

74.     The purpose of the Date Requirement was to protect the band's "integrity" and to ensure fans did not confuse the pre-crash band and the post-crash band.  TR 24:12-19; 48:21-24.

75.     ***Second***, the Consent Decree required certain enumerated musicians to participate in live performances and recordings in order for LS to be used.  DX 15, § 2(c); TR 49:15-18.

76.     Specifically, the Decree required either (1) Gary Rossington and Allen Collins to appear for substantially the entire performance or (2) if and only if Rossington or Collins consented to not participating or were dead or incapacitated, then Rossington or Collins plus two of the following four musicians must participate:  Pyle; Leon Wilkeson; William Powell; and Edward King.  DX 15, § 2(c); TR 49:19-50:2.

77.     Collins was seriously injured around the time of the execution of the Consent Decree, which meant that three of the enumerated musicians (Rossington plus two others) had to perform in order to use LS.  Thus, this requirement became known as the "Rule of Three."  Pyle 62:14-63:3; TR 50:4-16.

78.     The purpose of the Rule of Three was to protect the integrity of the band.  TR 50:21-51:2.

79.     The Rule of Three prohibits LS from being used once a sufficient number of the enumerated musicians have become unable to perform, quit, or died.  At the time the Consent Decree was signed, Plaintiffs understood that the Decree limited the life of the band.  TR 50:17-20.

80.     *Third*, the Decree prohibited the defendants in the 1988 Action from exploiting the history of the band without the approval of Rossington, Collins, and Ronnie's Estate.  DX 15, § 4.

**Plaintiffs' Violation of the Consent Decree**

81.     Shortly after Plaintiffs executed the Consent Decree, they began to violate it in essentially every respect.

82.     Plaintiffs have not complied with Date Requirement for decades and have been using LS without a date designator continuously since 1992.  TR 48:25-49:5.

83.     Judith Van Zant agreed not to sue the band for making this change in exchange for more money from the band's performances.  DX 42; TR 54:3-56:17.

84.     Since at least the 1990s, Plaintiffs have been violating the Rule of Three.  DX 46; TR 51:3-8.

85.     Plaintiffs expelled Ed King from the band even though his absence would make compliance with the Rule of Three difficult or impossible. TR 52:5-13.

86.     Plaintiffs have not paid royalties pursuant to the formulas set forth in the Decree, and have, on occasion, shortchanged Pyle, King, and even Van Zant.  DX 59, 502; Pyle 104:18-105:16; TR 53:19-54:2.

87.     The parties to the Consent Decree never executed an agreement modifying it, and no one ever sought a modification from the Court.  DX 40; TR 49:6-14.

**Other Works about the Band**

88.     In the decades since the Consent Decree was issued, dozens of films, books, television shows and radio programs have been made about the Lynyrd Skynyrd.  Numerous band members have participated in these projects without any complaint by Plaintiffs.

89.     Films about Lynyrd Skynyrd and its history, include *Lynyrd Skynyrd: Uncivil War* (2002), a VH1 film written and narrated by Jake Tapper; *Sweet Home Alabama: The Southern Rock Saga* (2012), by the BBC; and *Gone With the Wind: The Remarkable Rise and Tragic Fall of Lynyrd Skynyrd* (2015), which is nearly three hours long.  TR 78:3-21.

90.     VH1's *Uncivil War* included part of the history of the band, and interviewed Pyle and other band members to obtain it. TR 76:7-10.

91.     *Uncivil War* did not violate the Consent Decree because no band member had creative control over the finished product.  DX 23; TR 76:7-10.

92.     Plaintiffs did not object to Pyle's participation in *Uncivil War*.  TR 75:2-16.

93.     Plaintiffs have not even bothered to watch *Sweet Home Alabama:  The Southern Rock Saga* by the BBC or *Gone with the Wind:  The Remarkable Rise and Tragic Fall of Lynyrd Skynyrd* by the Country Music Channel.  TR 78:3-21.

94.     Films or television shows about Lynyrd Skynyrd enhance ticket sales and revenues to Plaintiffs. TR 78:22-79:18.

95.     Books written about the band, and the fateful plane crash, include *Whiskey Bottles and Brand-New Cars: The Fast Life and Sudden Death of Lynyrd Skynyrd* by Mark Ribowsky (2015); *Turn It Up! My Years with Lynyrd Skynyrd: Love, Life, and Death, Southern Style* by Lynyrd Skynyrd tour manager and plane crash survivor Ron Eckerman (2011); *The Last Tour: Love, Laughter, and Tears: In Memory of Ron Eckerman* by Carolyn Day (2014); and *Lynyrd Skynyrd: Remembering the Free Birds of Southern Rock* by Gene Odom (2003).  DX 62 at 266:22-268:13.

96.     There is even a website devoted to the Lynyrd Skynyrd plane crash, www.tennesseeconcerts.com/planecrash (last accessed May 10, 2017).

97.     With the exception of the book by Gene Odom, Plaintiffs have not bothered to read the books about the band or to determine whether they violate the Consent Decree.  Again, with the exception of the Odom book, Plaintiffs don't know whether Pyle participated in the books.  DX 62 at 266:22-268:13

98.     Pyle has previously told his story concerning the plane crash and involvement with the band to the public numerous times, apparently without objection from Plaintiffs, including:

    a.     a 90-minute interview with Pyle on Howard Stern's radio show on January 17, 2017, about among other things the plane crash,

https://www.youtube.com/watch?v=3dtIISh0ylY (last accessed May 10, 2017).  Pyle had previously discussed the plane crash with Stern years before.  *Artimus Pyle, Former Lynyrd Skynyrd, Recalls That Horrible Day*, Howard Stern Show (Feb. 12, 2007) (*available at* https://www.howardstern.com/show/2007/2/12/that-fateful-night-RundownGalleryModel-10547/);

b.   a 90-minute interview with Pyle on the DJ Eddie Winters radio show on January 26, 2015, https://www.youtube.com/watch?v=GltGL70QkQs (last accessed May 10, 2017), an excerpt of which discussing the plane crash is also available on YouTube, https://www.youtube.com/watch?v=cXKYAdDJ2Bw (last accessed May 10, 2017);

c.   a June 13, 2015 interview with Pyle available on YouTube, see https://www.youtube.com/watch?v=-l1-NDZN05w (last accessed May 10, 2017);

d.   a November 5, 2013 interview with Pyle available on YouTube, https://www.youtube.com/watch?v=c3naooEC6IQ (last accessed May 10, 2017); and

e.   a 1982 Modern Drummer interview with Pyle available on YouTube, https://www.youtube.com/watch?v=eA6p0Jm6hqY (last accessed May 10, 2017).

99.   Plaintiffs have been aware for years that Pyle gave interviews about the band and never objected to the interviews.  TR 77:7-13.

