UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

RONNIE VAN ZANT, INC., et al.,

                 Plaintiffs,

  -against-

ARTIMUS PYLE, et al.,

                 Defendants.

------------------------------------X

17 Civ. 3360 (RWS)

OPINION AND ORDER

A P P E A R A N C E S:

       Attorneys for Plaintiffs

       OTTERBOURG P.C.
       230 Park Avenue
       New York, NY 10169
       By:  Richard G. Haddad, Esq.
            Sandor Frankel, Esq.
            Pauline McTernan, Esq.

       Attorneys for Defendants Cleopatra Records, Inc.
       and Cleopatra Films

       MANDEL BHANDARI LLP
       80 Pine Street, 33rd Floor
       New York, NY 10005
       By:  Evan Mandel, Esq.
            Robert Glunt, Esq.

       Attorney for Defendant Artimus Pyle

       Defendant, *pro se*
       Artimus Pyle
       103 Kennedy Street
       Black Mountain, NC 28711

**Sweet, D.J.**


This action was tried before the Court between July 11 and July 12, 2017. Based upon all the prior proceedings, the findings of fact, and conclusions set forth below, judgment will be entered in favor of Plaintiffs Ronnie Van Zant, Inc., Gary R. Rossington ("Rossington"), Johnny Van Zant, Barbara Houston, as the Trustee of the Allen Collins Trust, and Alicia Rapp and Carinna Gaines Biemiller, as the personal representatives of the estate of Steven Gaines (collectively, the "Plaintiffs"), granting a permanent injunction against Defendants Cleopatra Records, Inc. ("Cleopatra Records"), and Cleopatra Films (together with Cleopatra Records, "Cleopatra") and award of costs and attorneys' fees against Cleopatra and Artimus Pyle ("Pyle," and together with Cleopatra, the "Defendants"). In addition, Plaintiffs' motion for an adverse inference is granted, and Cleopatra's motions for summary judgment and judgment as a matter of law are dismissed as moot.

## **Findings of Fact**

I.     Lynyrd Skynyrd and 1977 Plane Crash

Lynyrd Skynyrd was a rock band formed in Jacksonville, Florida in the 1960s. (Tr. 8:4-19.[1]) The band's founding members were Ronnie Van Zant ("Van Zant"), Rossington, and Allen Collins ("Collins"). (Tr. 8:20-22, 69:25-70:1.) Pyle joined as the band's drummer in 1975. (Tr. 11:4-7, 70:2-6.) During the 1970s, Lynyrd Skynyrd became a popular band, selling millions of albums and writing classic songs such as "Sweet Home Alabama" and "Free Bird." (Tr. 10:2-11:2.) During this period, Van Zant was the band's lead singer and primary songwriter. (Tr. 11:12-24.) The band's final album, entitled "Street Survivor," was released in 1977. (Tr. 10:16-22.)

On October 20, 1977, the plane in which the band and its support team were traveling crashed in Mississippi. (Tr. 12:4-12.) As a result of the plane crash, Van Zant, Gaines, Gaines' sister, a member of the support crew, and the plane's two pilots died. (Tr. 12:4-13:2.) The remainder of the plane's passengers,

---

[1]     All citations to "Tr." refer to the trial transcript. References to deposition transcripts which include portions to which a party has objected indicates the objection has been overruled.

including Rossington and Pyle, were critically injured but
survived. (Tr. 14:9-21.)

In the aftermath of the crash, Rossington, Collins, and Van
Zant's widow, now Judy Van Zant Jenness ("Jenness"), entered
into what has since been termed a "blood oath," under which the
three of them decided that no one would ever perform as Lynyrd
Skynyrd again. (Tr. 15:4-24.) Gaines' widow, now Teresa Gaines
Rapp ("Rapp"), and band keyboardist Billy Powell also witnessed
the blood oath. (Tr. 15:14-17.) For ten years, former band
members performed with other bands and under other band names,
but no performances took place under the name "Lynyrd Skynyrd."
(Tr.15:25-16:6.)

II.     1988 Action and Consent Order

In 1987, to commemorate the ten-year anniversary of the
crash, the band's surviving members reunited for a tribute tour
to Lynyrd Skynyrd. (Tr. 16:7-18.) Jenness and the band members
on the tribute tour disputed the use of the Lynyrd Skynyrd name,
which culminated in a lawsuit, Grondin et ano. v. Rossington et
al., No. 88 Civ. 3192 (RWS), in which Jenness sought to enjoin
the use of the band's name in performance (the "1988 Action").
(Tr. 16:23-17:15.) On October 11, 1988, the 1988 Action was

3

resolved by the parties' entry into a Consent Order, Judgment, and Decree (the "Consent Order," Pls.' Ex. 1). (Tr. 17:19-18:13.) Pyle, a defendant in 1988 Action and who was represented by counsel throughout the lawsuit and during the signing of the Consent Order, was one of the Consent Order's signatories; he described the aftermath of the Consent Order as everyone "on the same page" and everything was "copacetic," although he also notated adjacent to his signature on the Consent Order the words "Under Protest." (Consent Order, at 30; Deposition Transcript of Artemis Pyle dated June 20, 2017 ("Pyle Dep.") 25:8-15, 29:2-21, 30:10-23, 34:13-16.)

The Consent Order set forth, amongst many things, restrictions as to how the parties in the 1988 Action could use the name Lynyrd Skynyrd, the name, images and likeness of Van Zant and Gaines, or the history of Lynyrd Skynyrd. As relevant to the instant litigation, the Consent Order contained the following provisions:

- "[A]ll corporations owned or controlled by [any of the parties in the 1988 Action], and all agents, attorneys, employees, officers, directors, successors, assigns, and all others in concert or participation with them, are hereby jointly and severally permanently restrained and permanently enjoined from doing any of the following:

    o "Using or purporting to authorize the use of the name 'Lynyrd Skynyrd' or any logos, trade or service marks associated with the name 'Lynyrd Skynyrd,' in

4

the entertainment industry or otherwise, except as
specifically authorized herein;" (Consent Order
¶ 1(ii))

- o "Using the name, likeness, portrait, picture,
    performances or biographical material of Ronnie Van
    Zant . . . or Steven Gaines . . . for any purpose
    whatsoever, except as specifically authorized
    herein." (Id. ¶ 1(iii).)

- "[The 1988 Action parties] shall have the right to use the
  words 'Lynyrd Skynyrd' as part of a name . . . When the
  name 'Lynyrd Skynyrd' is followed immediately thereafter
  by, and includes, the calendar year at the time of such use
  . . . . The calendar year shall not be included in
  parentheses and shall be of a size, type, and prominence
  equal in all respects to the words 'Lynyrd Skynyrd.'" (Id.
  ¶ 2(a) (the "Date Requirement").)

- For purposes of live musical performances, either both
  Rossington and Collins must appear on stage together as
  active players for substantially the entire duration of the
  live performance, or Rossington or Collins must appear
  along with two of the following four musicians: Pyle, Leon
  Wilkeson, Billy Powell, or Ed King. (Id. ¶ 2(c) (the "Rule
  of Three").)

- "Each of the [1988 Action parties] shall have the right to
  exploit his (or with respect to the Estates, the applicable
  decedent's) own respective life story in any manner or
  medium, including without limitation, in books or other
  print publications and in theatrical feature or television
  motion picture, without obligation, financial or otherwise,
  to any other party hereto. In such connection, each of the
  foregoing shall have the right to refer to 'Lynyrd Skynyrd'
  and related matters and to describe and portray his
  experience(s) with 'Lynyrd Skynyrd,' provided that no such
  exploitation of life state rights is authorized which
  purpose to be a history of the 'Lynyrd Skynyrd' band, as
  opposed to the life story of the applicable individual."
  (Id. ¶ 3.)

- "There shall be no exploitation in whole or in part of the
  history of the Lynyrd Skynyrd band without the prior
  written approval of Rossington, Collins and [Van Zant's]

Estate. In the event Rossington or Collins dies or is
incapacitated, his respective estate or other legal
representative shall be entitled to exercise the approval
rights granted pursuant to [this paragraph.]" (Id. ¶ 4.)

- "No [defendant in the 1988 Action] shall make any use of
  the name, likeness, portrait, picture, or biographical
  material or Van Zant or of Gaines except pursuant to
  [certain enumerated conditions, such as record
  merchandising and particular tribute tours]." (Id. ¶ 5.)

- "[Defendants in the 1988 Action] shall not be in violation
  of this Order if a third party fails to comply with the
  terms herein contained; provided that, upon learning of
  each such failure, the [1988 Action defendants] immediately
  notify [the 1988 Action plaintiffs] and . . . immediately
  notify such third party of the applicable terms hereof and
  demand prompt compliance with all such terms. In no event
  shall the [1988 Action defendants] implicitly or through
  inaction authorize the violation of the terms hereof by any
  third party." (Id. ¶ 26.)

- "This Court shall retain jurisdiction over this action and
  over the parties for the purpose of enforcing the
  provisions hereof." (Id. ¶ 33.)

- "An amount equal to actual and reasonable attorneys [sic]
  fees shall be award to the prevailing party in any
  proceeding brought to enforce the terms and conditions of
  this Order." (Id. ¶ 34.)

- "The parties hereto may unanimously agree to amend their
  respective rights and obligations pursuant to this Order,
  without seeking further intervention of the Court, provided
  such shall be in a writing signed by all parties." (Id.
  ¶ 37.)

- Provisions containing formulas detailing the respective
  parties' rights to royalties from Lynyrd Skynyrd music,
  merchandise, and other proceeds. (See id. ¶¶ 10-12, 14-16,
  21.)

6

III.      Consent Order Aftermath

Following the Consent Order, the surviving members of
Lynyrd Skynyrd, including Pyle, continued to perform under the
"Lynyrd Skynyrd" name. (Tr. 19:8-18; Pyle Dep. 34:3-24, 41:23-
43:3, 104:18-105:16.) Pyle ceased performing with the surviving
Lynyrd Skynyrd band in 1991, at which point he signed a
termination agreement. (Tr. 19:19-25; Pyle Dep. 35:21-37:24; see
Pls.' Ex. 61.)