100.   Plaintiffs Gary Rossington and Johnny Van Zant ("Johnny") are currently working with Country Music Television ("CMT") on a film about Lynyrd Skynyrd.  Their role in the CMT film appears to be perfectly analogous to Pyle's role in the CMT film:

|  | **Rossington/Johnny Film** | **Cleopatra Film** |
|---|---|---|
| **Title** | *If I Leave Here Tomorrow:  A Film About Lynyrd Skynyrd* | *Street Survivors:  The Story of the Lynyrd Skynyrd Plane Crash* |
| **Perspective** | Johnny:  "Gary [Rossington] will finally get a chance to tell his side of the story, being there since the beginning." | The film "will focus primarily on Pyle's recollection of the tragedy...." |

|  | **Rossington/Johnny Film** | **Cleopatra Film** |
|---|---|---|
| **Portrayal of Other Band Members** | "Above all else, it's a story of frontman Ronnie Van Zant, his upbringing, his roots, his work ethic and his contradictory persona [ ] both as a mythic Southern Rock poet and notorious boozed-up brawler.  The documentary also explores the relationships between Rossington and founding member Allen Collins, as well as Ed King and Art[i]mus Pyle." | Pyle:  "I want the movie to portray my band members the way they were:  real, funny people who loved the music, loved the success that allowed us to be able to travel the world and play for kings and queens all over the planet." |
| **Band Member Quotes To Media:** | Rossington:  "I'm excited to work with [CMT] to tell the no-holds-barred Skynyrd story—things that have never been told before and the days of when we started and all the hard work we put in to the music and the band." | Pyle: "This is a much-deserved movie for the fans of Skynyrd, and for people who'll become fans after they see it." |
| **Citation** | PX 67. | DX 61. |

101.   Plaintiffs have testified that they will not know whether the CMT film complies with the Consent Decree until it is released.  TR at 86:10-12; DX 66 at 136:16-22.

102.   As a result, the CMT film has not been approved in accordance with the Consent Decree, and Plaintiffs are waiting to determine whether it is a film focused on Rossington and Johnny as opposed to Ronnie Van Zant.

**Plaintiffs' Failed Efforts To Produce a Film or Book**

103.   Although the Consent Decree permitted Plaintiffs to produce a book, film, or other work, Plaintiffs have failed to do so for the last thirty years.

104.   In 1998, Viacom offered Plaintiffs $75,000 for the right to make an authorized film about the band.  The film was either never made or never released.  DX 25; TR 80:8-12.

105.     There was extensive correspondence with Endeavor in 1998 and 1999 about production of a film.  Plaintiffs and Endeavor actually agreed upon a treatment for the film.  No movie was made.  DX 26, 28; TR 80:13-17.

106.     In 1999, discussions progressed far enough about a movie deal with Ideal Entertainment that Ideal took the time to draft and send a written agreement to Plaintiffs.  Again, no film was made.  DX 27; TR 80:18-22.

107.     At some point in the 1990s or 2000, Fusion Studios purchased an option from Plaintiffs to make an authorized biopic about the band.  Despite this, no film was made.  DX 30; TR 80:23-82:7.

108.     In 2000, Plaintiffs took the time to mark-up a contract for two individuals to make a film about the band.  It does not appear that a final contract was executed.  DX 29.

109.     Ron Howard and Oliver Stone approached Plaintiffs to make a film.  However, they could not reach a deal because Plaintiffs "demanded complete control on all the money." Pyle 116:7-19.

**Plaintiffs' Latest Project**

110.     Plaintiffs' latest film project is still in its earliest stages.  TR 83:6-13.

111.     Plaintiffs have yet to decide whether the project will be a film or a series.  TR 83:6-13.

112.     Plaintiffs have received an outline, but no one associated with LS has approved the outline.  TR 82:23-83:2.

113.     Other than two potential producers, Plaintiffs have not identified anyone who will be involved in the project.  TR 82:19-22.

114.    No one has approved of a film or series being made, and no one has conveyed any rights in connection with a film or series about the band.  TR 82:23-83:2.

115.    There has been no discussion about how to finance the film or series or how any proceeds will be divided.  DX 62 at 182:25-3.

116.    While Plaintiffs believe that the outline that they have is the first "step" in making the film or series, since receiving the outline in February 2017, Plaintiffs have not made any effort to advance this purported project.  DX 62 at 183:21-185:2; TR 83:22-25.

117.    Plaintiffs don't know what the next steps in their project will be, but they think it may involve "having some meetings and conversations."  Unsurprisingly, the meetings and conversations have yet to be scheduled.  DX 62 at 183:21-185:2.

## CONCLUSIONS OF LAW

### Requirements for a Permanent Injunction

1.    "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (internal quotation marks omitted).

2.    "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation."  *Aguilar v. Immigration & Customs Enf't Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 828 (S.D.N.Y. 2011) (internal quotation marks omitted).

### The First Amendment and the Rule Against Prior Restraint Preclude Any Injunction

3.    The application of the First Amendment's protections to motion pictures has been established since the Supreme Court's decision in *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952), where the Court recognized that "[t]he importance of motion pictures as an organ of

public opinion is not lessened by the fact that they are designed to entertain as well as to inform." *Id*. at 501. The Court also held that motion pictures are "within the free speech and free press guaranty of the First and Fourteenth Amendments." *Id*. at 502. *Cf. Superior Films, Inc. v. Dep't of Educ. of State of Ohio, Div. of Film Censorship*, 346 U.S. 587, 589 (1954) (Douglas, J., concurring) ("Motion pictures are of course a different medium of expression than the public speech, the radio, the stage, the novel, or the magazine… [b]ut the First Amendment draws no distinction between the various methods of communicating ideas.").

4.      The fact that a motion picture is intended as entertainment is immaterial. *See Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee"). *Cf. Hicks v. Casablanca Records*, 464 F. Supp. 426, 433 (S.D.N.Y. 1978) (denying preliminary injunction and granting motion to dismiss claims against fictional film and book about Agatha Christie titled "Agatha").

5.      The act of making a film is necessarily included within the First Amendment's guarantee of free speech rights. *E.g., ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595-96 (7th Cir. 2012) ("The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected … there is no fixed First Amendment line between the act of creating speech and the speech itself.")

6.      In light of these authorities, Cleopatra has an unambiguous First Amendment right to publish its film.

7.      Plaintiffs seek an order prohibiting the release of the film, an archetypical prior restraint. Dkt. 18 ¶¶ 73-80.

8.     The essence of prior restraints are that they give "public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).  "Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993).

9.     As dangerous restrictions of free speech rights, a prior restraint on expression comes with a "heavy presumption" against its constitutional validity.  *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees and Rest. Employees Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001) ("[w]hen a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech protected under the First Amendment increases").  *See also Matter of Providence Journal Co.*, 820 F.2d 1342, 1348 (1st Cir. 1986), *opinion modified on reh'g*, 820 F.2d 1354 (1st Cir. 1987) ("In its nearly two centuries of existence, the Supreme Court has never upheld a prior restraint on pure speech."); *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996), *opinion clarified* (May 8, 1996) ("Indeed, the Supreme Court has never upheld a prior restraint[.]").