While the conditions of the Consent Order were to
distinguish between the pre-crash and post-crash band and avoid
confusing the fans, not every provision has been consistently
followed since 1988. (Tr. 24:16-19.) Since around 1992, the band
has performed using the name Lynyrd Skynyrd but not in
accordance with the Date Requirement provision of the Consent
Order, a provision that stopped being followed after the still-
performing band members asked Jenness and Rapp for permission,
to which they acquiesced. (Tr. 24:20-25:5, 54:3-56:17.) The Rule
of Three has not been followed since Collins' death in the early
1990s, a requirement made more difficult with the subsequent
deaths of Leon Wilkeson and Billy Powell and departures of Pyle
and Ed King. (Tr. 22:4-23:5.) In light of these facts, Jenness
and the remaining band members agreed that the Rule of Three

7

requirement would be satisfied by the presence of Rossington.
(Tr. 23:6-12.) Royalty payments have also been modified over the
years. (Tr. 53:1-3.)

These modifications were neither executed by agreement
between the Consent Order parties nor sought from the Court.
(Tr. 49:6-14.) To the extent that modifications were objected
to, such objections were resolved. (Tr. 87:18-22, 98:13-15.) In
the years following the Consent Order, Pyle has never objected
to or taken action based on modifications made to the terms of
the Consent Order, and has continued to receive royalty
payments. (Tr. 23:15-17, 25:12-17; Pyle Dep. 34:22-24, 41:23-
43:3, 65:1-23; 104:18-105:16.) Over the years, Plaintiffs have
periodically brought injunction suits against Consent Order
signatories, including Pyle, and third parties at actual or
perceived breaches of the Consent Order's strictures. (Tr.
25:18-27:10, 97:24-98:12; see Pls.' Exs. 2-6.)

IV.    Cleopatra's Film

Cleopatra Records is a Los Angeles-based independent record
label founded in 1992. (Tr. 115:4-19; Deposition of Brian Perera
dated June 9, 2017 ("Perera Dep.") 8:21-22.) Cleopatra Records
has a film component that, until around 2016, was run through an

8

affiliate division, Cleopatra Films[2], and today is run through an affiliate business, Cleopatra Entertainment LLC, which Brian Perera ("Perera"), founder, president, and co-owner of Cleopatra Records, also operates with the same employees and out of the same office.[3] (Perera Dep. 9:10-14, 9:18-25, 13:19-14:8; Tr. 118:14-16; see Tr. 145:24-146:1 (describing the "Cleopatra entities" as having paid for the "plane crash film").)

In early 2016, Cleopatra decided to pursue making a feature-length film based on the 1977 Lynyrd Skynyrd plane crash (the "Film").[4] (Tr. 119:1-20.) Around that time, Perera hired Jared Cohn ("Cohn"), a director and screenwriter, to work on

---

[2]   Perera testified that he is not aware of or transacted business through an entity entitled Cleopatra Films. (See Perera Dep. 11:19-12:20; Tr. 118:22-24.) Documentary evidence demonstrates that such an entity in fact did exist in 2016 and, at minimum, was receiving legal representation at the time of Plaintiffs' first cease and desist letter, discussed infra. (See Defs.' Exs. 2-3 (noting that Cleopatra Records was "d/b/a/ Cleopatra Films").) While the precise legal relationship between the two entities was not adduced at trial, Perera's recollection is incorrect.

[3]   Perera co-owns Cleopatra with his wife. (Perera Dep. 8:2-14.)

[4]   Perera's gossamery explanation that he believed it "a good idea to make a movie about the Lynyrd Skynyrd plane crash" because he saw "lots of Behind the Music," "felt it would be a good historical document to release a movie about a rock band on a plane, because it seems like there is some interest in movies . . . about a plane," and that "including a rock band on the plane would definitely be of interest," suggests there might be something more to the Film's origin story. (Tr. 119:5-12.)

9

writing and directing the proposed Film. (Perera Dep. 7:22-25;
Tr. 131:8-132:3; Defs.' Ex. 805.) Cohn was paid by Cleopatra and
reported to Perera but was not a Cleopatra employee. (Tr.
180:16-21; Deposition of Jared Cohn dated June 26, 2017 ("Cohn
Dep.") 31:16-21.) Around the same time, Perera reached out and
met with Pyle in Nashville, TN, to discuss the project; Pyle
expressed interest in the Film, although there was no discussion
as to Pyle's role, if any, in it. (Tr. 121:6-123:18.)

In June 2016, Cleopatra paid Pyle to fly out to Los Angeles
to discuss his involvement with the Film. (Tr. 123:19-25,
124:12-22; Perera Dep. 42:13-43:15, 44:24-45:2.) Emails between
Perera, Cohn, and Tim Yasui ("Yasui"), Cleopatra's vice
president, establish that Pyle was being brought in to work on
the script with Cohn, (Pls.' Ex. 15), take publicity photos,
(Pls.' Ex. 17), and get video recordings of Pyle from which to
create the Film's screenplay, (Pls.' Ex. 16).

On June 7, 2016, while meeting in Los Angeles, Pyle signed
an agreement with Cleopatra that entitled him to 5% of the
Film's net receipts, which would be "based on the story of
Lynyrd Skynyrd's 1977 plane crash and the event surrounding it,"
on which he would receive a "Consultant" or "Co-Producer"
credit; Pyle also contracted to narrate the Film, make a cameo

appearance in the Film, and contribute an original song to the Film. (See Defs.' Ex. 9.) During this meeting, Pyle did not tell Perera about the Consent Order, but did inform him of the litigious history between those historically connected to Lynyrd Skynyrd and that, should Pyle's involvement with the Film imperil its production, Pyle would "rip . . . up" the contract.[5] (Tr. 128:12; see also Tr. 128:7-19; Perera Dep. 49:17-21, 50:2-51:18, 64:14-18, 150:13-151:12.) While Pyle was in Los Angeles, Cohn interviewed and video-recorded Pyle for eleven hours. (Tr. 142:23-143:6; Cohn Dep. 42:24-43:2.) Around the end of June 2016, Cleopatra put out press releases advertising Pyle's involvement as a co-writer and co-producer of the Film. (See Pls.' Exs. 49-50.)

V.      Plaintiffs' Cease and Desist Letter

    On July 15, 2016, Plaintiffs sent Cleopatra a cease and desist letter after learning through news articles that Cleopatra intended to produce a movie being co-written by Cohn and Pyle entitled "Free Bird" about Lynyrd Skynyrd and the 1977

---

[5]     Pyle testified that, at the June 2016 meeting, he described the Consent Order to Perera and that, while Pyle did not have a copy of the Consent Order, he advised Perera one was on file in New York; it appears that, at that time, Pyle did not state the details about the restrictions resulting from the Consent Order's existence. (See Pyle Dep. 62:14-64:5.)

plane crash.[6] (See Pls.' Exs. 7-8; Defs.' Exs. 1, 55; Tr. 27:11-29:17.) In the letter, Plaintiffs requested a copy of the Film's script and noted various restrictions based on terms of the Consent Order. (See Pls.' Ex. 7.) On July 19, 2017, Cleopatra requested a copy of the Consent Order and declared its First Amendment right to make its film. (Defs.' Exs. 2-3.) On July 22, 2016, Plaintiffs mailed Cleopatra a copy of the Consent Order, which Cleopatra received shortly thereafter.[7] (Tr. 134:8-15, 160:9-11; Defs.' Ex. 4; Pls.' Ex. 9.) Perera, Cohn, and Cleopatra's counsel, Evan Cohen ("Cohen"), read and discussed the Consent Order.[8] (Cohn Dep. 13:17-23, 14:16-15:3, 16:13-22, 17:12-21; Perera Dep. 108:22-110:15.)

---

[6]    Perera stated that the choice of the title "Free Bird" had nothing to do with the Lynyrd Skynyrd song but, rather, was because of "an airplane in the sky and a bird." (Tr. 163:20-21.) Such an explanation is not credible.

[7]    At the time of receipt of the Consent Order around July 22, 2016, Cleopatra has spent approximately $7,000 in the development of its Film. (See Tr. 171:13-172:23, 175:14-177:20; Pls.' Ex. 53.)

[8]    Perera testified at trial that he neither recalled providing a copy of the Consent Order to Cohn, (Tr. 180:22-181:2), the contents of the Consent Order, (Tr. 134:11-15, 160:9-22), and the cease and desist letter, (Tr. 160:23-161:22). Given the inconsistencies of this testimony in conjunction both with Perera's prior testimony and other admitted testimonial evidence, that version of the events is not credible.

On August 5, 2016, Cohn, in consultation with Perera, messaged Jenness over Facebook and invited her to Los Angeles to "talk about the movie project"; the goal was to determine a way to address the cease and desist letter Cleopatra had received. (Pls.' Ex. 10; see Tr. 31:2-33:1, 62:21-63:16, 89:18-20, 134:25-135:13; Cohn Dep. 99:7-9, 99:13-19, 104:5-13.) Jenness responded by Facebook message and requested Cleopatra to "send an email explaining and outlining [Cleopatra's] plans and how [Cleopatra] see[s] it involving [her]." (Pls.' Ex. 10.) After conferring with Cohen, Cleopatra chose not to respond. (Tr. 135:21-136:4; 221:1-223:25.) Neither Jenness, Rossington, nor Collins' estate discussed the Film further with Cleopatra. (Tr. 46:6-10, 91:22-25.)

VI.     Cleopatra's Film Production Post-Cease and Desist

Following receipt of the cease and desist letter, Cleopatra continued to work on producing its Film, but stopped publically referring to Pyle as a writer or producer of the Film. (Tr. 141:16-142:4.) For almost the next year, Cohn wrote over a dozen drafts of the Film's script. (See Defs.' Exs. 301-317.) Evidence adduced established that Cleopatra involved Pyle in many aspects of its Film production process, although Pyle neither did any of the actual script writing nor had final control over the Film's

13

content, which is maintained by Cleopatra. (See Tr. 139:9-10, 146:13-147:25; Pyle Dep. 88:19-21.)