10.     Provided the material is neither obscene nor violates a copyright, this strong presumption can sometimes be overcome "when either national security or an individual's right to a fair trial is at stake."  *Matter of Providence Journal Co.*, 820 F.2d at 1351.

11.     The lessor interests identified by Plaintiffs do not qualify.

12.     Privacy or reputational interests cannot support a restraint.  "An individual's right to protect his privacy from damage by private parties, although meriting great protection, is simply not of the same magnitude" as the national-security-type concerns that can support a prior restraint.  *Matter of Providence Journal Co.*, 820 F.2d at 1351 (reversing prior restraint on the

publication of material that the government had obtained in violation of private citizens' Fourth Amendment rights).  *See also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976) ("Designating the conduct as an invasion of privacy, the apparent basis for the injunction here, is not sufficient to support an injunction against peaceful distribution of informational literature of the nature revealed by this record.") (internal quotation marks omitted).

13.    Private confidentiality agreements, even those backed by law, cannot support a prior restraint.  In *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971), the Supreme Court rejected any prior restraint on the publication of classified information because "[t]he guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic."  *Id.* at 719 (Black, J., concurring).  In *CBS, Inc. v. Davis*, 510 U.S. 1315 (1994), Justice Blackmun, acting as the Circuit Justice, reversed a lower court's injunction against the publication of a video of a meat packing plant surreptitiously taken by an employee even though there was evidence that the video had been taken unlawfully.  *Id.* at 1318. In *Procter & Gamble Co.*, 78 F.3d at 224-26, the court rejected a district court's temporary injunction prohibiting the publication of documents that were the subject of a protective order. The court explained that "[t]he private litigants' interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds for imposing a prior restraint."  *Id.* at 225.  The justification for a prior restraint was so weak that the district court never would have issued the injunction "had it engaged in the proper constitutional inquiry."  *See also Ford Motor Co. v. Lane*, 67 F. Supp. 2d 745, 753 (E.D. Mich. 1999) (interest in protecting trade secrets insufficient to warrant prior restraint).

14.    Mere financial injury cannot support a prior restraint.  Courts regularly reject applications for a prior restraint premised on an economic harm.  *See CBS*, 510 U.S. at 1315

(reversing preliminary injunction premised upon economic harm); *Procter & Gamble*, 78 F.3d at 224-26 ("[C]ommercial self-interest" insufficient to justify prior restraint).

15.     Even if economic harm could be sufficiently catastrophic to warrant a prior restraint, the harm allegedly here is wildly speculative.  And only certain and immediate harms can justify a prior restraint.  *New York Times Co.*, 403 U.S. at 730 (Stewart, J., concurring) (to support prior restraint, movant must show that publication would "surely result in direct, immediate, and irreparable damage" to his rights).

16.     The court's interest in enforcing its order in the 1988 Action does not justify a prior restraint.  *Crosby v. Bradstreet & Co.*, 312 F.2d 483 (2d Cir. 1963), precludes any such argument.  There, the district court entered a consent decree prohibiting the company that ultimately became Dun & Bradstreet from publishing any information about certain persons' business activities.  *Id.* at 484.  Thirty years later, the district court denied a motion to vacate the decree, and the Second Circuit reversed, holding that the decree was an unconstitutional prior restraint:

> We are concerned with the power of a court of the United States to enjoin publication of information about a person, without regard to truth, falsity, or defamatory character of that information. Such an injunction, enforceable through the contempt power, constitutes a prior restraint by the United States against the publication of facts which the community has a right to know and which Dun & Bradstreet had and has the right to publish. The court was without power to make such an order; that the parties may have agreed to it is immaterial.

*Id.* at 485.  The court invalidated the thirty-year old consent decree because "there does not seem to be any equity in… the continuation of an injunction which should never have been entered in the first place."  *See also Procter & Gamble*, 78 F.3d at 224-26 (violation of protective order insufficient to warrant prior restraint); *Matter of Providence Journal*, 820 F.2d at 1353 (reversing contempt citation when order that was violated was an unconstitutional prior restraint of speech).

22

17.     Reading the instant Consent Decree as an order that restrains the speech of third-parties like Cleopatra would be inappropriate and potentially call the legitimacy of the entire order into question.

18.     The Consent Decree permits the parties to the 1988 Action to amend the Decree without leave of Court.  DX 15 ¶ 37 ("The parties hereto may unanimously agree to amend their respective rights and obligations pursuant to this Order, without seeking further intervention of the Court, provided such shall be in a writing signed by all parties.").

19.     If the Consent Decree were read to bind third-parties, it would mean that the 1988 Action parties could impose obligations on third-parties without obtaining the consent of the third-parties or the approval of the court.  One judge has referred to such an order as "ludicrous." *Procter & Gamble*, 78 F.3d at 228 (Martin, J., concurring).

20.     *Retail Credit Co. v. Russell*, 218 S.E.2d 54, 62-63 (Ga. 1975), does not mandate a different result.  In *Retail Credit*, the Georgia court enjoined the defendant from repeating a defamatory statement that it had made in the past, finding that such defamation "is unprotected by the First Amendment."  *Id.* at 63.  This is incompatible with binding authority in this Circuit. *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) ("for almost a century the Second Circuit has subscribed to the majority view that, absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases."); *see also Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 721-22 (1931) (holding statute that permits prior restraint of defamatory material unconstitutional).

21.     *Beastie Boys v. Monster Energy Drinks*, 87 F. Supp. 3d 672, 679 (S.D.N.Y. 2015), does not mandate a different result.  *Beastie Boys* is a copyright and trademark case.  No such claims are brought here.  First Amendment analysis is different in the context of intellectual

property claims such as trademark and copyright infringement because of the fair use doctrine. *See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 74 (2d Cir. 1999) ("We have repeatedly rejected First Amendment challenges to injunctions from copyright infringement on the ground that First Amendment concerns are protected by and coextensive with the fair use doctrine.").

22. Even if trademark law were applicable, Cleopatra's use of the names and likenesses protected by the Consent Decree constitutes fair use. The trademark laws cannot be used "to prevent the publication of an unauthorized group biography or to censor all parodies or satires which use their name." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 309 (9th Cir. 1992) (publisher allowed to use musicians' name for money-generating survey).

23. Similarly, "a defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102–03 (2d Cir. 2010). To the extent that Cleopatra uses the names and likenesses covered by the Decree, it did so because it was the only way to identify such persons and, as a result, any use of the names constituted a nominative fair use.

24. There is no "acting in concert" exception to the rule against prior restraint. To the contrary, courts deny or strike down applications for prior restraint even when the information has been obtained in breach of a law or legal duty. *See, e.g.*, *N.Y. Times*, 403 U.S. at 714 (unlawful dissemination of classified information); *CBS*, 510 U.S. at 1315 (video unlawfully taken by an employee); *Procter & Gamble Co.*, 78 F.3d at 224-26 (documents subject to protective order disclosed); *Providence Journal*, 820 F.2d at 1348 (information subject to sealing order disclosed). Courts do so because prior restraints pose a greater threat to democracy than do

24

other criminal and civil penalties.  *See Metro. Opera Ass'n, Inc.*, 239 F.3d at 176 (explaining that

post-publication criminal and civil sanctions "chill" speech while prior restraints "freeze" it and

that criminal and civil penalties afford "the whole panoply of protections afforded by deferring

the impact of the judgment until all avenues of appellate review have been exhausted.") (internal

quotation marks omitted).  Even if Cleopatra acted in concert with Pyle, the First Amendment

prohibits this Court from enjoining the publication of the film.