Pyle regularly texted or called Cohn to relay historical information, sometimes directly, sometimes through intermediaries at Cleopatra, which Cohn would incorporate into his written work.[9] (See Pls.' Exs. 20, 22, 25, 26; Cohn Dep. 22:8-22, 43:25-44:9). Around August 8, 2016, Pyle received a copy of Cohn's fifteen page outline for the Film, which Pyle reviewed and offered "minor" comments, (Pls.' Ex. 22; see Pls.' Ex. 23; Cohn Dep. 63:16-64:14), and received copies of the Film's script in September, October, and November 2016, (see Pls.' Exs. 27, 28, 30; Tr. 169:3-6). Pyle discussed his notes and revisions with Cohn on at least some of these drafts. (See Pls.' Exs. 29, 31, 32; Tr. 197:9-24.) Cohn's script drafts continued to incorporate feedback from Pyle through early 2017 and the Film's filming.[10] (See Pls.' Ex. 34; Tr. 200:15-20; Cohn Dep. 46:17-48:7.)

---

[9]    Phone calling and texting were Pyle's principal media of communication because Pyle does not own or know how to use a computer and does not send or receive email messages, practices corroborated by the evidence. (See Pyle Dep. 45:18-46:7.)

[10]   Cohn contends that he did substantive independent research for the Film, although he did not recall whether he maintained notes on any of that research, aside from Cohn's initial meeting with Pyle. (See Cohn Dep. 32:5-35:21; see also Tr. 188:3-12.) At minimum, no substantive evidence of independent research by Cohn

Cleopatra solicited Pyle's views on casting and costumes as well. Around February 2017, during the Film's casting and actor auditions, Pyle provided notes and thoughts, which Cohn viewed as "helpful." (Pls.' Ex. 34; see also Pls.' Exs. 33, 35; Tr. 204:15-23; Cohn Dep. 49:20-50:10.) In March 2017, Pyle discussed costuming selections with the Film's costume designer. (See Pls.' Exs. 37, 38; Tr. 212:16-18; Cohn Dep. 48:11-15.) In April 2017, Cleopatra paid for Pyle to fly to Los Angeles to participate in a table read with actors selected for the Film, during and after which Pyle provided feedback on the accuracy of the portrayals, feedback which Cohn incorporated into the Film's script. (See Pls.' Exs. 39-41; Tr. 214:23-215:11; Pyle Dep. 81:6-83:6; Cohn Dep. 58:12-59:21.)

Pyle has also provided video footage for a cameo appearance in Cleopatra's Film and worked on original music for the Film's soundtrack. (See Tr. 201:4-10, 216:10-25; Cohn Tr. 60:18-24; Pyle Dep. 76:19-25, 77:6-12.)

---

has been presented, in which circumstances Cohn's claim is difficult to accept as true.

VII.    Cleopatra's Film

The Film's final script focuses principally on Pyle, his relationship with the Lynyrd Skynyrd band members, particularly Van Zant, and events during and immediately following the 1977 plane crash. (See generally Pls.' Ex. 13.) The script broadly includes: scenes of the band performing at a concert and playing well-known Lynyrd Skynyrd songs, (see id., at P000051-56); post-concert and general scenes of the band cavorting, (see id., at P000056-69, 81-84); flashbacks to when Pyle first met and joined the band, (see id., at P000084-91); and scenes just before, during, and shortly after the band's plane crash, (see id., at P000070-81, 91-155). As Pyle summarized it, the Film "was a compression of – of our life as a band." (Pyle Dep. 103:16-17; see also Tr. 227:4-6 (noting that the Film is not a "life story").)

Pyle is the main character of the Film, although Van Zant has much of the dialogue and the remaining band members, including Gaines and Rossington, are featured and have dialogue. (See generally Pls.' Ex. 13.) Portions of the script are historically inaccurate, either because the chronology of events depicted is incorrect, such as instances of Van Zant's infidelity or a scene of Van Zant breaking a glass bottle over a

16

person's head the night before the plane crash, or because of factual inaccuracy, such as Pyle encountering an alligator after fleeing from the plane crash wreckage.[11] (Pyle Dep. 95:20-97:7, 97:22-101:22.)

Cleopatra intends to place cards in the Film's opening credits to indicate that the film was not authorized by Lynyrd Skynyrd or any current or former member of Lynyrd Skynyrd. (Tr. 146:7-12.)

The Film is, overall, a film about Lynyrd Skynyrd. This finding is based on a number of factors: a review of the Film's script as detailed above, which exclusively tells a portion of the band's history through the lens of Pyle; Cleopatra's regular and factually-focused interactions with Pyle throughout the film-making process; Cleopatra's repeated selection of film titles that evoke the Lynyrd Skynyrd legacy, noted both above and below; and the Court's overall finding of Perera as an unreliable witness whose answers and demeanor evinced an attempt

---

[11]   Other aspects of the script are less concretely inaccurate, such as the depiction of the 1977 plane crash pilots consuming alcohol prior to the flight, although the Federal Aviation Administration's post-crash report did not identify drugs or alcohol use by the pilots in the report's toxicology findings. (Compare Pls.' Ex. 62, at P001128, with Pls.' Ex. 13, at P000078.)

by the Film's makers and producers to evade the Consent Order
upon its receipt.[12]

VIII.     Plaintiffs' Instant Action

On April 23, 2017, Variety released a news article about
Cleopatra's Film, now entitled "Street Survivors: The True Story
of the Lynyrd Skynyrd Plane Crash," around which time Plaintiffs
became aware that Cleopatra had continued with its Film
production.[13] (Tr. 38:7-20, 90:8-23; see Pls.' Ex. 11.) Principal
filming began on April 24, 2017. (Cohn Dep. 13:25-14:3.)
Plaintiffs initiated the present action on May 5, 2017. (Tr.
38:25-40:1.)

On May 9, 2017, in response to Plaintiffs' lawsuit,
Cleopatra mailed Pyle a letter to modify the contract with Pyle,
limit his title to "a historical consultant," and avoid

---

[12]    As such, Perera and Cohn's contentions that Pyle was
repeatedly solicited for information to "make him feel good,"
(Cohn Dep. 49:11), or to "keep everything friendly and positive
and move things along," (Tr. 199:14), are not accepted.

[13]    Perera explained that he selected the new title "Street
Survivors" because it was "just another good title," not because
of any connection to the identically named Lynyrd Skynyrd album
title. (Tr. 164:18.) The title was changed because of the
initial cease and desist letter. (See Tr. 138:18-20.) As the
Film is, in major part, about a plane crash, the title appears
to have been selected to evoke the emotional impact of the band.

violating the Consent Order. (Tr. 237:21-25; see also 240:5-25;
Pls.' Ex. 58.) The May 9 letter stated that the prior June 2016
agreement between Cleopatra and Pyle was to be "void ab initio"
and that, actually, Pyle had agreed back in June 2016 to provide
historical information for the Film for a set sum of $2,500, a
fee which Cleopatra proceeded to issue to Pyle that same day.
(Pls.' Ex. 58; see Pls.' Ex. 59.) Cleopatra viewed acquiring
Pyle's signature on this document as "fairly urgent." (Pls.' Ex.
57.)[14]


Principal photography of Cleopatra's Film wrapped up in
mid-May 2017.[15] (Cohn Dep. 23:12-13.) Sometime in mid-May 2017,
following the end of filming, Cohn switched cell phone providers
and, consequently, acquired a new cell phone. (Cohn Dep. 23:2-
20.) Although certain data on Cohn's old phone was backed-up,
such as pictures, other data was not preserved, such as Cohn's
text messages, including those sent and received from Pyle.
(Cohn Dep. 23:21-24:16.)

---

[14]   Other actions were taken following the instigation of
Plaintiffs' lawsuit to extricate Pyle's involvement from the
Film, such as editing the Film's listing on the Internet Movie
Database website to remove Pyle's name as a co-writer in June
2017. (Compare Pls.' Ex. 54, and Pls.' Ex. 55, with Pls.' Ex.
56; see Tr. 231:19-22.)

[15]   Cleopatra's filming and production costs for its Film up to
around the instant action are approximately $1.2 million. (See
Defs.' Ex. 13; Tr. 145:24-146:1.)

IX.     Plaintiffs' Lynyrd Skynyrd Film, Country Music
        Television Project, and Other Prior Works About Lynyrd
        Skynyrd

Plaintiffs are currently developing their own film about Lynyrd Skynyrd, though the process is still in early stages. (Tr. 34:12-16, 83:6-13.) Back in February 2017, two film producers presented Plaintiffs with an outline of the project, though the outline has yet to be approved and next steps are still forthcoming. (Tr. 34:17-35:4, 82:23-83:2, 83:22-25; see Pls.' Ex. 14.)

Rossington, Jenness, and Johnny Van Zant, Van Zant's brother, are also working with Country Music Television ("CMT") on a documentary film about Lynyrd Skynyrd entitled "If I Leave Here Tomorrow: A Film About Lynyrd Skynyrd," which will be focused on Van Zant and his relationship with the Lynyrd Skynyrd band members. (See Pls.' Ex. 67; Tr. 84:26-87:14.)

In the years following the signing of the Consent Order, there have been many different books, television shows, and radio programs about Lynyrd Skynyrd. (See, e.g., Defs.' Ex. 62 at 266:22-268:13; Tr. 78:3-21) At times, signatories to the Consent Order such as Pyle have been interviewed for such projects. (See, e.g., Tr. 75:5-6, 77:7-10.)

20

**Prior Proceedings**

Plaintiffs filed their Complaint on May 5, 2017, alleging a violation of the Consent Order and seeking a permanent injunction as to Cleopatra's film (First Cause of Action) and an award of attorneys' fees (Second Cause of Action). (Dkt. No. 18 (the "Complaint").) On June 12, 2017, Plaintiffs' request for a temporary restraining order and preliminary injunction was denied. (Dkt. No. 11.) Expedited discovery proceeded.

On June 30, 2017, Plaintiffs requested the Court issue an adverse inference sanction against Defendants for spoliation of text message evidence between Cohn and Pyle. On July 1, 2017, Cleopatra moved to dismiss the Complaint and for summary judgment. On July 11, 2017, Cleopatra's motion to dismiss was denied.