### Defendants Have Not Waived Their First Amendment Rights

25.     Waiver of first amendment rights is heavily disfavored.  *Legal Aid Soc'y v. City of

N.Y.*, 114 F. Supp. 2d 204, 226-27 (S.D.N.Y. 2000) (internal citations omitted) (holding that

agreement did not waive constitutional right that was not clearly established at time that

agreement was executed).

26.     Courts find this high waiver standard to be met only "where parties to the contract

have bargaining equality and have negotiated the terms of the contract, and where the waiving

party is advised by competent counsel and engaged in other contract negotiations."  *Marinaccio

v. Boardman*, Case No. 1:02 CV 00831 NPM, 2005 WL 928631, at *16 (N.D.N.Y. Apr. 19,

2005) (internal quotation marks omitted).  *See also Leonard v. Clark*, 12 F.3d 885, 890-92 (9th

Cir. 1994) (finding waiver where party was represented by skilled counsel, party proposed the

language to which it objected, and parties had relatively equal bargaining power); *Accord Lake

James Community Volunteer Fire Dept., Inc. v. Burke*, 149 F.3d 277, 280 (4th Cir. 1998).

27.     Even when this standard is met, courts do not enforce a waiver where it would be

against the public's interest to do so.  *See Leonard v. Clark*, 12 F.3d 885, 890 (9th Cir. 1993)

("[W]e will not enforce the waiver if the interest in its enforcement is outweighed in the

circumstances by a public policy harmed by enforcement of the agreement.") (internal quotation marks omitted).

28.     This waiver standard has not been met with respect to Pyle or Cleopatra.  In *Marinaccio v. Boardman*, 2005 WL 928631, at *17 (N.D.N.Y. Apr. 19, 2005), the court held that an agreement signed "under protest" did not constitute a waiver of First Amendment rights as a matter of law.  Because Pyle signed the Consent Decree "under protest" (DX 15), it similarly does not constitute a waiver as a matter of law.

29.     Nor does Pyle's execution of the 1991 agreement constitute a waiver.  The parties did not negotiate the 1991 Agreement and Pyle was not represented by an attorney.  Pyle 38:10-41:4.  To the contrary, the band told him not to get an attorney and "that they would take good care of [Pyle] and they would be fair."  *Id.*  Because Plaintiffs controlled the band and Pyle controlled nothing, Plaintiffs held all of the negotiating leverage.  *Id.*  Pyle's primary goal was to "try to shock [the band] out of the gluttonous overconsumption of cocaine" rather than to negotiate the finer points of his intellectual property rights.  *Id.* at 36:5-16.  In fact, the 1991 agreement does not contain the language prohibiting Pyle from exploiting the band's name or history upon which Plaintiffs rely in this case.  It merely references the Consent Decree, and Pyle could not have had a copy of the Decree at the time he signed the 1991 agreement because he neither uses computers nor maintains documents.  Pyle at 11:4-1, 44:18-46:7.  Accordingly, there is zero "clear and compelling evidence" that Pyle "voluntarily, knowingly, and intelligently" waived his right to free speech.[1]

---

[1] Plaintiffs argue that Pyle cannot assert the defense of duress because he never repudiated the 1991 agreement.  (Pl. SJ Opp. at 25.)  Even if true, that is irrelevant.  An agreement that was not entered into under duress can still fail to meet the high threshold for waiving a First Amendment right.  *See Legal Aid Soc'y*, 114 F. Supp. 2d at 225-27 (holding that agreement did not waive First Amendment right even though agreement was not result of duress as a matter of law).

30.     Cleopatra never waived its First Amendment rights.   In fact, Cleopatra did not even exist at the time the Decree was signed.  TR 115:4-7; *see Rudd Equip. Co., Inc. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 595 (6th Cir. 2016) ("Deere could not have waived the public's First Amendment and common law right of access to court filings.") (internal quotation marks omitted); *Novalogic, Inc. v. Activision Blizzard*, 41 F. Supp. 3d 885, 903 (C.D. Cal. 2013) ("Plaintiff's argument is unpersuasive and borders on the frivolous. Activision was not a party to the 2005 Vivendi Contract and Plaintiff fails to explain how an unrelated third party's contract could have resulted in the surrender of Activision's First Amendment rights with respect to a product, MW3, that was not produced until 2011.").

**Laches Bars Any Injunction in this Case**

31.     In order to "prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiffs' unreasonable delay in bringing the action." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996).  *Accord Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir. 1980).

32.     Over a century ago, Judge Learned Hand explained the "obvious" rationale for the laches doctrine:

> It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win.

*Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916).

33.   Plaintiffs were aware that Cleopatra was making the film by July 15, 2016, the date of Plaintiffs' cease and desist letter, and several weeks after the news stories about the film. DX 1.

34.   Six days later, Cleopatra advised Plaintiffs that their cease and desist letter was rejected because Cleopatra had a First Amendment right to make the film.  Cleopatra also refused Plaintiffs' demands, including a demand for a copy of the script and a demand for confirmation "in writing" that the film would not be made.  DX 3; TR 62:6-13.

35.   Plaintiffs waited until May 5, 2017, almost a year after it sent its cease and desist letter.  Dkt. 18.  A delay of almost a year is unreasonable and warrants denial of injunctive relief. *See Kamat v. Kurtha*, Case No. 05 CIV.10618 KMW THK, 2008 WL 5505880, at *5 (S.D.N.Y. Apr. 14, 2008), *report and recommendation adopted*, No. 05 CV. 10618 KMW THK, 2009 WL 103643 (S.D.N.Y. Jan. 15, 2009) ("Courts have found such prejudice and, thus, made a laches determination, even where a party's delay in asserting its rights was less than one year.") (collecting cases).

36.   Since Plaintiffs learned that Cleopatra was making the film, Cleopatra has invested over $1 million in producing the film.  DX 13; TR 145:20-146:1.

37.   This constitutes undue prejudice sufficient to establish laches.  In *New Era Publications International, ApS v. Henry Holt and Company, Inc.*, 873 F.2d 576 (2d Cir. 1989), the plaintiff learned in 1986 that the defendant was producing an infringing book.  *Id.* at 584. That same year the defendant made clear to the plaintiff that it was unwilling to enter into discussions concerning the alleged infringement.  *Id.*  Yet, the plaintiff delayed bringing suit in the United States until 1988.  *Id.*  The Second Circuit held that laches barred any injunction against the distribution of the infringing book:

> If New Era promptly had sought an adjudication of its rights, the
> book might have been changed at minimal cost while there still
> was an opportunity to do so. At this point, however, it appears that
> a permanent injunction would result in the total destruction of the
> work since it is not economically feasible to reprint the book after
> deletion of the infringing material. Such severe prejudice, coupled
> with the unconscionable delay already described, mandates denial
> of the injunction for laches and relegation of New Era to its
> damages remedy.