Evidence was presented on July 11 and 12, 2017. Final arguments and submissions were made on July 26, 2017; Plaintiffs' and Cleopatra's outstanding motions were heard and marked fully submitted the same day.

**Conclusions of Law**

## I.   Plaintiffs are Entitled to An Adverse Inference

As an initial matter, Plaintiffs have moved, either
pursuant to Federal Rule of Civil Procedure 37(e) or the Court's
inherent authority, that the Court draw an adverse inference
with respect to the unpreserved text messages between Cohn and
Pyle lost when Cohn switched phones in May 2017. This showing
has been met.[16]

Spoliation is "the destruction or significant alteration of
evidence, or the failure to preserve property for another's use
as evidence in pending or reasonably foreseeable litigation."
West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir.

---

[16]   Defendants argue that the recent amendments to Fed. R. Civ.
P. 37(e) and its advisory notes limit a court's ability to
exercise inherent powers to remedy spoliation. However, even
after the 2015 amendments, courts have continued to recognize
powers to sanction the destruction of evidence outside of Rule
37(e) because "'[c]ertain implied powers must necessarily result
to our Courts of justice from the nature of their institution,'
powers 'which cannot be dispensed with in a Court, because they
are necessary to the exercise of all others." CAT3, LLC v. Black
Lineage, Inc., 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016) (quoting
Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)); see also Hsueh
v. New York State Dep't of Fin. Servs., No. 15 Civ. 3401 (PAC),
2017 WL 1194706, at *4 (S.D.N.Y. Mar. 31, 2017) (collecting
cases). As Rule 37(e) does apply here, however, there is no need
to rely on such powers.

1999). Federal Rule of Civil Procedure 37(e)(1) permits a court to sanction a party "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Where the party that failed to preserve the electronically stored information ("ESI") "acted with the intent to deprive another party of the information's use in the litigation," the Court may "instruct the jury that it may or must presume the information was unfavorable to the party" or "dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2). The duty to preserve extends to "any documents or tangible things (as defined by Rule 34(a)) . . . 'likely to have discoverable information that the disclosing party may use to support its claims or defenses.'" Zubulake v. UBS Warburg, LLC, 220 F.R.D. 212, 217 (S.D.N.Y .2003) (citations omitted) (the parties "must not destroy unique, relevant evidence that might be useful to an adversary"). Factors that the court considers include: (1) whether the party acted willfully, negligently, or in bad faith; and (2) the prejudice suffered by the party seeking the discovery. See John Bo Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988)).

Cleopatra argues that it cannot be sanctioned for the actions Cohn, a non-party, took and whose phone, Cleopatra contends, was not within their control. However, the "concept of 'control' has been construed broadly." In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 195 & n.19 (S.D.N.Y. 2007) (quoting Marc Rich & Co. v. United States, 707 F.2d 663, 667 (2d Cir. 1983), and collecting cases), aff'd sub nom. Gordon Partners v. Blumenthal, No. 02 Civ. 7377 (LAK), 2007 WL 1518632 (S.D.N.Y. May 17, 2007). Documents are considered to be under a party's control "if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement." In re NASDAQ Mkt. Makers Antitrust Litig., 169 F.R.D. 493, 530 (S.D.N.Y. 1996) (citation omitted).

Here, while Cohn is a non-party, his text messages were, practically speaking, under Cleopatra's control. Cohn was contracted by Cleopatra to work on the Film, and the evidence has establishes that he worked closely with Cleopatra for over the past year. Over the course of the instant litigation, Cohn has participated by providing documents and took a deposition sought by Plaintiffs during discovery.[17] As has been found relevant in other cases determining the relationship between a

---

[17]    Even without a subpoena, the validity of which Cleopatra has contested and which is discussed infra.

party and non-parties, Cohn also has a financial interest in the
outcome of this litigation, since he is entitled to a percentage
of the Film's net receipts, which would be zero should
Plaintiffs prevail. See Golden Trade, S.r.L. v. Lee Apparel Co.,
143 F.R.D. 514, 525 (S.D.N.Y. 1992) (finding that a company had
legal control over documents in possession of non-party,
unaffiliated sub-licensing company because of the cooperative
relationship between the two); (Defs.' Ex. 805 at 2). In sum,
while determining practical control is not an exact science,
"common sense" indicates that Cohn's texts with Pyle were within
Cleopatra's control, and in the face of pending litigation over
Pyle's role in the Film, should have been preserved. GenOn Mid-
Atl., LLC v. Stone & Webster, Inc., 282 F.R.D. 346, 355
(S.D.N.Y. 2012) (finding that while a party possessed no legal
control over non-party's documents, there was "little doubt that
[the third-party] would have complied with a timely request by
[Plaintiff] to preserve its information").

Cleopatra next contends that Plaintiffs have not
established Plaintiffs issued Cohn a valid subpoena for the text
messages and, therefore, there cannot be sanctions for Cohn's
noncompliance. Defendants are correct that under Fed. R. Civ. P.
45(c)(2)(A), subpoenas for document production must have
production locations within 100 miles of where the person

"resides, is employed, or regularly transacts business in person." Plaintiffs have not established that Cohn works or resides anywhere but California, and the subpoena issued for him required production in New York; it is also unestablished that Defendants were willing to accept service of the subpoena on Cohn's behalf.

However, what the rules require is independent of a proper subpoena and simply that the lost information "should have been preserved," and there has been no dispute that the missing texts would have been relevant to the instant matter. Fed. R. Civ. P. 37(e); see West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) ("Even without a discovery order, a district court may impose sanctions for spoliation."). Moreover, unlike the cases Cleopatra has cited in support its position, Plaintiffs have tried repeatedly—albeit unsuccessfully— throughout this expedited litigation to access these documents. Contra Goonewardena v. N.Y. Workers Comp. Bd., No. 09 Civ. 8244 (RA), 2017 WL 2799171, at *16 (S.D.N.Y. June 28, 2017) (rejecting prejudice from spoliation and sanctions where during "discovery [the other parties] never asked for the evidence later shown to have been spoliated"). Plaintiffs may very likely have attempted, with greater success, to acquire Cohn's texts

26

with Pyle; after learning the texts were destroyed, however, such opportunity was foreclosed.

Lastly, Cleopatra argues that Plaintiff have not shown prejudice because Plaintiffs could in theory have acquired the text messages from Pyle and because Defendants have produced a large number of other documents, rendering the missing messages cumulative. As to Pyle, who has made minimal appearance and has not produced any documents in this litigation, Plaintiffs have represented that they sought Pyle's messages to no avail, a credible claim; moreover, given the timeframe sought by the parties for this matter, this is sufficient effort. As to the messages themselves, while Cleopatra has produced much evidence during the discovery process, none speak directly to an important piece of this puzzle that would have been covered by the texts: the quality of interaction between Pyle, the Consent Order's signatory, and Cohn, the principal writer and singular director of the Film, a relationship that evidence established was principally developed through text messages. (Cohn Dep. 22:8-22, Pyle Dep. 46:15-47:4.) Without those messages, the precise nature and frequency of those communications cannot be verified.

Lastly, Cohn's actions with regard to the text messages—
getting a new phone after Plaintiffs brought the instant action
and managing to back-up pictures but, somehow, not text
messages, (see Cohn Dep. 23:1-24:16)—evince the kind of
deliberate behavior that sanctions are intended to prevent and
weigh in favor of an adverse inference. See West, 167 F.3d at
779 (holding that "sanction[s] should be designed to: (1) deter
parties from engaging in spoliation; (2) place the risk of an
erroneous judgment on the party who wrongfully created the risk;
and (3) restore the prejudiced party to the same position he
would have been in absent the wrongful destruction of evidence
by the opposing party" (citations and internal quotation marks
omitted)). Accordingly, an adverse inference as to the missing
Cohn text messages will be presumed against Cleopatra.


## II.   Plaintiffs are Not Entitled to A Missing Witness Charge

Plaintiffs seek a missing witness adverse inference because
Cohn did not testify at trial. Plaintiffs argue that Cleopatra
failed to call Cohn to testify and concealed Cohn's presence
during the trial proceedings from the Court. Even if language
employed by Cleopatra's counsel during trial was artfully

crafted[18], none of Plaintiffs' arguments warrant the adverse inference they seek.

"A missing witness charge . . . to infer that the testimony of an uncalled witness might have favored a specified party is appropriate if production of that witness is peculiarly within the power of the other party." United States v. Mittelstaedt, 31 F.3d 1208, 1216 (2d Cir. 1994) (citing United States v. Nichols, 912 F.2d 598, 601 (2d Cir. 1990)) (internal alterations and quotation marks omitted). A court is to consider "all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility." Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409, 432 n.10 (2d Cir. 1999) (quoting United States v. Torres, 845 F.2d 1165, 1170–71 (2d Cir. 1988)). "Whether a missing witness charge should be given lies in the sound discretion of the trial court." Torres, 845 F.2d at 1170–71 (citations omitted).

---

[18]   Cleopatra's counsel's comments were always truthful, though, in retrospect, not directly aligned as responses to Plaintiff's counsel's queries or the discussion before the Court. (Compare Tr. 104:6-105:10 (stating, after discussing whether Cohn was previously present in a video-fed testimony room, that "he's [Cohn] not present" in the room), with Tr. 168:19-169:2 (acknowledging the next day that Cohn had been in the room earlier but left just before testimony began and the earlier statement was made).)

Nothing presented has established that Cohn was peculiarly in the control of Cleopatra, and the fact that Cleopatra chose not to call him does not affect that. Moreover, Plaintiffs had the ability to depose Cohn, which they did, and the deposition of which was admitted into evidence. A missing witness charge is not merited in such circumstances. See Velez v. Novartis Pharm. Corp., No. 04 Civ. 9194 (CM), 2010 WL 11043081, at *3 (S.D.N.Y. Feb. 25, 2010) (noting that "ability of [opposing counsel] to use its own time to call (by subpoena or by deposition)" the missing witness weighs against a missing witness charge); accord Cameo Convalescent Ctr., Inc. v. Senn, 738 F.2d 836, 844 (7th Cir. 1984) (observing that "the justification for the missing witness instruction diminishes with the availability of the tools of discovery" and rejecting missing witness charge when opposing party "relied upon and quoted extensively from the depositions of missing witnesses") (citing E. CLEARY, McCormick on Evidence § 272, at 657 (2d ed. 1972)).