*Id.* at 584-85 (internal citation omitted).

38.     Courts have reached precisely the same outcome in cases where plaintiff delayed while the infringing or otherwise unlawful asset was being created. *See Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 235-36 (6th Cir. 2007) (laches prohibited injunction requiring destruction of constructed or substantially constructed homes because plaintiff delayed bringing second infringement action); *Allens Creek/Corbetts Glen Pres. Grp., Inc. v. West*, 2 F. App'x 162, 165 (2d Cir. 2001) (expenditure of $1 million on environmental project constitutes prejudice); *Conopco*, 95 F.3d at 191-93 (laches barred false advertising claim because defendant had invested in marketing strategy and it was too late to adopt alternative marketing strategy).

39.     Because Plaintiffs waited almost a year to bring this action and, in the interim, Cleopatra invested significant resources in making its film, the doctrine of laches bars any injunction, which constitutes the only relief that Plaintiffs seek in this case.

## Unclean Hands Bars Any Injunction

40.     The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009) (internal quotation marks omitted).

41.     "To sustain an unclean hands defense, a defendant must show that the plaintiff has engaged in inequitable conduct or bad faith where the misconduct has a material relation to the

equitable relief that plaintiff seeks."  *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d

510, 533 (S.D.N.Y. 2009).  In *Motorola*, the Second Circuit held that the doctrine of unclean

hands prohibited parties who violated an injunction from seeking relief from the injunction.

42.     Plaintiffs have violated the Date Requirement, the Rule of Three, and royalty

payments required by the Consent Decree for decades.  TR 48:9-54:2.  Plaintiffs have also

participated in a film with CMT that is extremely similar to Cleopatra's film, which violates the

Decree to the extent that the Cleopatra film runs afoul of the Decree.   TR 84:16-85:3; DX 101.

43.     This inequitable conduct prohibits any injunction permitting Plaintiffs to claim the

benefits of the Consent Decree against other parties.

44.     Whether Plaintiffs have a meritorious claim is irrelevant to the unclean hands

determination. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814

(1945) (unclean hands "closes the doors of a court of equity to one tainted with inequitableness

or bad faith relative to the matter in which he seeks relief, however improper may have been the

behavior of the defendant."); *see also Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 794

(5th Cir. 1999) ("if the plaintiff has unclean hands and seeks equitable relief, the defendant's own

improper behavior serves as no bar to its equitable defenses."); *E.E.O.C. v. Recruit U.S.A., Inc.*,

939 F.2d 746, 752 (9th Cir. 1991) (unclean hands "closes the doors of a court of equity to one

tainted with an inequitableness or bad faith relative to the matter in which he seeks relief,

however improper may have been the behavior of the defendant."); *West v. West*, 825 F. Supp.

1033, 1049 (N.D. Ga. 1992) ("Unclean hands generally prevents the court from even considering

the merits of plaintiff's claims. The fact that defendant may be liable for all claims alleged is

simply irrelevant.").

**Artimus Pyle is Not Bound by the Consent Decree**

45.     "[A] consent decree's force comes from agreement rather than positive law."
*Dunn v. Carey*, 808 F.2d 555, 559–60 (7th Cir. 1986); *see also Keith v. Volpe*, 118 F.3d 1386,
1393 (9th Cir. 1997) (same).

46.     Accordingly, a party cannot be properly bound by a consent decree to which he or
she never actually agreed.  On these grounds, courts regularly refuse to enforce consent decrees
against parties who either never signed them, or whose signatories lacked authority.  *See*, *e.g.*,
*Perkins v. City of Chicago Heights*, 47 F.3d 212, 218 (7th Cir. 1995) (vacating consent decree
whose signatories lacked authority to agree).

47.     Artimus Pyle did not assent to the Consent Decree.  While his signature appears
on the document, it is clearly followed by the words "Under Protest," unambiguously indicating
that he does not agree to its terms.  DX 15 at P000044.

48.     Numerous courts have held that a signature "under protest" does not constitute
actual assent to an agreement.  *See e.g. Bergenline Prop. Grp., LLC v. Coto*, Index No. A-0259-
14T2, 2015 WL 7428755, at *7 (N.J. App. Div. Nov. 10, 2015) ("defendant's 'signing under
protest' language did not constitute an unqualified acceptance of those essential terms"); *Ex parte
Wright*, 443 So. 2d 40, 41 (Ala. 1983) (amendment to teachers' contract signed "under protest"
was not enforceable); *Church Mut. Ins. Co. v. Kleingardner*, 2 Misc. 3d 676, 683, 774 N.Y.S.2d
265, 271 (Sup. Ct. 2003) (acceptance of check "under protest" did not constitute assent to accord
and satisfaction).

**Cleopatra is Not Bound by the Consent Decree**

49.     Although injunctions that are required by law can bind persons acting in "active
concert" with parties named in the injunction, consent decrees bind only those who voluntarily

agreed to them.  *See United States v. City of N.Y.*, 198 F.3d 360, 366 (2d Cir. 1999) ("Those who

are not parties to a consent decree are free to challenge the decree and actions taken under it.");

*Cobalt Multifamily Inv'rs I, LLC v. Shapiro*, Case No. 06 CIV. 6468 KMW MHD, 2013 WL

5418588, at *1 (S.D.N.Y. Sept. 27, 2013) (denying motion to issue order limiting third-parties'

rights).

     50.     This is because a consent decree "does not determine that the obligations assumed

by the parties are required by law" and "often impose[s] rights and obligations greater than those

required by law."  *Ass'n for Retarded Citizens of Connecticut, Inc. v. Thorne*, 30 F.3d 367, 370

(2d Cir. 1994).  In contrast, injunctions "required by law" enforce pre-existing rights under

constitutions, legislative statutes, or the common law and may be entered even against unwilling

parties "[w]here the district court exercises its jurisdiction to rule on the merits of a litigation"

and "determines that the law requires a certain outcome and is empowered to issue remedial

orders to effectuate that outcome."  *Id.*

     51.     In contrast, "[b]ecause the terms of the consent decree [are] voluntarily assumed

rather than legally imposed, there is no basis for extending the negotiated outcome to a

nonparty."  *Ass'n for Retarded Citizens of Connecticut,* 30 F.3d at 370; *accord Martin v. Wilks*,

490 U.S. 755, 761–62 (1989) (superseded by statute, 42 U.S.C. § 2000e-2(n), but only for

employment-related claims) ("A court's approval of a consent decree between some of the parties

therefore cannot dispose of the valid claims of nonconsenting intervenors.") (internal quotation

marks omitted); *Madison Square Garden Boxing, Inc. v. Shavers*, 562 F.2d 141, 143-44 (2d Cir.