### III.  Plaintiffs are Entitled to A Permanent Injunction

Plaintiffs contend that Pyle, as a signatory to the Consent Order, is bound by its provisions; that Cleopatra acted in concert or participation with Pyle in producing Cleopatra's

motion picture, in turn binding Cleopatra to the Consent Order;
and that the production of Cleopatra's motion picture was in
violation of the Consent Order. In response, Cleopatra has made
counterarguments attacking each link in Plaintiffs' syllogism.

"To obtain a permanent injunction, a plaintiff must succeed
on the merits and 'show the absence of an adequate remedy at law
and irreparable harm if the relief is not granted.'" Roach v.
Morse, 440 F.3d 53, 56 (2d Cir. 2006) (quoting N.Y.S. Nat'l Org.
for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir. 1989)). Based
on the aforementioned findings of fact and as discussed below,
Plaintiffs have established their case, adequately responded to
each of Cleopatra's arguments, and are entitled to judgment in
their favor.

### 1. Pyle is Bound by the Consent Order

Cleopatra has argued that, although it is uncontested that
Pyle signed the Consent Order, by writing next to his signature
the words "Under Protest," he rendered his signature
nonconsensual and, therefore, is not bound to the Consent
Order's provisions. In support, Cleopatra points to a handful of
state-level authority for the proposition that signing "under

protest" on a document does not constitute actual assent.[19] (See
Pls.' Ex. 1.)

Cleopatra's argument and supporting authority are not
persuasive. First, as even Cleopatra's cases make clear, in the
context of common law contractual assent, the presence of a
phrase like "under protest" does not singularly turn a signatory
into a non-signatory: what matters is the context surrounding
the inclusion and whether a "contemporaneous explanation"
supported its presence, Bergenline Prop. Grp., 2015 WL 7428755,
at *4 n.2 (quoting Quigley v. KPMG Peat Marwick, LLP, 330 N.J.
Super. 252, 266-267, 749 A.2d 405 (App. Div. 2000), a factor
that courts in this state also consider. See Miller v. N.Y.C.
Health & Hosp. Corp., No. 00 Civ. 140 (PKC), 2004 WL 1907310, at
*13 (S.D.N.Y. Aug. 25, 2004) (rejecting that an agreement was
signed under duress when "Signed Under Protest" was written
above the signature line when objecting party "raise[d] no

---

[19]    Cleopatra has cited three cases in support: Bergenline
Prop. Grp., LLC v. Coto, No. A-0259-14T2, 2015 WL 7428755, at *4
(N.J. Super. Ct. App. Div. Nov. 10, 2015) (affirming a trial
court's finding of no meeting of the minds after a party
epeatedly rejecting lease agreement and then notating "signing
under protets"); Ex parte Wright, 443 So. 2d 40, 42 (Ala. 1983)
(failing to find a "meeting of the minds" when new employment
contracts were signed "under protest and under duress"); Church
Mut. Ins. Co. v. Kleingardner, 2 Misc. 3d 676, 680-81, 774
N.Y.S.2d 265 (Sup. Ct. 2003) (finding similar but in the context
of applying the New York Uniform Commercial Code).

argument concerning the circumstances" underlying the signature).

The factual circumstances establish that Pyle's inclusion of the notation "Under Protest" does not render Pyle's signature nonconsensual. Pyle signed the Consent Order while represented by counsel; furthermore, Pyle has acknowledged that the Consent Order reflected that the parties to the 1988 Action were in agreement as to its terms, he has accepted payments under the Consent Order for many years, and has never personally contested that he is not bound by the Consent Order's conditions. As such, the evidence supports the conclusion that there was a "meeting of the minds" at the time the Consent Order was signed, and the circumstances here foreclose Cleopatra's ability to argue that Pyle is not bound by the strictures of the Consent Order. Schurr v. Austin Galleries of Ill., Inc., 719 F.2d 571, 576 (2d Cir. 1983) (citations omitted) ("Under New York contract law, the fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties."); cf. Donovan v. Penn Shipping Co., 536 F.2d 536, 536 (2d Cir. 1976) (rejecting plaintiff's ability to contest a remittitur signed "under protest" after accepting said remittitur).

33

2. <u>Cleopatra Can Be Bound by the Consent Order</u>

Cleopatra next argues that, even if Pyle is bound by the
Consent Order, Cleopatra cannot be because Cleopatra is a non-
signatory to the Consent Order and a non-party to the underlying
1988 Action. Specifically, Cleopatra has argued there is a
distinction between an enforcing court's powers in the context
of enforcing an injunction versus enforcing a consent decree.
Such a divide has no support in law, and Cleopatra can be bound
by the Consent Order.

A court's power to enforce provisions of consent orders
comes principally from the All Writs Act, 28 U.S.C. § 1651(a),
which "empowers Courts to issue extraordinary writs 'as may be
necessary or appropriate to effectuate and prevent the
frustration of an order it has previously issued.'" <u>United
States v. Int'l Bhd. of Teamsters</u>, 907 F.2d 277, 280 (2d Cir.
1997) (quoting <u>United States v. N.Y. Tel. Co.</u>, 434 U.S. 159, 172
(1977)). The sweep of the Act is wide: "The power conferred by
the Act extends, under appropriate circumstances, to persons
who, though not parties to the original action or engaged in
wrongdoing, are in a position to frustrate the implementation of
a court order or the proper administration of justice,
encompasses even those who have not taken any affirmative action

34

to hinder justice." N.Y. Tel. Co., 434 U.S. at 174. In the
Second Circuit, the All Writs Act has been affirmed when used to
prevent the circumvention of a court's previous order, see Sheet
Metal Contractors Ass'n of N. N.J. v. Sheet Metal Workers' Int'l
Ass'n, 157 F.3d 78, 82-83 (2d Cir. 1998) (finding All Writs Act
the proper basis for injunction of nonparty to the original
order), and "makes no distinctions between parties and
nonparties," Int'l Bhd. Of Teamsters, 266 F.3d at 50. Consent
orders and decrees are enforced like other court orders. Berger
v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985) (citations
omitted) ("Consent decrees are subject to continuing supervision
and enforcement by the court. A court has an affirmative duty to
protect the integrity of its decree. This duty arises where the
performance of one party threatens to frustrate the purpose of
the decree." (citation and internal alternations omitted)).

    Cleopatra relies on language from Ass'n for Retarded
Citizens of Conn., Inc. v. Thorne, 30 F.3d 367 (2d Cir. 1994),
to argue that consent orders only bind those who voluntarily
agree to them, which Cleopatra undisputedly did not do with
respect to the Consent Order. See id. at 370 ("While a district
court has authority to enforce a judicially-approved consent
decree against the parties to it, a district court that enforces
the decree against a nonparty acts beyond its jurisdiction and

35

thus beyond the scope of the All Writs Act."). However, Thorne's facts and holding are inapposite to the instant case.

In Thorne, the Second Circuit overturned a district's court decision to join a previous non-party as a defendant to a litigation years after a final order was entered by the district court, the effect of which would have made the non-party subject to every provision of the previously-entered consent decree. See id. at 368. The Thorne court made its opinion pointedly narrow, "conclud[ing] only that the district court's decision to add [the non-party] to this suit after a final consent judgment had already been entered was not authorized by the All Writs Act." Id. at 373. Thorne's holding was based on facts distinct those presented here. Plaintiffs are not seeking to add Cleopatra as a party to the 1988 Action or to bind Cleopatra to every provision of the Consent Order.

By contrast, in subsequent Second Circuit authority, In re Egri, 68 F. App'x 249, 256 (2d Cir. 2003), the circuit court affirmed a district court's grant of a permanent injunction under the All Writs Act that prevented non-signatory residents of a town from challenging the validity of a consent decree between the town and an electric company. The Egri Court rejected comparisons to Thorne by noting that "unlike the

36

district court in [Thorne], here the district court 'has sought
not to bind [non-party] appellants to the consent decree, but to
enjoin them from acts that would frustrate the consent decree's
operation on parties that are bound to the decree.'" Id. at 255
(quoting United States v. Int'l Bhd. of Teamsters, Chauffeurs,
Warehousemen & Helpers of Am., AFL-CIO, 266 F.3d 45, 50 (2d Cir.
2001)). "[A]n injunction that merely seeks to enjoin behaviors
that could frustrate the operation of a consent decree are
authorized by the All Writs Act, even if the injunction operates
against non-parties." Id. at 256.

Such is the situation here. The Consent Order dictates,
amongst many things, parameters for the signatories' use of the
name Lynyrd Skynyrd, the band's story, the band's music, and the
name, likenes, or history of Van Zant or Gaines; its terms
prohibit those "in concert or participation with" the
signatories from violating these portions of the Consent Order's
strictures. (See Consent Order at 1-2.) If there was a violation
of the Consent Order by Pyle, it is within the power of the
Court to enjoin those acting in concert with him, not "to force
non-parties to abide by the terms of that order," but "insofar
as [it is] essential to the implementation of that order." In re
Egri, 68 F. App'x at 256; see also United States v. Mason
Tenders Dist. Council of Greater N.Y., 205 F. Supp. 2d 183, 189

(S.D.N.Y. 2002) (enjoining non-signatories to consent decree under the All Writs Act and noting that those enjoined were not "bound to the strictures of the [Consent Decree], an action that would be outside the district court's discretion" but rather were "enjoined from acts that would frustrate the Consent Decree's operation on parties that are bound by the decree—an act well within the district court's discretion"); Bear U.S.A., Inc. v. Kim, 71 F. Supp. 2d 237, 246, 248 (S.D.N.Y. 1999) (enjoining third-party manufacturer who acted "in active concert" with defendant bound by previous court order from distributing infringing products after being informed of court order), aff'd, 216 F.3d 1071 (2d Cir. 2000). For a Consent Order to be effective, it must provide protection against those who would seek to undermine its terms; without meaningful protection, such an order is just a piece of paper and "ain't no good for nothing else." LYNYRD SKYNYRD, Saturday Night Special, on NUTHIN' FANCY (MCA Records 1974); see also Bear U.S.A., 71 F. Supp. 2d at 246 ("Learned Hand explained that a judgment binds not only the parties, but also 'a person not a party . . . when he has helped to bring about . . . an act of a party [forbidden by the judgment].'" (quoting Alemite Mfg. Corp. v. Staff, 42 F.2d 832, 833 (2d Cir. 1930)).