1977) (reversing injunction issued against non-party to consent judgment because "[a] judgment

entered by consent and stipulation is binding upon the consenting parties only.").

52.    And "[w]hile a district court has authority to enforce a judicially-approved consent decree against the parties to it, a district court that enforces the decree against a nonparty acts beyond its jurisdiction and thus beyond the scope of the All Writs Act." *Ass'n for Retarded Citizens of Connecticut*, 30 F.3d at 370 (holding that state agency was not bound by consent decree entered into by another agency of the very same state).

53.    *United States v. Int'l Broth. Of Teamsters*, 266 F.3d 45 (2d Cir. 2001) ("*Teamsters*"), is not to the contrary.  In *Teamsters*, the Second Circuit held that a consent decree into which a union had entered continued to apply to labor union members after they left the union:  "[w]e fail to see how their having been forced out of the IBT ipso facto deprives the district court of the jurisdiction over them it unquestionably had while they were members of the IBT."  *Id.* at 50.  In contrast to the appellants in *Teamsters*, Cleopatra was never subject to the Consent Decree.  *Teamsters* stands for the unremarkable proposition that a party who is bound by an order of the court cannot escape compliance because he or she changes employers or otherwise alters his or her circumstances.

54.    And notably, the Second Circuit in *Teamsters* struck down all portions of the lower court's decision that did not involve "direct association with members or employees of the IBT or its local unions."  *Id.*  Moreover, the court specifically struck down portions of the district court's injunction that "risk[ed] interference with appellants' First Amendment right of petition." *Id.*  As such, even if *Teamsters* were read to permit a court to enjoin third party action under a consent decree, it would do so only in cases where free speech rights are not violated, as is the case here.

55.    Cleopatra was not a party to the 1988 Action, never agreed to the Consent Decree and cannot properly be bound by it.

33

**Cleopatra Did Not Violate the Consent Decree**

56.     Only the actions that Cleopatra took after receiving notice of the Consent Decree could possibly have violated its terms.  *See* Fed. R. Civ. P. 65(d); *S.E.C. v. Platinum Inv. Corp.*, 98 F. App'x 33, 35 (2d Cir. 2004).

57.     It is undisputed that Cleopatra did not receive notice of the Consent Decree – which Plaintiffs insisted be under seal – until late July 2016.  DX 8; TR 128:20-129:2.  As such, nothing that Cleopatra did prior to late July 2016 – including signing an agreement with Pyle and interviewing him – could have violated the Consent Decree as a matter of law.  *See SEC v. Haligiannis*, 608 F. Supp. 2d 444 (S.D.N.Y. 2009) (third-party entitled to collect on judgment obtained in violation of asset freeze because third-party did not have notice of asset freeze); *O&L Assocs. v. Del Conte*, 601 F. Supp. 1463, 1464-65 (S.D.N.Y. 1985) (Movie studio did not violate injunction when it licensed music from defendant even though injunction prohibited defendant from using band's name).

58.     Cleopatra's interaction with Pyle after July 2016 was limited to obtaining certain historical information from him and permitting Pyle to appear in a cameo.  DX 9; TR 139:2-6.  At no point after July 2016 did Cleopatra hold Pyle out to be a writer or producer of the film.  Exs. 60-61.

59.     It is undisputed that mere interviews with Pyle do not violate the Consent Decree.  TR 76:21-77:6.  Similarly, Pyle's cameo does not violate the Consent Decree:  Pyle appeared in VH1's *Uncivil Wars*, and Plaintiffs had no problem with it.  TR 76:7-10.

60.     The Consent Decree does not prohibit "fair use" of the name "Lynyrd Skynyrd" and the persons whose names and likenesses are protected in the Decree.  To the contrary, it

explicitly authorizes Pyle to use the "Lynyrd Skynyrd" name and "related matters" when

exploiting his own life story "in any medium":

> Each of the Individual Defendants, Ronnie's Estate and Gaines'
> Estate shall have the right to exploit his (or with respect to the
> Estates, the applicable decedent's) own respective life story in any
> manner or medium, including without limitation, in books or other
> print publications and in theatrical feature or television motion
> pictures, without obligation, financial or otherwise, to any other
> party hereto.  In such connection, each of the foregoing shall have
> the right to refer to "Lynyrd Skynyrd" and related matters to
> describe and portray his experience(s) with "Lynyrd Skynyrd;"
> provided that no such exploitation of life story rights is authorized
> which purports to be a history of the "Lynyrd Skynyrd" band, as
> opposed to the life story of the applicable individual.

DX 15 ¶ 3.

61.     At no point did Pyle convey the band's story rights to Cleopatra.  And the Consent

Decree explicitly authorized Pyle to use the band and its members' names when providing his

own biographical information, including his recollection about the 1977 crash.  DX 15.

62.     Even if the Consent Decree did not explicitly permit Cleopatra to interview Pyle,

any references to the band or its members would have constituted a nominative fair use.  The

trademark laws cannot be used "to prevent the publication of an unauthorized group biography or

to censor all parodies or satires which use their name."  *New Kids on the Block v. News Am.
Pub., Inc.*, 971 F.2d 302, 309 (9th Cir. 1992) (publisher allowed to use musicians' name for

money-generating survey).  Similarly, "a defendant may lawfully use a plaintiff's trademark

where doing so is necessary to describe the plaintiff's product and does not imply a false

affiliation or endorsement by the plaintiff of the defendant."  *Tiffany (NJ) Inc. v. eBay Inc.*, 600

F.3d at 102–03.

63.     To the extent that Pyle used any of the Plaintiffs' names in his interview with Cleopatra, he did so because it was the only way to identify such persons and, as a result, any use of the names constituted a nominative fair use.

64.     The Consent Decree permits Pyle and/or those acting in concert with him, to exploit Pyle's "life story in any manner or medium" and to "refer to 'Lynyrd Skynyrd' and related matters and to describe and portray [Pyle's] experience(s) with 'Lynyrd Skynyrd'" so long as Pyle does not create a "history of the 'Lynyrd Skynyrd' band."  DX 15 at ¶ 3.

65.     Cleopatra's film is not a history of the Lynyrd Skynyrd band, as it takes place during a single week and does not depict (i) the founding of the band; (ii) any of the band's experiences prior to Pyle's joining; (iii) any of the band's experiences after the 1977 plane crash. TR 71:4-6; TR 72:13-15; 133:13-14; 153:18-154:2; Cohn 96:5-8; *see also, generally* DX 6.

66.     Cleopatra's film does not hold itself out as a history of the Lynyrd Skynyrd band, as its credits specifically state that it is not authorized by the band itself or its former members. TR 146:7-12.

67.     Cleopatra's film depicts Pyle's experience with the band, as the entire film is told from Pyle's perspective and he is the main character.  DX 401; Cohn 141:11-18; TR 140:2-10; 143:15-16; *see also, generally* DX 6.