### 3. Defendants Have Violated the Consent Order

Cleopatra next argues that, even if Pyle and Cleopatra are bound to terms of the Consent Order, Defendants actions do not constitute a violation of its terms. First, Cleopatra contends that Cleopatra could only have violated the Consent Order after learning of its terms, after which Cleopatra claims that it ameliorated the harm; second, Cleopatra attempts to house its use of Van Zant and Gaines' names and likenesses as protected as "nominative fair use." These arguments are unavailing.

Given the terms of the Consent Order and Plaintiffs' allegations, to establish that Defendants violated the Consent Order's terms, Plaintiffs need to show that Cleopatra (1) had knowledge of the Consent Order and (2) acted "in concert or participation" with a Pyle to use the "name, likeness, portrait, picture, performance or biographical material of Ronnie Van Zant [] or Steven Gaines []." (Consent Order ¶ 1(iii)); see In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d 328, 339 (2d Cir. 1985) ("Although Rule 65 does not apply to injunctions issued under the All-Writs Act against non-parties whose actions would impair the court's jurisdiction, we do not abandon the requirements that an injunction be specific and definite enough to apprise those

within its scope of the conduct that is being proscribed and
that those subject to the injunction receive appropriate notice
of its terms." (internal citation omitted)); Vuitton et Fils S.
A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir. 1979)
(requiring that plaintiff prove that non-parties to consent
order were aware of order's provisions before enjoining
defendants).

Here, as described above, the facts have established that
Cleopatra was aware of the Consent Order and its provisions, at
the latest, by July 2016.[20] See Findings of Fact Section V supra.
In the time between then and the start of the instant
litigation, evidence established that Cleopatra and Pyle
continued to adhere to their June 2016 contract: Pyle was filmed
for a cameo appearance and wrote original music for the Film.
Moreover, while not the final say on creative decisions in the
Film, Pyle was repeatedly consulted throughout the whole
production process, providing advice about the Film's script,
casting, and costumes that the internal Cleopatra communications

---

[20]    While in theory Pyle was responsible under the terms of the
Consent Order to inform any party with whom he worked about the
strictures of the Consent Order, (see Consent Order ¶ 26), it is
unestablished and, given Pyle's fickle devotion to the terms of
the Consent Order in the past, (see, e.g., Pls.' Exs. 4, 6),
unlikely that the Consent Order's details were discussed with
Cleopatra prior to Plaintiffs' 2016 cease-and-desist letter.

establish were both solicited and used by Cleopatra. See
Findings of Fact Section VI supra. In the aftermath of the cease
and desist letter, while Cleopatra may have stopped outwardly
referring to Pyle as a co-producer, and Pyle may not himself
have penned the final script, the evidence presented has shown
that Cleopatra's Film was made, throughout 2016 and 2017, with
the participation of Pyle.[21]

Cleopatra's consultations with Pyle were important because
the Film incorporates, in substantive part, the depictions of
Van Zant, Gaines, and the rest of the Lynyrd Skynyrd band, as
well as major bits of their history. Cleopatra argues that their
Film is Pyle's story, as no part of the Film depicts the history
of Lynyrd Skynyrd without Pyle and which is permitted under the
terms of the Consent Order. (See Consent Order ¶ 3.) To an
extent, this is true: there is no doubt that Pyle plays a
central role in the Film. However, the inverse of Cleopatra's
claim is true too: no part of the Film depicts Pyle outside his
time with Lynyrd Skynyrd. As such, there is also no doubt that

---

[21]   Cleopatra's letter to Pyle on May 9, 2017, to void their
2016 contract and pay Pyle under the title "Historical
Consultant" does nothing to eliminate all the assistance Pyle
had to that point provided in support of the Film and its
production or that, while providing assistance, Pyle was set to
receive a percentage of the Film's net receipts. See Findings of
Fact Sections IV, VIII supra.

the Film is a film about the Lynyrd Skynyrd band. As the facts

have demonstrated, none of the Defendants received the requisite

authorization under the terms of the Consent Order in depiction

of Van Zant or Gaines or in the use of the Lynyrd Skynyrd name,

and therefore all have violated the Consent Order.[22]


### 4. Plaintiffs Have Shown Irreparable Harm


Lastly, Cleopatra has argued that, even if the Consent

Order were violated, a permanent injunction would still be

inappropriate because Plaintiffs have not shown irreparable harm

caused by the production of Cleopatra's Film. As a preliminary

matter, is not clear that such a requirement exists with regard

to injunctions issued under the All Writs Act, as "in fashioning

an injunction under the [All Writs Act], a court is not

constrained to follow the requirements of Rule 65." Am.

Booksellers Ass'n, Inc. v. Houghton Mifflin Co., No. 94 Civ.

---

[22]   Cleopatra argues that their Film is protected under the
fair use doctrine. However, the affirmative defense is
irrelevant because Plaintiffs claim is not under trademark law,
but rather contract law. Even, arguendo, such an affirmative
defense were applicable, it still must fail, as the facts
established indicate that Defendants' use of the Lynyrd Skynyrd
name and history here was not done in good faith. See Kelly-
Brown v. Winfrey, 717 F.3d 295, 308 (2d Cir. 2013) (a successful
fair use defense to a trademark infringement claim requires a
defendant to prove that the use was made (1) other than as a
mark, (2) in a descriptive sense, and (3) in good faith).

8566 (JFK), 1998 WL 436364, at *2 (S.D.N.Y. July 28, 1998)
(citations omitted); see In re Baldwin-United Corp., 770 F.2d at
339 ("We do not believe that Rule 65 was intended to impose . .
. a limit on the court's authority provided by the All Writs Act
to protect its ability to render a binding judgment."). But see
Ellis v. Gallatin Steel Co., 390 F.3d 461, 472, 474 (6th Cir.
2004) (noting that the traditional standards for obtaining
injunctive relief includes a showing of irreparable harm, but in
the context of an injunction granted "under state law" and
citing to precedent addressing preliminary injunctions). Rather,
"all that is necessary is that the injunction under the All
Writs Act be 'necessary or appropriate' to prevent the
frustration of a court's previous remedial order." Federated
Conservationists of Westchester Cty., Inc. v. City of Yonkers,
117 F. Supp. 2d 371, 384 (S.D.N.Y. 2000) (citation omitted),
aff'd, 26 F. App'x 84 (2d Cir. 2002). As discussed above,
enjoining the production of Cleopatra's Film is necessary to
prevent the terms of the Consent Order from being violated.

In any event, Plaintiffs have demonstrated proof of
irreparable harm.[23] The creation of the Consent Order, and in

---

[23]  The parties have disputed Plaintiffs' seriousness and
commitment to making their own film about Lynyrd Skynyrd—in
which case, Plaintiff argues, Cleopatra's film might cause
confusion and financial harm to Plaintiffs' film. As Cleopatra

particular the provisions restricting the use of the name,
likeness, and biography of Zant and Gaines, demonstrate in part
a desire to preserve and protect the memory of deceased husbands
and friends. The evidence has not established that required
authorizers under the Consent Order have given approval to the
way Cleopatra has chosen to tell the story of Van Zant, Jenness'
dead husband, or the band member's band. To the extent that
those who bargained for the right to have a say in how such
memories are sustained, the "loss of control over one's
reputation is neither 'calculable nor precisely compensable'"
U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d
515, 540 (S.D.N.Y. 2011) (quoting Power Test Petroleum
Distribs., Inc. v. Calcu Gas, Inc., 754 F.2d 91, 95 (2d Cir.
1985)), aff'd, 511 F. App'x 81 (2d Cir. 2013). Furthermore, as
to the legacy of friends and loved ones, the "emotional damages
are difficult to quantify" and the remedy cannot be found to be
monetary. Grondin v. Rossington, 690 F. Supp. 200, 204 (S.D.N.Y.
1988). Lastly, this latest attempt by Pyle to evade the Consent
Order's requirements, now with assistance by Cleopatra but

---

noted, however, there is reasonable likelihood that Cleopatra's
film would rather boost the sales of Lynyrd Skynyrd music and
ticket sales for any subsequent movies about the band; whether
there would or would not be confusion has not been established
by either party. The economic interplay between the two is
irrelevant however, since the dispute is does not need
resolution to establish the irreparable harm wrought by the
production of the Film in violation of the Consent Order.

previously with others, itself creates "palpable" irreparable injury, and it is likely that Plaintiffs will continue to be frustrated in their attempt to enforce the Consent Order absent a permanent injunction. Experience Hendrix, LLC v. Chalpin, 461 F. Supp. 2d 165, 169 (S.D.N.Y. 2006).

### 5. Cleopatra's Affirmative Defenses Are Unavailing

Cleopatra has put forward several affirmative defenses to negate liability even if the Film would otherwise have been in violation of the Consent Order: specifically, that Plaintiffs' claim is barred by the doctrines of latches or unclean hands, or that Plaintiffs' sought-after injunction would impose unconstitutional prior restraint of protected speech on Cleopatra in violation of the First Amendment of the U.S. Constitution. Each of Cleopatra's defenses fails.

#### i. Laches

Cleopatra has argued that the doctrine of laches prohibits Plaintiffs from obtaining the equitable relief they seek. Specifically, Cleopatra contends that Plaintiffs knew that Cleopatra was producing the Film back in July 2016 when Plaintiffs first sent Cleopatra the cease and desist letter,

received correspondence from Cleopatra in August 2016 indicating Cleopatra intended to continue making the Film, and then unreasonably waited until May 2017 to bring the instant action, by which point Cleopatra had spent over a million dollars in production costs. Plaintiffs respond that in 2016 they were led to believe that filming had stopped and, furthermore, that no significant financial expenditures occurred until after Plaintiffs had provided notice to Cleopatra of the Consent Order.