**The Lack of Irreparable Harm Precludes an Injunction**

68.     "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach*, 440 F.3d at 56 (internal quotation marks omitted).

69.     *Canada Dry Delaware Valley Bottling Co. v. Hornell Brewing Co., Inc.*, Case No. 11 Civ. 4308 (PGG), 2013 WL 5434623, at *10 (S.D.N.Y. Sept. 30, 2013), does not mandate a

contrary result.  It is settled law that courts only issue injunctions for violating consent decrees upon a showing of irreparable harm.  *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 476 (6th Cir. 2004) (reversing injunction premised on violation of consent decree where there was no showing of "a risk of continuing irreparable harm").

70.     Courts even require a showing of irreparable harm when a party has entered into a contract calling for specific performance.  *See Saint Laurie Ltd. v. Yves Laurent Am., Inc.*, Case No. 13-CV-6857 (DAB), 2015 WL 12991205, at *14-16 (S.D.N.Y. Mar. 27, 2015) (rejecting argument that irreparable harm need not be shown).

71.     To establish irreparable harm, Plaintiffs must demonstrate injury "that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation."  *Worldwide Diamond Trademarks, Ltd. v. Blue Nile, Inc*., Case No. 14-CV-3521 (VSB), 2014 WL 7933941, at *3 (S.D.N.Y. Nov. 6, 2014) (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc*., 60 F.3d 27, 37 (2d Cir. 1995)).  "It is not enough for a movant to demonstrate the possibility of irreparable harm; the movant must show that it is likely to suffer irreparable harm if equitable relief is denied."  *Worldwide Diamond*, 2014 WL 7933941, at *3 (*citing JSG Trading Corp. v. Tray–Wrap, Inc*., 917 F.2d 75, 79 (2d Cir. 1990)).

72.     At various points in this case, Plaintiffs have asserted that three harms warrant an injunction:  (a) Cleopatra's film will injure Plaintiffs' alleged competing film; (b) Pyle's association with the band will cause irreparable harm; and (c) consumer confusion.  In fact, Cleopatra's film will not cause Plaintiffs any harm whatsoever.

73.     *First*, Plaintiffs have not provided evidence that they are likely to make any film concerning the Lynyrd Skynyrd band.  Plaintiffs have failed to make a film for thirty years and there is – literally – zero evidence that they are ever going to do so.  As set forth in detail above,

Plaintiffs have previously been significantly closer to making a film than they are today – at one point, they even sold an option for a film.  But today, they are absolutely nowhere, speculating about maybe "having some meetings and conversations."  Plaintiffs' possible production at some future date of a film of uncertain topic and scope with unknown business partners or collaborators, is the textbook example of "remote and speculative."

74.     In addition, Plaintiffs have not even attempted to show how the film would affect, let alone impair, their "right to produce and distribute" their prospective film.  *See Burroughs v. Metro-Goldwyn Mayer, Inc.*, 491 F. Supp. 1320 (S.D.N.Y.), *aff'd*, 636 F.2d 1200 (2d Cir. 1980) (rejecting plaintiff's speculative claim that a potential film based on "Tarzan" would not be made by plaintiff's licensee in absence of injunction assuring that licensee would have exclusive rights to "Tarzan").  According to Plaintiffs, they and the producers that they have selected have decided to proceed with their film despite the Cleopatra film and the CMT film that is set to be released shortly.  In the unlikely event that Plaintiffs producer and distribute a film, it will be the *sixth* film about the band.  If the Court were to enjoin the Cleopatra film, Plaintiffs' purported film would be the *fifth* film about the band.  There is no reason to believe that anyone would see a fifth film about a band but not the sixth.

75.     Even if Cleopatra's film made some future picture less economically valuable, Courts in the Second Circuit have long held that an injury compensable by money damages is insufficient to establish irreparable harm.  *E.g., CRP/Extell Parcel I, L.P. v. Cuomo*, 394 Fed. Appx. 779, 781 (2d Cir. 2010) ("[N]otwithstanding any compensable losses, a movant must provide evidence that it is likely to suffer damage that cannot be rectified by financial compensation before a district court may providently exercise its equitable power to grant injunctive relief.").  Here, had Plaintiffs sought compensatory damages, they would have been

easily calculated.  Plaintiffs were previously offered $75,000 for the rights to make a film.

Similarly, three decades of correspondence provide numerous offers that provide a basis for

calculating what Plaintiffs would have made if they ever produced a film.

76.     ***Second***, Plaintiffs no longer claim that Pyle's involvement with Cleopatra's film

will harm their reputation; instead, they admit that they want Pyle to be involved in their own

film.  TR 84:6-12.  Even if they did assert reputational harm, such a claim would not be

sufficient to show irreparable harm.  *In re United Pan-Europe Comms, N.V.*, Case Nos. 02–

16020 (BRL), M–47(RWS), 2003 WL 221819, at *4 (S.D.N.Y. Jan. 30, 2003) (rejecting

"irreparable harm" because there were no "specific allegations" as to what movant's reputation

was at time and how it would be affected by non-movant's actions); *see also Nat'l Football*

*League Players Ass'n v. Nat'l Football League Props., Inc.*, Case No. 90 Civ. 4244 (MJL), 1991

WL 79325, at *4-5 (S.D.N.Y. May 7, 1991) ("Plaintiff also argues that it faces destruction of its

reputation and goodwill, the loss of which cannot be compensated with money damages.

However, we fail to see convincing evidence of any loss of reputation or goodwill in the

elaborate affidavits and exhibits submitted with this motion."); *Worldwide Diamond*, 2014 WL

7933941, at *4 (subjective belief and speculation do not establish irreparable harm).

77.     *Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.*, 754 F. Supp. 2d 616

(S.D.N.Y. 2010), does not mandate a different result.  To the contrary, *Rex Medical* explains that

"[t]ypically, cases where courts have found irreparable harm from a loss of goodwill or business

relationships have involved situations where the dispute between the parties leaves one party

unable to provide its product to its customers."  *Id.* at 621.

78.     Here, Cleopatra's exercise of its First Amendment right to publish its film in no

way deprives Plaintiffs of their First Amendment right to publish a competing film or television

series. *See Burroughs*, 491 F. Supp. at 1320 (two movies can be made about same subject matter).  Anyway, Plaintiffs have testified that their film will be made, thus eliminating any putative injury resulting from their film not being made.

79.    ***Third***, Plaintiffs have introduced no evidence that Cleopatra's film will lead to consumer confusion.  Even if they had, it would not rise to the kind of irreparable harm that would support an injunction:

> Marketplace confusion between two movies … does not lead inexorably to a finding of irreparable harm.  In contrast to the purchase of an expensive camera, the purchase of one DVD is not likely to preclude the purchase of another.  And unlike confusion between two cameras, marketplace confusion about the alleged connection between these movies is not as likely to affect consumer judgments about the quality of either.  Finally, there is evidence here that any confusion has actually benefitted [Plaintiff] by bringing it increased publicity.