Laches protects defendants when a plaintiff has "unreasonably and inexcusably delays in seeking an injunction, and the defendant is prejudiced by that delay." Nat'l Council of Arab Ams. v. City of N.Y., 331 F. Supp. 2d 258, 265 (S.D.N.Y. 2004) (citing Perez v. Danbury Hosp., 347 F.3d 419, 426 (2d Cir. 2003)). The question of laches is one "primarily addressed to the discretion of the trial court which must consider the equities of the parties." Beacher v. Estate of Beacher, 756 F. Supp. 2d 254, 277 (E.D.N.Y. 2010) (quoting Gardner v. Panama R.R. Co., 342 U.S. 29, 30, 31 (1951) (per curiam)); Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 17 F.3d 38, 44 (2d Cir. 1994) ("The inquiry is a factual one. The determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court.").

As neither element of laches has been established by the
facts, this argument must fail. As to the first element,
Plaintiffs delay in bringing its action in 2017, while not
grounded in a flawless reading of the exchanges between
Cleopatra and Plaintiffs in 2016, was not unreasonable.
Cleopatra points to its reply letter to the initial cease and
desist, which includes language strongly affirming Cleopatra's
right to make its film independent of the existence of the
Consent Order. (See Defs.' Ex. 3.) Cleopatra's response,
however, was sent before Cleopatra had received and read the
terms of the Consent Order, which was sent by Plaintiffs shortly
thereafter.

Once in context, the August 2016 communication between
Cleopatra and Plaintiffs, through Jenness—the Facebook message
exchange—takes on a different light. When Cleopatra requested to
chat with Jenness about the movie project, shortly after
receiving the Consent Order, it would have been reasonable from
Plaintiffs' perspective to construe the message as an attempt by
Cleopatra to work with Plaintiffs to reach an accommodation to
permit the Film be made within the now-understood Consent Order
parameters. After hearing no response from Cleopatra after
Jenness requested additional information about the project,

47

Plaintiffs could reasonably have thought the Film's project was aborted, an understanding only disturbed after reading the news about the commencement of filming Cleopatra's film in May 2017, established at trial as the next major press release on the Film. This is excusable delay.

Cleopatra points to New Era Publications Int'l, ApS v. Henry Holt & Co., 873 F.2d 576 (2d Cir. 1989), to support its laches argument, but such authority is inapposite. In New Era, the Second Circuit found that laches barred a plaintiff from seeking an injunction for a copyright infringement because plaintiff had known, definitively and years earlier, of an allegedly infringing book's publication in the United States because of a defiant letter by defendant refusing to discuss the infringement, had pursued injunction relief against the same defendant in other countries, and only then brought suit in the United States after defendant had printed thousands of copies. Id. at 584. After considering the facts, the court found such delay "unconscionable." Id. at 585.

Aside from the New Era defendants and the Defendants here both having sent defiant letters to the opposing side at some point, the differing facts warrant different results. Unlike the situation in New Era, Plaintiffs' receipt of Cleopatra's defiant

48

letter preceded Cleopatra's understanding of the Consent Order
and shaded by the successive messaging with Jenness to discuss
work on the Film in the context of the Consent Order. The
evidence presented here makes clear that Plaintiffs threatened
or brought legal action quickly, and twice, upon reading news of
Cleopatra's Film, and that the instant suit was brought in May
2017 not because Plaintiffs deviously sought to pounce on
Defendants only after the Film was made, but rather because of a
reasonable misunderstanding as to whether further action was
needed to halt the its production. See Imagineering, Inc. v. Van
Klassens, Inc., 851 F. Supp. 532, 535 (S.D.N.Y. 1994) (rejecting
laches defense where delay of several years prior to the
commencement of an action based, in part, on plaintiff's belief
that competitor had complied with cease and desist letter, even
after competitor had sent defiant response letter), aff'd in
relevant part, 53 F.3d 1260 (Fed. Cir. 1995). None of these
actions rises to the level of unconscionability.

Even, *arguendo*, were Plaintiffs' delay to be unreasonable,
the second laches element is also not met. The facts have shown
that, in terms of financial expenditure, Cleopatra spent the
lion's share of the approximately $1.2 million producing the
Film in the time following Plaintiff's cease and desist letter
and deliverance of the Consent Order. (See Defs.' Ex. 13

(showing the majority of costs by Cleopatra in April and May 2017).) Cleopatra was aware of the strictures of the Consent Order, was aware that Plaintiffs were ultimately likely to bring suit, and nevertheless persisted in the Film's production; a balance of these equities requires rejecting a laches defense.[24] See Steinberg v. Columbia Pictures Indus., Inc., 663 F. Supp. 706, 716 (S.D.N.Y. 1987) (rejecting a finding of prejudice where "defendants were informed within weeks of plaintiff's disapproval of their poster" and "presented no evidence that, even if they had acknowledged any awareness of plaintiff's reaction, they would in any way have modified their subsequent actions").

---

[24]    Cleopatra's cited Second Circuit authority are unavailing. In Allens Creek/Corbetts Glen Pres. Grp., Inc. v. West, 2 F. App'x 162, 165 & n.1 (2d Cir. 2001), the court accepted a laches defense expressly because of a delay both by plaintiff in bringing a lawsuit and delay in moving for an injunction after bringing suit. Cleopatra can only argue a delay in the former here. And in Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 192 (2d Cir. 1996), the court affirmed the application of a laches defense where plaintiff waited five years after learning of the infringing advertising campaign while defendant continued to air commercials. The facts available to Cleopatra here as to Plaintiffs' knowledge and period of delay are meaningfully disimilar.

ii.  Unclean Hands


Cleopatra has argued that, even if Plaintiffs' action were timely, it would still be barred under the doctrine of unclean hands. Specifically, Cleopatra claims that as other signatories of the Consent Order have been violating other provisions of the Consent Order—such as the Rule of Three, Date Requirement, or being involved in film projects Cleopatra contends are substantively similar to Cleopatra's Film—it would be unfair to require Cleopatra to abide by provisions under the same contract.


The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." Motorola Credit Corp. v. Uzan, 561 F.3d 123, 129 (2d Cir. 2009) (quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945)). Unclean hands is a narrow doctrine, and "applies only where the misconduct alleged as the basis for the defense 'has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation.'" Specialty Minerals, Inc. v. Pluess-Staufer AG, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) (quoting Keystone Driller Co. v. Gen.

Excavator Co., 290 U.S. 240, 245 (1933)); see also Warner Bros., Inc. v. Gay Toys, Inc., 724 F.2d 327, 334 (2d Cir. 1983) (holding that plaintiff's alleged false accusation of copyright infringement did not bar relief in trademark infringement claim). "Typically, courts that have denied injunctive relief due to plaintiff's unclean hands have found plaintiff guilty of truly unconscionable and brazen behavior." Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999) (collecting cases). "Application of the 'unclean hands' doctrine rests with the discretion of the court, which is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'" Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc., 792 F. Supp. 969, 969–70 (S.D.N.Y. 1992) (quoting Keystone Driller Co., 290 U.S. at 245).

It is clear that Plaintiffs have not precisely followed the letter of the Consent Order's edicts. For example, it is uncontestable—and even readily admitted by Plaintiffs—that there have been modifications to the Consent Order over the years, such as to the Rule of Three and the Date Requirement, changes that were made without a formal writing signed by all the parties as required by the Consent Order. As the Consent Order

is the basis for Plaintiffs' claim, conduct under the Consent Order bears relation to the equity Plaintiffs seek.

What is not clear is that Plaintiffs should be barred from bringing the instant claim for these alterations. What "is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts." Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 13 F. Supp. 2d 430, 445 (S.D.N.Y. 1998) (quoting Project Strategies Corp. v. Nat'l Commc'n Corp., 948 F. Supp. 218, 227 (E.D.N.Y. 1996)). In evaluating whether unclean hands should be applied, "[t]he relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck." Project Strategies Corp., 948 F. Supp. at 227 (citation omitted).

Upon inspection, Plaintiffs' conduct does not rise to the level of "unconscionable" action justifying the foreclosure of their right to seek equitable relief. Keystone Driller, 290 U.S. at 240. The modifications done by Plaintiffs over the years have been narrowly-tailored and reasonable, such as adjusting the Rule of Three as former members of the original Lynyrd Skynyrd band became unable to perform. All the while, the facts have established that Plaintiffs have been focused on sustaining the

spirit of the Consent Order's underlying "blood oath,"
preserving the integrity of the Lynyrd Skynyrd band's and
members' story and music, by seeking injunctions against those
perceived to be improperly using their contracted-for rights to
tell their history. Furthermore, under the Consent Order, Pyle
has benefited financially for years without complaint, and the
fact that he has never sought to enforce any perceived breaches
of the Consent Order's terms, even when the changes Cleopatra
highlights today took place, speaks to the immateriality of such
changes. To bar Plaintiffs' claim today for actions that were,
at worst, sloppily enacted but apparently uncontroversial, would
"thereby leav[e] two wrongs unremedied." Project Strategies
Corp., 948 F. Supp. at 227 (citation omitted). Equity is not
served by such an outcome.

Lastly, Cleopatra's argument that other films and projects
related to Lynyrd Skynyrd, such as the CMT documentary, have
been permitted to be made and should merit a finding of unclean
hands is unavailing. The CMT film, along with the many other
Lynyrd Skynyrd works that Cleopatra has detailed in its
briefings and which Plaintiffs have not sought injunctions over,
are fundamentally different in at least one crucial respect:
they have not been established as violating the terms of the
Consent Order. Books and films are permitted to be written about

Lynyrd Skynyrd, and if done in concert with parties to the
Consent Order, can incorporate use the name and history of
Lynyrd Skynyrd as part of a telling of each individual's life
story or with certain Consent Order signatories' permission.
Cleopatra has not established that any of their other identified
Lynyrd Skynyrd projects had Consent Order signatories acting in
concert with the project producers and contributing content to
the degree that Pyle was involved in contributing to Cleopatra's
Film or did not have the requisite permissions under the Consent
Order. See Findings of Fact Section IX supra. Pyle's involvement
in Cleopatra's particular and unauthorized Film, unlike other
projects, places it outside the Consent Order's permissible
bounds.