*Clonus Assocs. v. Dreamworks, LLC*, 417 F. Supp. 2d 248, 256 (S.D.N.Y. 2005).

80.    In any event, Cleopatra's film includes a clear statement in the opening of the film that Plaintiffs have not authorized the film.  TR 146:7-12.  Such a disclaimer precludes a finding of consumer confusion.  *See Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1053 (2d Cir. 1983) ("Disclaimers are a favored way of alleviating consumer confusion as to source or sponsorship.  …  Absolute prohibitions of speech as provided for in the instant preliminary injunction are improper where there is any possibility that an explanation or disclaimer will suffice.").

**Balancing Hardships Weighs Against an Injunction**

81.    An injunction would irreparably injure Cleopatra because the loss of First Amendment rights, even for a moment, is irreparable injury.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.")  *Accord N.Y. Progress & Prot. PAC v. Walsh*,

733 F.3d 483, 486 (2d Cir. 2013) (reversing denial of preliminary injunction against statute that limited speech).

82.     The public's right to view Cleopatra's film strongly favors denial of the preliminary injunction.  *See, e.g., N.Y. Times Co*, 403 U.S. at 730 (Stewart, J. concurring) ("[While] I am convinced that the executive is correct with respect to some of the documents involved" that publication is against "the national interest," "I cannot say that disclosure of any of them will surely result in direct, immediate, and irreparably damage to our Nation or its people," and, as a result, no injunction against publication of classified documents should issue); *Monster Comms., Inc. v. Turner Broadcasting Sys., Inc*., 935 F. Supp. 490, 494 (S.D.N.Y. 1996) ("There is a public interest in receiving information concerning the world in which we live.  The more newsworthy the person or event depicted, the greater the concern that too narrow a view of the fair use defense will deprive the public of significant information.").

83.     Any interest that the public has in ensuring that its court orders are enforced is easily outweighed by the public's interest in freedom of speech.  *See Crosby*, 312 F.2d at 485 (invalidating thirty-year old consent decree that violated the First Amendment because "there does not seem to be any equity in… the continuation of an injunction which should never have been entered in the first place"); *Matter of Providence Journal*, 820 F.2d at 1353 (reversing contempt citation when order that was violated was an unconstitutional prior restraint of speech).

**Plaintiffs' Claims Against Pyle Are Moot**

84.     Plaintiffs' only claim in this action is for an injunction barring the release of Cleopatra's film.

85.     A request for injunctive relief is properly dismissed as moot where the party to be enjoined has no ability to engage in the prohibited behavior.  *Watford v. Scully*, Case No. 88

CIV. 8372 (RWS), 1989 WL 58062, at *1 (S.D.N.Y. May 24, 1989) ("Because Scully has no authority to administer the Program at Attica, an injunction could have no affect on his conduct. Accordingly, the complaint against Scully is dismissed as moot."). *See also Correction Officers Benev. Ass'n v. Kralik*, Case No. 04 CIV. 2199 (PGG), 2009 WL 856395, at *8 (S.D.N.Y. Mar. 26, 2009) ("Because Croce is no longer the Chairman of the Commission, and therefore no longer has the power to ensure compliance with any injunction granted by the Court, any claim for such relief against Croce in his individual capacity must be dismissed."); *Odom v. Senkowski*, Case No. 96-CV-554, 1997 WL 458450, at *1 (N.D.N.Y. Aug. 7, 1997) ("Odom's request for an injunction against retaliation is also moot because the named defendants—with the exception of high level DOCS personnel against whom Odom has furnished no credible, specific evidence of retaliation—are no longer in a position to retaliate against him.")

86.     Pyle has no copies of the film or its footage.  He has no right or ability to control the film's release or exhibition.  TR 146:13-147:25.  Accordingly, all claims against Pyle are properly dismissed as moot.

## No Missing Witness Inference Is Warranted

87.     Plaintiffs seek a missing witness inference because third-party Jared Cohn did not provide live testimony at the trial.  No such instruction is warranted because all parties introduced Cohn's deposition testimony.

88.     Courts routinely reject a missing witness inference where the witness's deposition testimony was introduced in evidence at the trial.  *See Williams v. Arctic Cat, Inc.*, Case No. 3:11-CV-445, 2014 WL 1028476, at *11 (N.D.N.Y. Mar. 13, 2014) ("The Court has already ruled that Bernier's testimony may be presented at the trial via his recorded deposition testimony. Because his testimony will be available at trial, the missing witness instruction is not available

for this witness, and the motion will be denied in this respect."); *Velez v. Novartis Pharm. Corp.*, Case No. 04 CIV. 9194 CM, 2010 WL 11043081, at *3 (S.D.N.Y. Feb. 25, 2010) (no missing witness charge where deposition testimony can be introduced). *See also Latin Am. Music Co. v. Am. Soc. of Composers Authors & Publishers*, 593 F.3d 95, 102 (1st Cir. 2010) (no missing witness instruction warranted where witness's deposition testimony was introduced); *Scripps-Howard Broad. Co. v. Regency Elecs., Inc.*, 765 F.2d 146 (6th Cir. 1985) (same); *Cameo Convalescent Ctr., Inc. v. Senn*, 738 F.2d 836, 844 (7th Cir. 1984) (same).

89.     To give a missing witness instruction, the witness must have been "peculiarly within [the] power of the other party." *United States v. Mittelstaedt*, 31 F.3d 1208, 1216 (2d Cir. 1994) (internal quotation marks omitted).  However, where all parties have had an opportunity to depose the witness, the witness's testimony is equally available to all parties.

90.     Missing witness instructions are also not permitted where the witness's testimony would be cumulative, *Rodriguez v. Walker*, Case No. 97 CIV. 2823 KTD, 1999 WL 61834, at *4 (S.D.N.Y. Feb. 9, 1999) ("[N]o instruction is necessary where the unpresented testimony would be merely cumulative.").  Because deposition testimony was introduced, Cohn's live testimony would have been necessarily cumulative of his deposition testimony.

91.     Missing witness instructions are inappropriate where there is no dispute about the contents of the witness's testimony. *See United States v. Caccia*, 122 F.3d 136, 138–39 (2d Cir. 1997) ("In such circumstances, it is more likely than not that the testimony of an uncalled witness would have been unfavorable to the party with such control, and a jury may reasonably draw such an inference.").  There is no uncertainty as to what Cohn's testimony would be and, as a result, there is no reason to make any inferences whatsoever as to what Cohn's testimony would be had he been called to testify.

92.     There is no basis in law or fact for a missing witness inference in this case.

Plaintiffs' request for such an inference is pure gamesmanship and is denied.  *See United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004) ("[W]e recognize that an "aura of gamesmanship" frequently accompanies requests for missing witness charges").

Dated:  New York, NY
            July 24, 2017

Respectfully submitted,

MANDEL BHANDARI LLP

By:     /s/ Evan Mandel
            Evan Mandel
            Robert Glunt
            80 Pine Street
            New York, NY 10005
            T:  (212) 269-5600
            F:  (646) 964-6667
            em@mandelbhandari.com