### iii.  First Amendment Rights

Lastly, Cleopatra contends that to enjoin its publication
of its Film would violate its constitutionally protected right
to free speech under the First Amendment of the U.S.
Constitution. As the Consent Order is a private agreement that
is narrowly-tailored to protect the bargained-for rights of its
signatories, with whom Cleopatra chose to do business, this
argument fails.

The First Amendment to the Constitution states, in relevant part: "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST., amend. I. As between private parties, however, courts have consistently found that an individual has the ability to "contract away his right to engage in what otherwise might be considered protected . . . speech." JA Apparel Corp. v. Abboud, 682 F. Supp. 2d 294, 317 (S.D.N.Y. 2010); see also Snepp v. United States, 444 U.S. 507, 509 & n.3, 444 U.S. 507, 509 (1980) (affirming agreement to limit otherwise protected speech as part of employment with government agency); Paragould Cablevision, Inc. v. City of Paragould, Ark., 930 F.2d 1310, 1315 (8th Cir. 1991) ("By entering into the franchise agreement, however, Cablevision effectively bargained away some of its free speech rights. . . . Cablevision cannot now invoke the first amendment to recapture surrendered rights."); In re George F. Nord Bldg. Corp., 129 F.2d 173, 176 (7th Cir. 1942) ("Certainly, one who has been a party to a proceeding wherein a consent decree has been entered and who has been a party to that consent, is in no position to claim that such decree restricts his freedom of speech. He has waived his right and given his consent to its limitations within the scope of that decree."); Perricone v. Perricone, 292 Conn. 187, 205 n.18, 972 A.2d 666, 679 (2009) (collecting cases stating the same).[25]

---

[25]    Cf. Erie Telecomm., Inc. v. City of Erie, Pa., 853 F.2d

In support of their claim, Cleopatra principally argues authority that address two factual postures. First, there are opinions that reject blanket free speech infringements as to the news organizations based on government action on the grounds of secrecy or privacy. Procter & Gamble Co. v. Bankers Trust Co., 78 F.3d 219 (6th Cir. 1996); Matter of Providence Journal Co., 820 F.2d 1342 (1st Cir. 1986). Second, there are opinions rejecting free speech infringements arising from defamation claims that are found to be "so vague and imprecise" as to make it impossible to "fairly determine what future speech is permitted." Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union, 239 F.3d 172, 178 (2d Cir. 2001); see also Superior Films, Inc. v. Dep't of Educ. of State of Ohio, Div. of Film Censorship, 346 U.S. 587 (1954); Crosby v. Bradstreet Co., 312 F.2d 483 (2d Cir. 1963).

---

1084, 1096 (3d Cir. 1988) (holding that constitutional rights "may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver" and that "volition and understanding are deemed to be, and indeed have been held to be, present, where parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and engaged in other contract negotiations").

Neither of these factual strands is persuasive because none of them address the facts as established here. The injunction sought by Plaintiffs in the instant action is grounded in a private contract between signatories to the Consent Order, of which Pyle was one and under which he waived certain rights.[26] Insofar as the Consent Order limits the actions of those acting "in concert or participation" with the Consent Order's signatories, the limitations are narrow and specific, including, *inter alia*, limiting the use of the "name, likeness, portrait, picture, performance or biographical material of [Van Zant] or [Gaines]," (Consent Order at 2), and, as applicable only to the signatories, preventing "exploitation in whole or in part of the history of the Lynyrd Skynyrd band" without certain prior written approvals, (Consent Order at 6). These are not blanket prohibitions and are not vague or imprecise prohibitions; an individual could read the Consent Order and understand what actions are or are not permissible under its strictures.

---

[26]     Cleopatra has argued that Pyle, by signing the Consent Order "under protest," did not waive his First Amendment rights. However, as described above, the circumstances surrounding and following Pyle's signing of the Consent Order indicates that he knew at the time for what he had bargained and he was satisfied. See Conclusions of Law Section III.1 supra. Cleopatra's cited authority, Marinaccio v. Boardman, No. 02 Civ. 831 (NPM), 2005 WL 928631 (N.D.N.Y. Apr. 19, 2005), demonstrates that in circumstances where a person clearly expresses objections to his attorney before signing something "under protest" and the waiver is otherwise not "very clear," finding waiver is disfavored. See id., 2005 WL 928631, at *16. No such ambiguity exists here.

These are strictures that Pyle agreed to and which
Cleopatra, upon receiving the Consent Order, became aware of.
Prohibiting Cleopatra from making a particular movie in a
particular fashion is not the kind of restraint that courts have
designed prior restraint, the kind that "den[ies] use of a forum
in advance of actual expression . . . in which the exercise of
such authority was bounded by precise and clear standards." Se.
Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975). Cleopatra
has not been blanket prohibited from making a movie about Lynyrd
Skynyrd, about producing a movie about the 1977 plane crash
while hiring actors to play Van Zant and Gaines, or from
producing a movie that includes Pyle. Rather, Cleopatra is
prohibited from making its movie about Lynyrd Skynyrd when its
partner substantively contributes to the project in a way that,
in the past, he willingly bargained away the very right to do
just that; in any other circumstance, Cleopatra would be as
"free as a bird" to make and distribute its work.[27] LYNYRD SKYNYRD,

---

[27]    Authority put forward by Cleopatra to argue that Cleopatra
did not waive its First Amendment rights do not address the
present situation where a Consent Order which clearly prohibits
acting in concert or participation with signatories in
particular fashions was known to Cleopatra. Novalogic, Inc. v.
Activision Blizzard, 41 F. Supp. 3d 885 (C.D. Cal. 2013),
addresses the relationship between a private contract and its
impact on a third party. However, the Novalogic court could not
find how the contract's provisions had an impact on third-

Free Bird, on PRONOUNCED 'LĔH-'NĔRD 'SKIN-'NĔRD (MCA Records 1973);
see Homeworx Franchising, LLC v. Meadows, 09 Civ. 11 (DAK), 2009
WL 211918, at *1-2 (D. Utah Jan. 26, 2009) (finding non-
signatory to a contract bound by contract's terms as part of a
joint enterprise with signatory, even when infringement would
otherwise have violated free speech rights) (citing Paragould
Cablevision, 930 F.2d at 1315). The First Amendment is not
infringed by such private and voluntary decisions, and the Court
has the authority to protect those previously bargained-for
rights. See Conclusions of Law Section III.2 supra.


IV.   Plaintiffs' Action Against Pyle is Moot


The evidence adduced has established that Pyle is not in
possession of the Film and has no legal right to distribute or
release it. (See Tr. 146:13-147:25.) As such, Pyle is unable to
comply with the relief Plaintiffs seek, namely to prevent the
production, distribution, and display of the Film. (See
Complaint ¶ 82.) Accordingly, the injunction relief sought under

---

parties or subsequent licensing agreements; here, the Consent
Order explicitly envisions prohibitions on signatories'
interactions with third-parties. See id. at 903. And Rudd Equip.
Co., Inc. v. John Deere Constr. & Forestry Co., 834 F.3d 589,
595 (6th Cir. 2016), discusses whether an individual can waive
the public's right to court filings when sealing documents; the
openness of the courts is not in question here.

the Complaint's First Cause of Action must be dismissed as to
Pyle as moot. See Blackburn v. Goodwin, 608 F.2d 919, 925 (2d
Cir. 1979) (holding that since defendant "does not have the
official capacity necessary to enable him to comply with the
injunctive relief sought . . . the claim for declaratory relief
is now moot"); Doe v. Coumo, No. 08 Civ. 8055 (LAP), 2009 WL
3123045, at *5 (S.D.N.Y. Sept. 29, 2009) ("Doe's claims in his
proposed SAC would fail since none of these proposed defendants
is in a position to grant Doe the relief he seeks. Therefore,
Doe's claims for injunctive and declaratory relief would be moot
. . . .").

### V.   Plaintiffs are Entitled to Attorneys' Fees and Costs

Plaintiffs request that they be awarded reasonable
attorneys' fees should they prevail in the instant action. The
Second Circuit has found that: "Under New York law, a contract
that provides for an award of reasonable attorneys' fees to the
prevailing party in an action to enforce the contract is
enforceable if the contractual language is sufficiently clear."
Metro Found. Contractors, Inc. v. Arch Ins. Co., 551 F. App'x
607, 610 (2d Cir. 2014) (quoting NetJets Aviation, Inc. v. LHC
Comms., LLC, 537 F.3d 168, 175 (2d Cir. 2008)). Furthermore, "it
is appropriate for the court also to award the reasonable costs

of prosecuting the contempt, including attorney's fees, if the violation of the decree is found to have been willful." <u>Vuitton et Fils S. A.</u>, 592 F.2d at 130 (citing <u>W. E. Bassett Co. v. Revlon, Inc.</u>, 435 F.2d 656, 664-65 & n.5 (2d Cir. 1970)).

Here, the language of the Consent Order with regard to attorneys' fees is clear: "An amount equal to actual and reasonable attorneys' fees shall be awarded to the prevailing party in any proceeding brought to enforce the terms and conditions of this order." (Consent Order ¶ 34.) As established by the facts above, Defendants were aware of the restrictive provisions of the Consent Order by July 2016 and continued to make their film, in clear disregard, until the instant action. Accordingly, Plaintiffs are entitled to an award reasonable attorneys' fees and costs.

**Conclusion**

Based on the findings of fact and conclusion of law set forth above, Plaintiffs have met their burden of proof with regard to their claim for a permanent injunction against Cleopatra and for reasonable attorneys' fees and costs as to Defendants. Accordingly, judgment will be entered in favor of Plaintiffs, and Defendants' outstanding motions for summary judgment and judgment as a matter of law are dismissed as moot.

The parties are directed to jointly submit a proposed redacted version of this Opinion and Order consistent with the Protective Order entered in this case, (Dkt. No. 9), to be filed publically or to notify the Court that none are necessary within one week of receipt of this Opinion and Order.

It is so ordered.

**New York, NY**
**August 23, 2017**

ROBERT W. SWEET
U.S.D.J.